Steven T. Lowe, Esq.
Lowe & Associates
8383 Wilshire Boulevard, Suite 1038
Beverly Hills, CA 90211
E: steven@lowelaw.com

Alfred (AJ) Fluehr, Esq.
Attorney ID No.: 316503
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 341-1063
T: (215) 500-1000
E: aj@francisalexander.com
*Law Firm / Lawyer for Plaintiff*
*Pro Hac Vice*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sound and Color, LLC<br>        *Plaintiff*<br>                v.<br>Samuel Smith<br>Normani Kordei Hamilton<br>Stargate<br>Mikkel Storleer Eriksen<br>Tor Erik Hermansen<br>James John Napier<br>Universal Music Group<br>Universal Music Operations Limited<br>UMG Recordings Inc.<br>Sony Music Group<br>Sony Corporation of America<br>Sony/ATV Music Publishing LLC<br>Sony/ATV Music Publishing Ltd.<br>Sony/ATV Songs LLC<br>EMI Music Publishing LTD<br>EMI April Music Inc.<br>EMI Blackwood Music Inc.<br>Downtown Music Publishing LLC<br>Salli Isaak Songs LTD<br>Naughty Words Limited | **No.:** 2:22-cv-01508-AB<br><br><br>**Case Filed:** March 4, 2022<br><br><br>**Causes of Action:**<br>1.  Direct Infringement<br>2.  Vicarious Infringement<br><br>***Jury Trial Demanded*** |

i

PLAINTIFF'S SECOND AMENDED COMPLAINT

1    Songs of NKH
2    Stellar Songs Limited
     Stellar Songs
3    Tim & Danny Music LLC
4    45th & 3rd Music LLC
              *Defendants*
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S SECOND AMENDED COMPLAINT

## PLAINTIFF'S SECOND AMENDED COMPLAINT

### Introduction

1.    This music copyright infringement suit arises from copying by defendants Sam Smith ("Smith") and Normani Kordei Hamilton ("Normani") of Plaintiff's 2015 song "Dancing With a Stranger" (the Plaintiffs' composition/song recording shall hereinafter be referred to as the "Song") to create their hit 2019 song "Dancing With a Stranger" (the Defendants' composition/sound recording shall hereinafter be referred to as the "Infringing Song") (collectively the "Songs").

2.    The hook/chorus in both songs—the most significant part and artistic aspect of these works—contains the lyrics "dancing with a stranger" being sung over a nearly identical melody and musical composition. In both songs, the title, hook, chorus, lyrics, and musical composition are all the same—and are repeated throughout the song giving both songs their identities.

3.    A quick listen to the comparison at the following link, and consideration of the extraordinary similarities in the music videos, will quickly dispel any doubt that Plaintiff's song was copied: https://youtu.be/Ibh1yPSCIw8. See **Exhibit 4**.[1]

4.    The Infringing Song is certified Platinum in over ten countries and was the most-played radio track of 2019 according to several sources. It has been streamed over 3 billion times as of March 2021 and received well over 3.1 billion audience impressions from radio airplay just in 2019.

### Background

5.    In February/March 2015, singer and songwriter Jordan Vincent wrote "Dancing with a Stranger" (also known as "Dancing With Strangers"), along with Christopher Miranda of the production duo known as SKX.

6.    SKX is comprised of Christopher Miranda and Rosco Banlaoi, who split credit and ownership for all SKX songs.

---

[1] **Exhibits 4-7** were previously lodged with the Court on March 4, 2022. See Doc. No. 1-4.

PLAINTIFF'S SECOND AMENDED COMPLAINT

7. The sound recording and composition therein for Plaintiff's song is registered at no. SR0000847699 with the copyright office, attached as **Exhibit 1**.

8. In April 2015, Vincent, Miranda, and Banlaoi shot a music video for the Song, which primarily consisted of a young woman interpretive dancing alone in a minimalistic room/studio (the "Video").

9. After extensively shopping the Song and Video around the industry in 2015 and receiving interest (discussed more below), Vincent posted the Song on SoundCloud in January 2016. It garnered over 500,000 listens by mid-2018.

10. It was then released on Vincent's YouTube channel, Spotify, and other streaming services on August 30, 2017, where it garnered tens of thousands more views/listens by mid-2018.

11. Following this release, Vincent also hired Rayne Music who promoted the Song and Video to industry contacts in early 2018.

12. There was interest and Rayne Music had sit down meetings with several interested parties.

13. On January 11, 2019, Vincent was alerted by a friend that superstar Sam Smith and Normani (formerly of the girl group Fifth Harmony) had released a song entitled "Dancing with A Stranger" earlier that day. The Infringing Song went on to become a massive hit, which to date has been streamed billions of times and has billions of additional radio impressions.

14. It was immediately obvious from the title, lyrics, melody, and overall production that appears in both songs, especially the hooks, that Defendants had taken Plaintiff's work.[2]

15. It is beyond any real doubt that Smith, Normani, and the other defendants copied Plaintiff's work. The protected expression in both the Infringing Song and

---

[2] When a song or work is referred to the reference includes both the composition and sound recording unless otherwise specified.

2

PLAINTIFF'S SECOND AMENDED COMPLAINT

1    Plaintiff's preexisting work is nearly identical and is strikingly similar.

2         16.    It is a common practice in music production to take a reference track and

3    speed it up or slow it down; this results in a natural pitch shift which places it in a

4    different key more suited to a particular singer. Tellingly, when Plaintiff's song is

5    slowed down from 122 bpm to the 103 bpm used by the Infringing Song, the key of

6    the two songs match. This is a further indication that Plaintiff's song was copied by

7    Defendants and that they are substantially similar.

8         17.    When the songs are compared, it is apparent that the underlying

9    composition is nearly identical and was copied, as was the sound recording:

10   https://youtu.be/Ibh1yPSCIw8. A copy of the side-by-side comparison video of the

11   sound recordings shall be lodged with the court as **Exhibit 4**.

12        18.    In addition to the "hook" of the songs being the same musical phrase,

13   arranged with the same title and lyrics, Smith and Normani put out a music video for

14   the song which is very similar to Plaintiff's music video. Compare Plaintiff's Video

15   https://www.youtube.com/watch?v=JGYBUkvT3cU    with    Defendants'    Video,

16   https://www.youtube.com/watch?v=av5JD1dfj_c. A true and correct copy of the

17   Plaintiff's music video shall be lodged with the court as **Exhibit 5**. A true and correct

18   copy of the Defendants' music video shall also be lodged with the court as **Exhibit 6**.

19        19.    A true and correct copy of Plaintiff's Registered Deposit Copy Sound

20   Recording shall be lodged with the court as **Exhibit 7**.

21        20.    Both videos consist of a girl performing interpretive dance *alone* in a

22   minimalist studio, interspersed with shots of the male vocalist:

23

24

25

26   *[left intentionally blank]*

27

28

PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff's video:



Defendants' Video:



21.  A girl dancing alone is not an obvious visual theme for a music video titled "Dancing With a Stranger," tending to dispel any notion that this similarity is a coincidence.

22.  When the extraordinary musical similarity between the songs is also factored in, it becomes even more apparent that it is impossible that the infringing composition and sound recording were independently created.

*[left intentionally blank]*

4

23.     Bizarrely, the graphic logo for Defendants' video is practically identical in design to the logo on Vincent's business card:



24.     Another suspicious coincidence is that the call sheet for Plaintiff's music video specifically mentioned using the visual concept of mannequins coming to life.

25.     Although this concept was not ultimately utilized in Plaintiff's music video, Normani and the director of Defendants' music video gave an interview in 2019 discussing how Defendants wanted to use porcelain statues coming to life for their music video. The odds that such a unique but highly similar idea would have come independently to Defendants are astronomical, especially considering the other shared similarities.

26.     Plaintiff is not claiming copyright infringement of the visual content of Plaintiff's video (or infringement of Vincent's logo) but it is evidence to dispel the possibility of independent creation.

PLAINTIFF'S SECOND AMENDED COMPLAINT

**Alleged Creation of Defendants' Song**

27.    In late January 2019, after the Infringing Song was released to the public on January 11, 2019, defendant Smith stated in an interview with Beats Radio that he wrote the Infringing Song in one day with Stargate at The Stellar House studio during a break from his 2018 tour: "And she [Normani] was coming in that day to have a meeting with Tim [Blacksmith]. I played her the song. She just jumped on it there and then, and it was perfect." https://www.youtube.com/watch?v=nRREIlYUv1k&feature=youtu.be&t=138, at minute 2:18.

28.    Smith claims that Normani and Smith were introduced that day and that Normani then spontaneously contributed to existing music Smith was working on. The day is believed to be on or around August 7, 2018.

29.    Upon information and belief, Normani's presence at the studio and work with Sam Smith were not spontaneous nor coincidental.

30.    In May 2020, Normani referenced upcoming collaborations in an interview. https://www.dailymotion.com/video/x6jydyz. Further bolstering this conclusion is the fact that planned social media and press exposure took place in the form of social media postings by Normani's manager on or around August 8, 2018, when the Infringing Song was allegedly written, promoting Smith and Normani working together, and music industry news outlets also reported on a Smith-Normani collaboration in late-summer, early fall 2018.

**Defendants' Had Access to Plaintiff's Song**

31.    "Access" can and will be proven in several different ways:

32.    **First**, the songs are musically strikingly similar, i.e. independent creation is extremely unlikely, especially when factoring in the selection and arrangement of the lyrics, melody, and hook.

33.    Attached as **Exhibit 2** is the Report of Dr. Alexander Stewart, opining that the similarities in the music and the selection and arrangement of the music,

6

production, lyrics, and other elements of the works make independent creation extremely unlikely.

34.   Furthermore, it is impossible that the combined similarities between the songs outside of the musical elements—same title, same video, same logo, proposed use of mannequins—all occurred coincidentally. These similarities further preclude independent creation.

35.   **Second**, Defendants had access to Plaintiff's Song because it was widely distributed. Not only was Plaintiff's Song widely "shopped" around the music industry from 2015 to 2018, but Jordan Vincent released the song publicly on SoundCloud in January 2016, and posted the Song and Video on his YouTube channel and also on Spotify, Apple Music, Tidal, Deezer, and other platforms on or around August 30, 2017. The SoundCloud posting alone accrued over 500,000 listens by mid-2018, and tens of thousands of additional views/listens on YouTube and other platforms. The fact that Plaintiff's song received over half a million views/listens before the Infringing Song was allegedly composed in August 2018 establishes access by Defendants to Plaintiff's work due to its sufficiently widespread distribution.

**<u>Defendants' Had Access to Plaintiff's Song through Thrive Records; Thrive was Given Plaintiff's Song in 2015 and then, After Defendants' Infringing Song was Released, Tried to Buy Plaintiff's Song in 2020</u>**

36.   **Third,** in the alternative, Plaintiff alleges that the Song was given to Defendants by and through Thrive Records. In 2015, Thrive Records was extremely interested in using Plaintiff's Song for another artist, but the deal never went through. Thrive is owned by Ricardo Vinas, and the contacts were facilitated by Peter Torres, who was either employed by Thrive at that time or helping Vinas acquire the Song. Thrive was also shown the Video and also given the call sheet for the Video.

37.   Thrive showed no further interest in the song in 2015.

38.   Then, in May/June 2020, Peter Torres reached out to the trio out of the blue on behalf of Ricardo Vinas, Thrive's owner. Torres was acting as an agent of

PLAINTIFF'S SECOND AMENDED COMPLAINT

Ricardo and Thrive. Thrive stated that it wanted to buy Plaintiff's Song—now five years after Thrive was first interested. Thrive had shown no interest during that intervening time period. This timing is highly unusual.

39.     Thrive now wanted to give Vincent, Miranda, and Banlaoi around $3,000 as an advance and some publishing rights. There, however, was a curious caveat: Thrive and Ricardo wanted all traces of Plaintiff's Song and Video removed from all platforms before the deal was consummated.

40.     All of this was bizarre as Thrive had passed on the Song in 2015, and had now contacted Vincent, Miranda, and Banlaoi out of the blue in May/June 2020 as if with an agenda or goal in mind.

41.     Vincent asked Torres why Thrive was interested given that it was five years later; Torres said only that Ricardo had been listening to old songs.

42.     This is not credible, because half a decade in music industry terms is a huge amount of time, when multitudes of new songs are being pushed by thousands of writers and artists every day to labels. Moreover, not only had Thrive passed on Plaintiff's Song, but it was now stale and had already been released for four years.

43.     Vincent asked Torres if Ricardo was aware of the Infringing Song and the similarities, and Torres admitted that Ricardo was aware of the similar titles, but that he was unaware of whether Ricardo knew about the melodic similarities.

44.     This story does not make sense. Ricardo clearly knew the melodies and lyrics are the same because the Infringing Song was a huge hit with which Ricardo must have been familiar, and by Torres's own admission Ricardo had recently listened to Plaintiff's Song and wanted to buy the rights. Ricardo knew about the pronounced similarities.

45.     If Ricardo and Torres had spoken about the similar titles of the two songs called Dancing With a Stranger, as Torres admits they did, then it is perfectly obvious that Thrive was aware of the other similarities.

PLAINTIFF'S SECOND AMENDED COMPLAINT

46.     That Thrive misled Vincent, Miranda, and Banlaoi about whether Thrive knew about the similarities between the two songs indicates a hidden agenda behind the sudden and otherwise inexplicable decision to buy Plaintiff's Song 5 years later.

47.     Torres also probed whether Vincent, Miranda, and Banlaoi had taken legal action; when they said no, Torres insisted that they should just let Thrive and Ricardo put some money in their pockets and that suing was expensive. This, too, was very suspicious.

48.     Vincent asked for a proposed contract as a demonstration of good faith. Thrive and Ricardo never sent the contract and Plaintiff's Song was never taken down; they heard nothing further from Thrive despite multiple attempts to follow up in June and early July 2020.

49.     As described below, Ricardo /Torres and Normani's team know each other, and the fact that Ricardo attempted to buy Plaintiff's Song after the fact knowing full well about its similarities to a major hit by Normani and Sam Smith, indicate that Defendants were well aware of Plaintiff's Song, and had access to same.

50.     Plaintiff alleges that Thrive and/or its agents gave their Song to Defendants and/or told them where it could be found prior to the Infringing Song's creation, and that Defendants had access in this way.

51.     Following this bizarre exchange and Thrive's subsequent nonresponses, Miranda and Banlaoi were at a party at Avex House studio on July 24, 2020, and randomly saw Peter Torres. Torres was at that point employed by Avex House as head of A&R. Ricardo Vinas also was present and reacted awkwardly when he saw that Miranda and Banlaoi were there. At one point during the party, Torres pointed out to the duo that Normani's manager Brandon Silverstein and his partner Josh Hallbauer were present; Torres was obviously acquainted with Silverstein.

52.     Upon information and belief, Thrive and Ricardo are also acquainted with Silverstein, as well as Tim Blacksmith (Normani's mentor, owner of Stellar

9

House Studio, and principal member of defendant Tim & Danny) and defendants Eriksen, Hermansen, Napier and Smith.

53.   The foregoing individuals (i.e., Silverstein, Blacksmith, Eriksen, Hermansen, Napier, and Smith) were all intimately involved in the alleged creation of Infringing Song and are alleged to have had access to Plaintiff's Song through Thrive.

54.   **Fifth**, in the alternative, defendant Normani was given the Song by Jared Cotter. Normani used to be in the girl band Fifth Harmony. When the Plaintiff's assignors were shopping the Song in September 2015 to Thrive Records, Jared Cotter was managing the prospective deal for the Plaintiff's assignors and received the Song and Video as part of facilitating the deal (which eventually fell through).

55.   Just two weeks later Cotter posted on social media that he was working with Normani and Fifth Harmony in the studio.

56.   Cotter is reasonably believed to have given Normani the Song during that time.

57.   Cotter, it should be noted, co-manages the artist, Bazzi, along with Normani's manager, Brandon Silverstein.

58.   **Sixth**, in the alternative, access to Plaintiff's Song is demonstrated by Defendants' use and mention of the ideas used and considered in the creation of Plaintiff's music video. Vincent, Miranda, and Banlaoi created the concept of a woman interpretive dancing alone, which was counterintuitive and unique given the title of the music video "Dancing With a Stranger". Nothing about this theme or motif is suggested by the title or lyrics of Plaintiff or Defendants' songs.

59.   Furthermore, during the creative process the Plaintiff's assignors created call sheets which discussed using the idea of portraying lifeless mannequins coming to life. This idea, too, is unique and not suggested by the title or lyrics of the song. In fact, it is a creative and bizarre concept. Moreover, it was not used in the video. Only a limited number of people had access to the call sheet.

PLAINTIFF'S SECOND AMENDED COMPLAINT

60.    The Video released by Defendants for their Infringing Song is thematically and visually similar to Plaintiff's video. It, too, features a lone woman performing interpretative dance, interspersed with shots of a male vocalist. When viewed along with the musical, lyrical, and title similarities, the possibility of independent creation is extremely unlikely.

61.    Further proof of access comes from an interview comment by Normani and the director of Defendants' music video, Vaughan Arnell, that Defendants had considered using porcelain statues coming to life in the music video—just as the trio had wanted to do with mannequins. Plaintiff alleges that it is not possible that these commonalities, especially in combination, are the product of coincidence.

62.    As a result of Defendants' exploitation of Plaintiff's song without permission, they obtained a massive international hit single which generated significant revenue and profits.

63.    Defendants' representatives were contacted in November 2020 about the similarities. Defendants were given every chance to come up with an innocent explanation, but, despite assurances that a response was coming including a musicological analysis and report, the Defendants never issued a response. This suit is being filed as a last resort.

## SONY INTERCOMPANY AGREEMENT

64.    US-based Sony Music Publishing's website indicates that Sony's foreign subsidiaries are departments and divisions of Sony:

> Sony Music Publishing's administration services utilize a worldwide network of local creative and administrative teams, giving its clients both global reach and a personal touch. Its songwriters and their representatives are able to obtain administrative support in their own territory directly from local administration staff, all of whom are experts in their field, have a passion for the music they represent, and are able to utilize their

11

close relationships with the relevant societies and their colleagues to accurately register songs and collect royalties.

https://www.sonymusicpub.com/en/services

65.     Sony's Form 20-F for FY ending March 31, 2022, indicates that its music publishing arm is "a US-based music publishing business that owns and acquires right sot musical compositions, exploiting and marketing those compositions and receiving royalties or fees for their use." The referenced music publishing business includes its foreign subsidiaries, including EMI Music Publishing UK and Sony/ATV Music Publishing (UK) Ltd.

66.     Sony has an intercompany agreement whereby its divisions or subsidiaries in particular territories will administer and exploit a copyright in their territory on behalf of publishers or subsidiaries. See Doc. No. 76-1, at p.10 (appointing and granting of rights), also attached as Exhibit 8. The parties to the agreement "own, control or manage and will hereafter own, control or manage" the covered works. Id. at p.6.

67.     The agreement is entered into in the state of New York. Id. at p.15-16. *The agreement states that the parties exclusively avail themselves of New York law, jurisdiction, and venue*. Id. It specifically lists the United States as a target area for exploitation, id. at p.32-34, and that market is in fact the biggest and most developed market for exploitation

68.     This agreement specifically requires the extensive exploitation of covered works in the United States for publishers. Id. at p.32-33. The intercompany agreement states that exploitation *must be aggressively pursued in all target territories, including the United States, for the benefit of the "Publisher and all third parties connected with them*," as well as the prompt collection of all royalties and fees. Id. at p.16. It can be terminated at the request of any publisher by written notice. Id. at p.11. It also requires the registration of the work with the applicable copyright authorities and collection agencies. Id. at p.15.

PLAINTIFF'S SECOND AMENDED COMPLAINT

69. The following definitions further illustrate that the Sony Intercompany agreement contemplates extensive exploitation of Sony's songs, and of those songs that Sony administers because of third party contracts with other publishers:

"Intellectual Property Rights" or "IPR" means any intellectual property or associated rights, literary, artistic or musical materials, including, but not limited to Compositions and Master Recordings owned, controlled, administered or managed by the Publisher respectively directly or indirectly through a subsidiary or other affiliate and/or a third party at the commencement of the Term or so acquired (or re-acquired) by the Publisher as appropriate during the Term subject always to the termination of any rights therein by any IPR Holder by way of contract or otherwise or any rights flowing to the IPR Agreements excluding "Neighboring Rights" and "Library Music" as defined, respectively, in the following sentences.

"Neighbouring Rights" means those rights granted to a Publisher, pursuant to an agreement between a Publisher and a third party performer and/or master recording owner, to authorize the public performance via any and all means of recorded performances and/or master recordings and/or to receive remuneration in respect of the same.

"Library Music" means recorded music and musical compositions licensed to customers for use in film, television, radio and other media which is to be specifically exploited as production music.

Id. at p.7-8.

70.     This intercompany agreement establishes that Sony has instructed and contracted for its various subsidiaries to act as agents for the protection and exploitation of the songs it administers in the United States, and around the world, including for third party publishers who contract with a Sony entity for Sony to administer the song. Again, by far the largest market referenced in the agreement is the United States.

71.     Any publisher or person contracting with a Sony entity would be well aware of this agreement, and would intend Sony to exploit the relevant intellectual property in the biggest music market in the world, the United States.

72.     The type of exploitation expected is extensive. The intercompany agreement defines digital rights as:

> the right to issue licenses in respect of performing (making available) and/or reproduction rights for exploitation (streaming, downloading and/or otherwise) on the Internet or other means of online and/or mobile digital delivery of the IPRs with or without any associated data such as text and/or still or moving visual images and shall include all digital transcriptions, duplications, encoding or any other method, now known or hereafter devised, which can now or may be used to duplicate, distribute, copy or perform publicly the said IPR via digital means including, but not limited to, streaming and/or downloading (as such terms are customarily used in the industry), ringtones, videos (user generated or otherwise), karaoke or otherwise and shall include distribution by means of automated retailing systems which use the Internet, the World Wide Web, any wireless satellite or mobile telephone transfer or electronic bulletin board services to distribute and/or sell music product or any similar means of distribution.

14

Id. at p.6-7. It is alleged that Defendants in fact acted in accordance with this agreement and exploited Defendants' song in all the listed ways.

73. The grant of rights for each subsidiary to act as an agent of the publisher and the other Sony entities is extremely broad. Id. at p.25-26 - Schedule 1 (Sub Publishing Rights) and Schedule 2 (Master Rights).

74. The grant of rights is not just for extant compositions, but is specifically understood by all parties and publishers to encompass "all rights of copyright and related rights in each of the Compositions whether now known or in the future created owned, controlled, administered or managed by the Publisher." Id. at p.25.

75. The Defendant entities this agreement explicitly applies to are Sony/ATV Music Publishing LLC, Sony/ATV Music Publishing (UK) Ltd., EMI Music Publishing (UK) Ltd, EMI April Music Inc., and EMI Blackwood Music Inc. Of note, the EMI entities were fully purchased as of 2018 by Sony.

76. Sony/ATV Songs LLC is also alleged to be controlled by this agreement because it effectuates the purpose of this agreement by serving as an agent for Naughty Words Limited with performing rights organizations, including BMI.

77. Other entities to which this agreement applies are Naughty Words Limited (Sam Smith's publishing entities), and Stellar Songs Limited and Stellar Songs (Eriksen and Hemansen's publishing entities). These entities are alleged to have agreements with Sony Music Publishing, or a subsidiary, and to have rights and expectations under the Intercompany Agreement. Note that each of these entities has given an express license to the Sony entities to exploit Defendants' song, showing that they know of the infringing activity.

## TYPES OF INFRINGEMENT

78. Defendants' song has been exploited heavily in the United States, and around the world. It has been streamed billions of times on streaming services. It has been performed many times in concerts, and on TV. It has been played on the radio and covered.

PLAINTIFF'S SECOND AMENDED COMPLAINT

79.   Note that any one defendant could be directly liable for one type of infringement (e.g., publishing sheet music) but vicariously liable for another type of infringement (e.g., licensing the song for use on streaming services)

80.   **CREATION OF THE SONG** - As described throughout this complaint, defendants Sam Smith, Normani Hamilton, James Napier, Mikkel Eriksen, and Tor Hermansen (also known as Stargate) are the authors of Defendants' song. Defendants Tim & Danny and 45th and 3rd are the executive producer and producer of Defendant's song. See Exhibit 3. These actions make them directly liable for copyright as they participated in copying Plaintiff's work.

81.   **LICENSING** - Defendants' licensing of Defendants' song—giving permission to others to use it—is a basis for infringement.

82.   Defendants licensed Defendants' song for performance and/or reproduction on streaming services and other websites, radio stations, at venues, and by all the other methods and types of exploitation identified in the Sony intercompany agreement. See Doc. No. 76-1, at p.6-8.

83.   The YouTube and Spotify profiles for Defendants' song identify those Defendants who licensed the song online and for performance, as does sheet music, and were therefore aware that the song was being exploited. See Exhibit 9 and 11. The same licensing occurred for all other online or public performances on all other streaming services or radio play.

84.   The Defendants referenced on the streaming services as licensors are Universal Music Group, UMG Recordings (dba as Capitol Records), and Sony Music Publishing.[3] See Exhibit 9.

---

[3] Sony Music Publishing refers to defendant Sony/ATV Music Publishing LLC. This complaint establishes via the Intercompany Agreement that the following entities use Sony Music Publishing to exploit Defendants' song in the United States and abroad, and that Sony Music Publishing is licensing Defendants' song for these entities (or by and through them): Sony/ATV Music Publishing LLC, Sony Music Publishing (UK) Ltd, Sony/ATV Songs, LLC, EMI Music Publishing (UK), EMI April Music Inc., EMI Blackwood Music Inc., Naughty Words Limited, and Stellar Songs Limited.

PLAINTIFF'S SECOND AMENDED COMPLAINT

85.    The Defendants listed on the sheet music as owning and licensing Defendants' composition are Salli Isaak Songs Ltd, Songs of NKH, Stellar Songs Limited, EMI Blackwood Music Inc, Naughty Words Limited, Downton Music UK Limited, EMI Music Publishing Ltd, and Sony/ATV Music Publishing (UK) Ltd. <u>See</u> Exhibit 11.

86.    The Defendants who engaged in this licensing activity are alleged to be directly infringing in that they licensed the allegedly infringing work to performed and reproduced without authorization by Plaintiff.

87.    In the alternative, if such licensing is not direct infringement, then it is alleged to be vicarious infringement (because Defendants are receiving monies as a result as a result of the infringement, and have the ability as the licensor to stop the infringement but are not doing so).

88.    **ADMINSTERING AND PUBLISHING** - Administering and publishing a copyright—the marketing, promotion, and exploitation of musical compositions, as well as the collection and management of royalties—is a basis for copyright infringement.

89.    Defendants administer and act as publishers or sub-publishers of Defendants' song for the purpose of exploiting the song via reproduction on streaming services and other websites, radio stations, and at venues, and all the other methods and types of exploitation identified in the Sony intercompany agreement. <u>See</u> Doc. No. 76-1, at p.6-8.

90.    The YouTube profile for Defendants' song identifies those Defendants who administered or acted as publisher for the song online, and also via sheet music, and were therefore aware that the song was being exploited. <u>See</u> Exhibits 9 and 11. The same administration and publishing occurred for all other online or public performances on all other streaming services or radio play.

PLAINTIFF'S SECOND AMENDED COMPLAINT

91.   The YouTube video identifies Sony Music Publishing as having provided a license, which it is able to do as an administrator and publisher of the song.[4]

92.   The Defendants listed on the sheet music as owning and licensing the composition are Salli Isaak Songs Ltd, Songs of NKH, Stellar Songs Limited, EMI Blackwood Music Inc., Naughty Words Limited, Downton Music UK Limited, EMI Music Publishing Ltd, and Sony/ATV Music Publishing (UK) Ltd.

93.   The Defendants who engaged in this administration and publishing activity are alleged to be directly infringing in that they promoted the exploitation of the allegedly infringing work, and collected royalties for the performance and reproduction of the work. The *sine qua non* of publishing and administering a copyright is to make sure that it is reproduced, performed, and generates as much revenue as possible for the publishers and other interested entities.

94.   In the alternative, if such administration and publishing is not direct infringement, then it is alleged to be vicarious infringement (because Defendants are receiving monies as a result as a result of the infringement, and have the ability as the licensor to stop the infringement but are not doing so).

95.   All Defendants, as licensors, administrators, or publishers would be aware of the conduct targeting the US market because their assent is necessary to the exploitation of the song, and their participation is required for collection of the royalties.

96.   All Defendants are owners of the song and therefore receive monies for the exploitation of the song, see Exhibit 3, and/or are licensors, administrators, and/or publishers of the song in question and receive financial remuneration because of the exploiting of Defendants' allegedly infringing song.

---

[4] Note that this complaint establishes that the following entities use Sony Music Publishing to exploit Defendants' song in the United States and abroad, and that Sony Music Publishing is administering and acting as a publisher for these entities or by and through them: Sony/ATV Music Publishing LLC, Sony Music Publishing (UK) Ltd, Sony/ATV Songs, LLC, EMI Music Publishing (UK), EMI April Music Inc., EMI Blackwood Music Inc., and Naughty Words Limited

18

1                                          *****
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S SECOND AMENDED COMPLAINT

# THE PARTIES

I.  **Plaintiff**

    A.  **Sound and Color, LLC ("Sound and Color" or "Plaintiff")**

97.  Plaintiff Sound and Color, LLC is a Pennsylvania limited liability company, which owns all rights and interests in Plaintiff's Song, including the music composition copyright and sound recording copyright.

98.  In February/March 2015, singer and songwriter Jordan Vincent wrote "Dancing with a Stranger" (also known as "Dancing With Strangers"), along with Christopher Miranda of the production duo known as SKX.

99.  "Dancing with a Stranger" is a novel and original creation—especially in the selection and arrangement of the musical composition and lyrics in the hook/chorus—and was fixed in a tangible medium in 2015.

100.  Vincent, Miranda, and Banlaoi have transferred all of their ownership and copyright interest in the music composition and sound recording to plaintiff entity Sound and Color, LLC, which is the owner of the song. The assignment is in the process of being recorded with the Copyright Office to update its current ownership.

101.  Vincent, Miranda, and Banlaoi are the owners of Sound and Color, LLC.

II.  **Defendants**

    A.  **Samuel Smith ("Smith")**

102.  Sam Smith is a recording artist who resides in Los Angeles, CA and London, UK.

103.  Defendant Smith co-authored and owns the infringing song "Dancing With a Stranger."

104.  Defendant Smith directly infringed Plaintiff's Song by duplicating it, copying it, creating derivative works, publicly performing it, and otherwise reproducing and exploiting it without authorization.

105.  At all points Defendant Smith had the right and ability to control or stop the infringing conduct but failed to do so.

PLAINTIFF'S SECOND AMENDED COMPLAINT

106.   At all points as a co-author and co-owner of the Infringing Song Defendant Smith participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

107.   Defendant has received significant financial benefits as a result of the infringement.

108.   Although Smith has publicly claimed that he wrote the Infringing Song in a day in August 2018, giving the impression he wrote the song from his own creativity, this is not consistent with how he and his team typically create music.

109.   In reality most of the songs he "writes" are collaborative efforts, as indicated by the five credited authors on "Dancing With a Stranger," including defendants Eriksen, Hermansen, and Napier. These collaborative writing efforts typically include using preexisting pieces of music to create songs.

110.   The songwriting process used by Smith and his team is relevant to how the Infringing Song was allegedly created, especially where existing music is typically used by Smith and his co-authors to create new songs.

111.   For instance, Smith and Napier wrote a song in or around 2014 called "Stay With Me." The melody was highly similar to Tom Petty's famous "I Won't Back Down," leading to infringement allegations by Petty against Smith.

112.   Although Smith (dubiously) denied ever hearing the famous song before writing "Stay With Me," there is little doubt that his co-authors and team had heard it and that it influenced the writing of Smith's song.

113.   Restated, Smith does not typically create songs on his own and by himself as he often states and implies, but instead the original musical ideas typically come from other sources.

PLAINTIFF'S SECOND AMENDED COMPLAINT

114.   The significance is that Defendants' songwriting process discredits Smith's public statements implying he wrote "Dancing With a Stranger" in a day, and also indicates that preexisting music (i.e. Plaintiff's Song) was used to create it.

**B.   Normani Kordei Hamilton ("Normani")**

115.   Normani Kordei Hamilton is a singer songwriter who upon information and belief resides in Los Angeles, CA and Texas.

116.   Defendant Normani co-authored and co-owns the infringing song "Dancing With a Stranger."

117.   Defendant Normani directly infringed Plaintiff's Song by duplicating it, copying it, creating derivative works, publicly performing it, and otherwise reproducing and exploiting it without authorization.

118.   At all points Defendant Normani had the right and ability to control or stop the infringing conduct but failed to do so.

119.   At all points as a co-author and co-owner of the Infringing Song Defendant Normani participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

120.   Defendant Normani has received significant financial benefits as a result of the infringement.

**C.   Stargate ("Stargate")**

121.    Stargate is a production duo composed of Mikkel Eriksen and Tor Hermansen.

122.   Upon information and belief it is an entity of unknown form.

123.   Defendant Stargate co-authored and co-owns the Infringing Song "Dancing With a Stranger."

PLAINTIFF'S SECOND AMENDED COMPLAINT

124.   Defendant Stargate, by and through Eriksen and Hermansen, directly infringed Plaintiff's Song by duplicating it, copying it, creating derivative works, publicly performing it, and otherwise reproducing and exploiting it without authorization.

125.   At all points Defendant Stargate had the right and ability to control or stop the infringing conduct but failed to do so.

126.   At all points as a co-author and co-owner of the Infringing Song Defendant Stargate participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

127.   Defendant Stargate has received significant financial benefits as a result of the infringement.

**D.     Mikkel Storleer Eriksen ("Eriksen")**

128.   Mikkel Storleer Eriksen is a songwriter residing in Los Angeles, CA.

129.   Defendant Eriksen co-authored and co-owns the Infringing Song "Dancing With a Stranger."

130.   Defendant Eriksen directly infringed Plaintiff's Song by duplicating it, copying it, creating derivative works, publicly performing it, and otherwise reproducing and exploiting it without authorization.

131.   At all points Defendant Eriksen had the right and ability to control or stop the infringing conduct but failed to do so.

132.   At all points as a co-author and co-owner of the infringing song Defendant Eriksen participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora,

23

1    Amazon, iTunes, and others.

2         133.   Defendant Eriksen has received significant financial benefits as a result

3    of the infringement.

4         **E.    Tor Erik Hermansen ("Hermansen")**

5         134.   Tor Erik Hermansen is a songwriter residing in or around Los Angeles,

6    CA.

7         135.   Defendant Hermansen co-authored and co-owns the Infringing Song

8    "Dancing With a Stranger."

9         136.   Defendant Hermansen directly infringed Plaintiff's Song by duplicating

10   it, copying it, creating derivative works, publicly performing it, and otherwise

11   reproducing and exploiting it without authorization.

12        137.   At all points Defendant Hermansen had the right and ability to control or

13   stop the infringing conduct but failed to do so.

14        138.   At all points as a co-author and co-owner of the infringing song

15   Defendant Hermansen participated in the infringement by, including but not limited

16   to, promoting, distributing, and selling the infringing song "Dancing With a Stranger"

17   and/or permitting its use. This includes by licensing the song's use, or allowing the

18   same, on streaming and digital download services such as Spotify, YouTube, Pandora,

19   Amazon, iTunes, and others.

20        139.   As an owner of the infringing copyright Defendant has received

21   significant financial benefits as a result of the infringement.

22        **F.    James John Napier aka Jimmy Napes ("Napier")**

23        140.   James John Napier is a British songwriter residing upon information and

24   belief in the United Kingdom and Los Angeles, CA.

25        141.   Defendant Napier co-authored and co-owns the Infringing Song

26   "Dancing With a Stranger."

27        142.   Defendant Napier directly infringed Plaintiff's Song by duplicating it,

28   copying it, creating derivative works, publicly performing it, and otherwise

1    reproducing and exploiting it without authorization.

2    143.    At all points Defendant Napier had the right and ability to control or stop

3 the infringing conduct but failed to do so.

4    144.    At all points as a co-author and co-owner of the infringing song

5 Defendant Napier participated in the infringement by, including but not limited to,

6 promoting, distributing, and selling the infringing song "Dancing With a Stranger"

7 and/or permitting its use. This includes by licensing the song's use, or allowing the

8 same, on streaming and digital download services such as Spotify, YouTube, Pandora,

9 Amazon, iTunes, and others.

10    145.    As an owner of the infringing copyright Defendant has received

11 significant financial benefits as a result of the infringement.

12    **G.**    **EMI Music Publishing LTD ("EMI Music Publishing")**

13    146.    EMI Music Publishing is owned by Sony/ATV Music Publishing LLC

14 (which states that it has changed its name to Sony Music Publishing (US) LLC) which

15 is doing business as Sony Music Publishing.

16    147.    Defendant EMI Music Publishing co-owns and/or publishes and/or

17 administers the Infringing Song "Dancing With a Stranger," at least in part.

18 Defendants state that EMI owns at least 24.75% of the composition of Defendants'

19 song. Plaintiff is not aware of how the remaining ownership breaks down.

20    148.    Defendant is listed as a copyright claimant on the registration for

21 Defendants' song. See Exhibit 3.

22    149.    The Sony Defendants acquired a controlling interest in EMI Music

23 Publishing LTD and other EMI entities in 2011.

24    150.    "Simultaneously with this acquisition, the EMI Partnership entered into

25 an Administration Agreement with Sony/ATV Music Publishing LLC ('Sony/ATV').

26 Under the Administration Agreement, Sony/ATV agreed to manage EMI's day to day

27 operations, including management and exploitation of EMI's music catalog, in

28 exchange for an administration fee." USA v. All Right To and Interest In Symphony

<u>Cp (Park Lane) LLC</u>, Case No. 2:16-cv-05364 (C.D. Cal. 2016), Doc. No. 1, at p.101:13; <u>see also</u> Sony Corporation of America Form 20-F filed for FY Ending March 31, 2022, at p.20 (detailing history of Sony's purchase and control of EMI Music Publishing).

151. The allegations regarding the Intercompany Agreement are incorporated here by reference.

152. Sony/ATV Music Publishing is EMI Music Publishing's alter ego.

153. Defendant EMI Music Publishing has an "in-name" only existence. It is entirely controlled and managed by Defendant Sony/ATV. This is why Sony/ATV is designated as EMI Music Publishing's agent on the copyright registration and with the performing rights organizations. <u>See</u> Exhibit 3.

154. Sony/ATV Music Publishing is also EMI Music Publishing's agent and its actions and omissions should be imputed to EMI. Sony/ATV, on behalf of EMI Music Publishing, filed a US copyright registration listing EMI as a copyright claimant in Defendants' song.

155. In addition, the copyright registration indicates that there is a written agreement of transfer for EMI Music Publishing.

156. On information and belief, this written transfer agreement establishes Defendant EMI Music Publishing's rights and ownership in the allegedly infringing song, designates Sony/ATV Music Publishing and its subsidiaries as its agent in the United States, and specifies the Sony entities' interest in the work.

157. By virtue of the written transfer agreement, and the intercompany agreement, Defendants EMI Music Publishing was aware that Defendants' song was being published and exploited in the United States, and intended for this to happen as part of its business model.

158. Furthermore, EMI Music Publishing's business model primarily targets the United States market because it is the largest market for selling, streaming, distributing, and publishing music.

159.   EMI Music Publishing, by and through its US-based Sony owners which are its agents and/or alter egos, directly targets the US music market including with Defendants' allegedly infringing song. The publishing and distribution of Defendants' song in the United States was and is part of EMI Music Publishing and Sony/ATV's long-term business plan to target and exploit the US music market.

160.   EMI Music Publishing receives monies from the exploitation of Defendants' song in the United States, as part of Defendants' business plan.

161.   Note that Defendants claimed that Stellar Songs Limited, Mikkel Eriksen, and Tor Hermansen granted EMI Music Publishing worldwide publishing rights for the song Dancing with a Stranger. Doc. No. 74-2, at p.4. It is alleged that Stellar Songs, Mikkel Eriksen, and Tor Hermansen knew and intended that EMI Music Publishing would by and through agents in the United States target the US market via the Intercompany Agreement. It is alleged that without the ability to exploit and target the US market, Defendants would not have contracted with EMI as a publisher.

162.   Defendant EMI Music Publishing by and through Sony/ATV Music Publishing and its subsidiaries directly infringed Plaintiff's Song by duplicating it, copying it, creating derivative works, publicly performing it, and otherwise reproducing and exploiting it without authorization.

163.   This direct infringement includes licensing the song on YouTube, which states that it was licensed by Sony Music Publishing (a business name that includes Sony/ATV Music Publishing and EMI Music Publishing). Exhibit 9. It also includes publishing the sheet music attached as Exhibit 11.

164.   Defendant EMI also similarly licensed Defendants song to be exploited on other streaming services including but not limited to Spotify, Pandora, Amazon, iTunes, and other streaming services.

165.   In the alternative, if this licensing and publishing conduct is not direct infringement, then it is alleged that EMI Music Publishing is vicariously liable for

PLAINTIFF'S SECOND AMENDED COMPLAINT

infringement.

166.   At all points Defendant EMI Music Publishing, by and through Sony/ATV, as the owner of the song, copyright claimant, publisher, and a licensing entity that it had the right and ability to control or stop the infringing conduct but failed to do so.

167.   At all points as a co-owner and co-administrator of the infringing song Defendant EMI Music Publishing knew of the infringing conduct and also materially contributed and caused the infringement by, including but not limited to, promoting, distributing, selling, licensing, publishing, the infringing song "Dancing With a Stranger" and/or otherwise permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

168.   As an owner and publisher of the infringing copyright Defendant has received significant financial benefits as a result of the infringement, including from the United States.

### H.   EMI April Music Inc. ("April Music")

169.    Defendant owns and/or publishes and/or administers the infringing song "Dancing With a Stranger," at least in part. See Exhibit 3.

170.    The allegations above regarding the Sony Intercompany Agreement are incorporated by reference.

171.   Defendant EMI April directly infringed Plaintiff's Song in its role as publisher by licensing, promoting, and administering, the reproduction and performance of Plaintiff's copyright without authorization.

172.   If this conduct is not directly infringing, then in the alternative it is alleged to be vicariously infringing.

173.   At all points as a licensor, publisher, and administrator Defendant April Music had the right and ability to control or stop the infringing conduct but failed to do so.

174.   At all points as a co-owner and co-administrator of the Infringing Song Defendant April Music participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

175.   Defendant has received significant financial benefits as a result of the infringement, including as an owner and for an administration fee.

**I.      EMI Blackwood Music Inc. ("EMI Blackwood")**

176.    Defendant owns and/or publishes and/or administers the infringing song "Dancing With a Stranger," at least in part. See Exhibit 3.

177.   The allegations above regarding the Sony Intercompany Agreement are incorporated by reference.

178.    Defendant EMI Blackwood directly infringed Plaintiff's Song in its role as publisher by licensing, promoting, and administering, the reproduction and performance of Plaintiff's copyright without authorization.

179.   If this conduct is not directly infringing, then in the alternative it is alleged to be vicariously infringing.

180.   At all points as a licensor, publisher, and administrator Defendant EMI Blackwood had the right and ability to control or stop the infringing conduct but failed to do so.

181.   At all points as a co-owner and co-administrator of the Infringing Song Defendant EMI Blackwood participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

182.   Defendant has received significant financial benefits as a result of the

infringement, including as an owner and for an administration fee.

**J.      Salli Isaak Songs LTD ("Salli")**

183.   This is a publishing entity for defendant Napier, which is owned by defendant Downtown Music Publishing.

184.   Defendant Salli owns and/or publishes and/or administers the infringing song "Dancing With a Stranger," at least in part, through defendant Downtown in the United States. See Exhibit 3; Exhibit 11.

185.    Defendant Salli directly infringed Plaintiff's Song by duplicating it, copying it, creating derivative works, publicly performing it, and otherwise reproducing and exploiting it without authorization.

186.   At all points Defendant Salli had the right and ability to control or stop the infringing conduct but failed to do so.

187.   At all points as a co-owner and co-administrator of the Infringing Song Defendant Salli participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

188.   Defendant has received significant financial benefits as a result of the infringement. including as an owner and for an administration fee.

**K.      Downtown Music Publishing LLC ("Downtown")**

189.   Defendant owns, publishes, administers, and licenses the infringing song "Dancing With a Stranger," as well as promotes the song, works to exploit it, and collects royalties for the song's exploitation. See Exhibits 3, 9, 11.

190.   Downtown also owns defendant Salli Isaak and administers its interests in Defendants' song.

191.    Defendant Downtown directly infringed Plaintiff's Song in its role as publisher by licensing, promoting, and administering the reproduction and

1   performance of Plaintiff's copyright without authorization.

2   192.   If this conduct is not directly infringing, then in the alternative it is
3   alleged to be vicariously infringing.

4   193.   At all points as a licensor, publisher, and administrator Defendant
5   Downtown had the right and ability to control or stop the infringing conduct but failed
6   to do so.

7   194.   At all points as a co-owner and co-administrator of the Infringing Song
8   Defendant Downtown participated in the infringement by, including but not limited
9   to, promoting, distributing, and selling the infringing song "Dancing With a Stranger"
10   and/or permitting its use. This includes by licensing the song's use, or allowing the
11   same, on streaming and digital download services such as Spotify, YouTube, Pandora,
12   Amazon, iTunes, and others.

13   195.   Defendant has received significant financial benefits as a result of the
14   infringement via its ownership of the song and/or its administration fee.

15   **L.   Universal Music Operations Limited ("Universal Music**
16   **Operations")**

17   196.   This is the official name of Universal Music UK, which owns the
18   phonographic copy of the infringing song "Dancing With a Stranger."

19   197.   Defendant Universal Music Operations owns and/or publishes and/or
20   administers the infringing song "Dancing With a Stranger," at least in part.

21   198.    Defendant Universal Music Operations directly infringed Plaintiff's
22   Song by duplicating it, copying it, creating derivative works, publicly performing it,
23   and otherwise reproducing and exploiting it without authorization.

24   199.   At all points Defendant Universal Music Operations had the right and
25   ability to control or stop the infringing conduct but failed to do so.

26   200.   At all points as a co-owner and co-administrator of the Infringing Song
27   Defendant Universal Music Operations participated in the infringement by, including
28   but not limited to, promoting, distributing, and selling the infringing song "Dancing

31

With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

201.   As an owner of the infringing copyright Defendant has received significant financial benefits as a result of the infringement.

**M.    Universal Music Group ("Universal Music")**

202.   Defendant Universal Music owns, created, and licenses the phonograph for the infringing song "Dancing With a Stranger." See Exhibit 3.

203.   Defendants Universal Music owns Capitol Records, aka UMG Recordings. Capitol Records posts the infringing song on its website and offers it for sale. See Exhibit 10. On information and believe, the song has been sold and copied from this website.

204.   Defendant Universal Music is listed on the YouTube profile for Dancing With a Stranger as a licensor.

205.    Defendant Universal Music, as creator and owner of Defendants' phonograph and the composition it contains, directly infringed Plaintiff's Song by duplicating it, copying it, creating derivative works, distributing it, publicly performing it, and otherwise reproducing and exploiting it without authorization. It also offers the song for sale on its website, where on information and belief it has been purchased.

206.   In the alternative, if Universal Music's conduct is determined not be directly infringing in any respect, then it is alleged to be secondarily liable.

207.   At all points as owner and licensor, Defendant Universal Music had the right and ability to control or stop the infringing conduct but failed to do so.

208.   At all points as a co-owner and co-administrator of the Infringing Song Defendant Universal Music participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or

allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

209. Defendant has received significant financial benefits as a result of the infringement as owner of the copyright.

**N.     Naughty Words Limited ("Naughty Words")**

210. This is Sam Smith's publishing entity.

211. Smith lives part time in Los Angeles and writes music in Los Angeles, including Defendants' song, and releases music in the United States. Naughty Words' business plan is to target and exploit the United States music market.

212. In 2017, defendant Naughty Words entered into a partnership with defendant Downtown Music (which has a Los Angeles office) to use Downtown to administer the songs it owns, including in the United States:

> Khan [the owner] launched an independent music publishing entity Naughty Words, signing lumineers [sic] such as Sam Smith with whom he's achieved bona fide global success. Khan has entrusted Downtown's bespoke creative and advisory services and global royalty collection platform, Songtrust, to service his own and Naughty Words' catalogs.
>
> Of the signing Khan said, "I am really excited about embarking upon a new chapter in my songwriting career with Downtown and together will continue building the Naughty Boy brand worldwide, film scoring and sync music are just a couple of the areas I want to expand on and also developing the Naughty Words brand further."

See        https://shorefire.com/releases/entry/downtown-enters-into-a-multi-year-worldwide-partnership-with-naughty-boy.

213. "Naughty Words will now be handled by Downtown's creative and advisory services and global royalty collection platform, Songtrust, servicing both

PLAINTIFF'S SECOND AMENDED COMPLAINT

his own and Naughty Words' song catalogues." https://www.prsformusic.com/m-magazine/news/naughty-boys-signs-downtown-music-publishing.

214. When the terms worldwide and global are referred to in these press releases, they include the primary music market in the world, the United States, which is the largest market for the exploitation of music (including Defendants' song).

215. It was intended that future songs written by Sam Smith, on which Naughty Words served as publisher, would be exploited primarily in the United States. The claims in this case thus arise by and through Naughty Words contract with the US-based Downtown Music.

216. Furthermore, Naughty Words also has an agreement with Sony/ATV Music Publishing (UK) Ltd for Sony to administer and sub-publish Naughty Words's compositions. By virtue of the Sony intercompany agreement, this means Sony administers and sub-publishes the song in the United States.

217. The allegations above regarding the Sony Intercompany Agreement are incorporated by reference.

218. Naughty Words, before and upon entering into a contract with Sony Music UK, would have been aware of the intercompany agreement and specifically intended that Sony exploit Defendants' song in the United States, the largest music market in the world.

219. If Sony UK and Sony could not have administered or exploited the song in the United States, the biggest music market in the world, Naughty Words would not have entered into the agreement with Sony UK. The same goes for Stellar, Eriksen, or Hermansen and EMI Music Publishing.

220. In accordance with the intercompany agreement Sony/ATV Music registered Naughty Words as a copyright claimant and owner of Defendants' song on the copyright registration, and Sony/ATV songs in Nashville did so with BMI. See Exhibit 3.

221. The copyright registration indicates that there is a written agreement

34

regarding the transfer of ownership and rights of Defendants' song to Naughty Words. See Exhibit 3. On information and believe, this written transfer agreement designates Sony/ATV Music Publishing as Naughty Words agent and contemplates exploitation of the song pursuant to the intercompany agreement, including expressly in the United States.

222.  By virtue of the written transfer agreement, its contract with Sony UK, and the Sony intercompany agreement, Defendant Naughty Words was aware that Defendants' song was being published, licensed, and exploited in the United States, and intended for this to happen as part of its business model.

223.  Defendant Naughty Words directly infringed Plaintiff's Song in its role as publisher by licensing, promoting, and administering the reproduction and performance of Plaintiff's copyright without authorization.

224.  If this conduct is not directly infringing, then in the alternative it is alleged to be vicariously infringing.

225.  At all points as a licensor, publisher, and administrator Defendant Naughty Words had the right and ability to control or stop the infringing conduct but failed to do so.

226.  It is unclear, legally speaking, if licensing and/or publishing a song is direct infringement or secondary infringement; Plaintiff therefore alleges direct and secondary infringement in the alternative.

227.  At all points Defendant Naughty Words—by and through its designated agents at Sony—as the owner of the song, copyright claimant, publisher, song administrator, and licensing entity had the right and ability to control or stop the infringing conduct but failed to do so.

228.  At all points as a co-owner and co-administrator of the Infringing Song Defendant Naughty Words participated in the infringement by, including but not limited to entering into contracts meant to allow the song to be exploited in the United States and the world, and by promoting, distributing, and selling the infringing song

"Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

229.   Defendant has received significant financial benefits as a result of the infringement as owner of the song and/or as an administration fee.

**O.    Songs of NKH ("NKH")**

230.   This is a publishing entity owned by defendant Normani.

231.   Defendant owns and/or publishes and/or administers the infringing song "Dancing With a Stranger," at least in part. See Exhibit 3.

232.   Defendant NKH directly infringed Plaintiff's Song in its role as publisher by licensing, promoting, and administering the reproduction and performance of Plaintiff's copyright without authorization.

233.   If this conduct is not directly infringing, then in the alternative it is alleged to be vicariously infringing.

234.   At all points as a licensor, publisher, and administrator Defendant NKH had the right and ability to control or stop the infringing conduct but failed to do so.

235.   At all points as a co-owner and co-administrator of the Infringing Song Defendant NKH participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

236.   Defendant has received significant financial benefits as a result of the infringement including as an owner, and as part of the administration fee.

**P.    Stellar Songs Limited ("Stellar Limited")**

237.   Upon information and belief this is a publishing entity for Stargate, Eriksen, and Hermansen.

238.   Defendant Stellar Limited owns and/or publishes and/or administers the

36

infringing song "Dancing With a Stranger," at least in part.

239.   Defendant Stellar Limited has contracted with EMI Music Publishing to administer its copyrights, and via the intercompany agreement exploit the US market using the US-based Sony subsidiaries as tis agents.

240.   The copyright registration indicates that there is a written agreement of transfer for Stellar Limited. See Exhibit 3.

241.   On information and belief, this written transfer agreement establishes Defendant Stellar LImited's rights and ownership in the allegedly infringing song, designates Sony/ATV Music Publishing and its subsidiaries as its agent in the United States, and specifies the Sony entities' interest in the work.

242.   By virtue of the written transfer agreement, and the intercompany agreement, Defendant Stellar Limited was aware that Defendants' song was being published and exploited in the United States, and intended for this to happen as part of its business model.

243.   Defendant Stellar Limited directly infringed Plaintiff's Song in its role as publisher by licensing, promoting, and administering the reproduction and performance of Plaintiff's copyright without authorization.

244.   If this conduct is not directly infringing, then in the alternative it is alleged to be vicariously infringing.

245.   At all points as a licensor, publisher, and administrator Defendant Stellar Limited had the right and ability to control or stop the infringing conduct but failed to do so.

246.   At all points as a co-owner and co-administrator of the Infringing Song Defendant Stellar Limited participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

247.   Defendant has received significant financial benefits as a result of the infringement as an owner and because of its administration fee.

**Q.    Stellar Songs ("Stellar")**

248.    Upon information and belief this is a publishing entity for Stargate, Eriken, and Hermansen

249.   The allegations regarding Stellar Limited are incorporated here by reference and realleged against Stellar Songs.

**R.    Sony/ATV Music Publishing LLC ("Sony/ATV Music Publishing"), now known as Sony Music Publishing (US) LLC**

250.    Defendant owns and/or publishes and/or administers the Infringing Song "Dancing With a Stranger," at least in part.

251.   Plaintiff incorporates by reference the allegations regarding the intercompany agreement.

252.   Defendant Sony/ATV Music Publishing is the primary entity running Sony's US-based music publishing business, which has subsidiaries worldwide. Defendant is headquartered in New York.

253.    Defendant Sony/ATV Music Publishing directly infringed Plaintiff's Song in its role as publisher by licensing, promoting, and administering the reproduction and performance of Plaintiff's copyright without authorization.

254.   If this conduct is not directly infringing, then in the alternative it is alleged to be vicariously infringing.

255.   At all points as a licensor, publisher, and administrator Defendant Sony/ATV Music Publishing had the right and ability to control or stop the infringing conduct but failed to do so.

256.   At all points as a co-owner and co-administrator of the Infringing Song Defendant Sony/ATV Music Publishing participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use,

1  or allowing the same, on streaming and digital download services such as Spotify,
2  YouTube, Pandora, Amazon, iTunes, and others.

3   257.  Defendant has received significant financial benefits as a result of the
4  infringement including as a owner of the song, and from an adminstration fee.

5  **S.** **Sony/ATV Music Publishing (UK) Ltd "Sony Music UK"**

6   258.  Defendant owns and/or publishes and/or administers the infringing song
7  "Dancing With a Stranger," at least in part.

8   259.  Plaintiff incorporates by reference the allegations regarding the
9  intercompany agreement.

10   260.  Defendant Sony Music UK is wholly owned by Sony/ATV Music
11  Publishing. Defendant Sony Music UK has an intercompany arrangement whereby
12  US affiliates act as its agent(s) to administer and exploit Defendants' song in the
13  United States.

14   261.  US-based Sony Music Publishing's website indicates that Sony's foreign
15  subsidiaries are departments and divisions of Sony:

16     Sony Music Publishing's administration services utilize a
17     worldwide network of local creative and administrative teams,
18     giving its clients both global reach and a personal touch. Its
19     songwriters and their representatives are able to obtain
20     administrative support in their own territory directly from local
21     administration staff, all of whom are experts in their field, have
22     a passion for the music they represent, and are able to utilize their
23     close relationships with the relevant societies and their
24     colleagues to accurately register songs and collect royalties.

25  https://www.sonymusicpub.com/en/services.

26   262.  Sony's Form 20-F for FY ending March 31, 2022, indicates that its music
27  publishing arm is "a US-based music publishing business that owns and acquires right
28  sot musical compositions, exploiting and marketing those compositions and receiving

royalties or fees for their use." This music publishing business includes foreign subsidiaries such as Sony Music UK.

263.   Sony Music UK has interest in Defendants' song via agreements with defendant Eriksen and Hermansen's publishing entities with Sony Music UK. The express purpose of these publishing agreements is for Sony to exploit Eriksen and Hermansen's work, especially in the United States. The intent and purpose of this agreement is for Eriksen and Hermansen's entities interests to be administered, published, and exploited in the United States via the intercompany agreement.

264.   Sony Music UK also has interest in Defendants' song via an agreement with Naughty Words, Sam Smith's publisher. The express purpose of this agreement is for Sony to exploit Naughty Word's interest, especially in the United States

265.   Defendant Sony Music UK directly infringed Plaintiff's Song in its role as publisher by licensing, promoting, and administering the reproduction and performance of Plaintiff's copyright without authorization.

266.   If this conduct is not directly infringing, then in the alternative it is alleged to be vicariously infringing.

267.   At all points as a licensor, publisher, and administrator Defendant Sony Music UK had the right and ability to control or stop the infringing conduct but failed to do so.

268.   At all points as a co-owner and co-administrator of the Infringing Song Defendant Sony Music UK participated in the infringement by, including but not limited to, promoting, distributing, licensing, administering, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

269.   Defendant has received significant financial benefits as a result of the infringement as an owner and for an administration fee

**T.     Sony/ATV Songs LLC ("Sony/ATV Songs")**

40

270.   Defendant owns and/or publishes and/or administers the Infringing Song "Dancing With a Stranger," at least in part.

271.   Plaintiff incorporates by reference the allegations regarding the intercompany agreement.

272.   Defendant Sony/ATV Songs directly infringed Plaintiff's Song by duplicating it, copying it, creating derivative works, publicly performing it, and otherwise reproducing and exploiting it without authorization.

273.   At all points Defendant Sony/ATV Songs had the right and ability to control or stop the infringing conduct but failed to do so.

274.   At all points as a co-owner and co-administrator of the Infringing Song Defendant Sony/ATV Songs participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

275.   Defendant has received significant financial benefits as a result of the infringement.

**U.   Sony Music Group; Sony Corporation of America (the "Sony Defendants")**

276.   The Sony Defendants own and/or publish and/or administer the Infringing Song "Dancing With a Stranger," at least in part.

277.   The Sony Defendants directly infringed Plaintiff's Song by duplicating it, copying it, creating derivative works, publicly performing it, and otherwise reproducing and exploiting it without authorization.

278.   At all points the Sony Defendants had the right and ability to control or stop the infringing conduct but failed to do so.

279.   At all points as a co-owner and co-administrator of the Infringing Song The Sony Defendants participated in the infringement by, including but not limited to,

41

promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

280.   Defendants have received significant financial benefits as a result of the infringement.

## V.    UMG Recordings, Inc. ("UMG Recordings")

281.    Defendant Universal Music owns, created, and licenses the phonograph for the infringing song "Dancing With a Stranger." See Exhibit 3.

282.   Defendants UMG Recordings does business under the name Capitol Records. Capitol Records posts the infringing song on its website and offers it for sale. See Exhibit 10. On information and believe, the song has been sold and copied from this website.

283.   Defendant UMG Recordings is listed on the YouTube profile for Dancing With a Stranger as a licensor.

284.    Defendant UMG Recordings, as creator and owner of Defendants' phonograph and the composition it contains, directly infringed Plaintiff's Song by duplicating it, copying it, creating derivative works, publicly performing it, and otherwise reproducing and exploiting it without authorization. It also offers the song for sale on its website, where on information and belief it has been purchased.

285.   In the alternative, if UMG Recordings's conduct is determined not be directly infringing in any respect, then it is alleged to be secondarily liable.

286.   At all points as owner and licensor, Defendant UMG Recordings had the right and ability to control or stop the infringing conduct but failed to do so.

287.   At all points as a co-owner and co-administrator of the infringing song Defendant UMG Recordings participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or

allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

288.   Defendant has received significant financial benefits as a result of the infringement as an owner of the copyright.

## W.   Tim & Danny Music LLC ("Tim & Danny")

289.   Defendant Tim and Danny executive produced and is alleged to own and/or publish and/or administer the infringing song "Dancing With a Stranger," at least in part. See Exhibit 3.

290.   Defendant Tim & Danny, as executive producer of the song, directly infringed Plaintiff's Song by participating in the creation of the infringing work.

291.   It is also alleged that, as executive producers, Tim & Danny, have ownership in the copyright and that it licensed the copyright for exploitation. Tim & Danny is alleged to receive financial remuneration for its participation in the creation of the song, and ongoing monies relating to the exploitation of the song such as to make it a beneficial owner.

292.   If the conduct described is not directly infringing, then it is alleged in the alternative to be secondarily infringing.

293.   At all points as owner of the work Defendant Tim & Danny had the right and ability to control or stop the infringing conduct but failed to do so.

294.   At all points as a co-owner of the Infringing Song Defendant Tim & Danny participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

295.   Defendant has received significant financial benefits as a result of the infringement.

## X.   45th & 3rd Music LLC ("45th & 3rd")

PLAINTIFF'S SECOND AMENDED COMPLAINT

296.   Defendant 45th & 3rd produced the infringing song "Dancing With a Stranger." <u>See</u> Exhibit 3.

297.   Defendant 45th and 3rd, as producer of the song, directly infringed Plaintiff's Song by participating in the creation of the infringing work.

298.   It is also alleged that, as producers, 45th & 3rd, have ownership in the copyright and that it licensed the copyright for exploitation. 45th & 3rd is alleged to receive financial remuneration for its participation in the creation of the song, and ongoing monies relating to the exploitation of the song such as to make it a beneficial owner.

299.   At all points Defendant 45th & 3rd had the right and ability to control or stop the infringing conduct but failed to do so.

300.   At all points as a co-owner of the Infringing Song Defendant 45th & 3rd participated in the infringement by, including but not limited to, promoting, distributing, and selling the infringing song "Dancing With a Stranger" and/or permitting its use. This includes by licensing the song's use, or allowing the same, on streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others.

301.   Defendant has received significant financial benefits as a result of the infringement.

*****

302.   On information and belief, each and every Defendant was an agent, partner, representative, affiliate, employee, alter ego, or co-conspirator of each and every other Defendant, and in doing the things alleged herein, each and every Defendant was acting pursuant to such conspiracy and/or within the course and scope of such agency, representation, affiliation, control or employment and was acting with the consent, permission and authorization of the other Defendants. Moreover, on information and belief, each Defendant who joined the conspiracy after its formation ratified, adopted and is liable for all acts committed in furtherance of the conspiracy

1  including those committed before such Defendant joined the conspiracy.

2  303.   Whenever the Complaint refers to any act or acts of a Defendant, the

3  reference shall also be deemed to mean that the directors, officers, employees,

4  affiliates, controlling companies or agents of the responsible Defendants authorized

5  such act while actively engaged in the management, direction or control of the affairs

6  of Defendant, and each of them, and/or by persons who are the alter ego of

7  Defendants, or while acting within the scope of their agency, affiliation, control, or

8  employment. Whenever the Complaint refers to any act of Defendants, the references

9  shall be deemed to be the act of each Defendant, jointly and severally.

10  ## JURISDICTION AND VENUE

11  304.   Plaintiff hereby incorporates by reference the preceding paragraphs and

12  repeats and realleges each of the allegations as if fully set forth here.

13  305.  This action is brought as a copyright infringement case and related

14  claims; and therefore, subject matter jurisdiction lies within this Court, pursuant to

15  28 U.S.C. §§ 1331 and 1338.

16  306.  The Central District of California has personal jurisdiction over each and

17  every Defendant by virtue of (1) their specific contacts with this district, and (2) their

18  general, systematic, and continuous business and music contacts with this district.

19  307.  Furthermore, the defendants, as elaborated in the above section and

20  incorporated here by reference, reside in the Central District of California, and/or do

21  substantial business with those businesses which reside in this district related to the

22  allegations in this complaint.

23  308.  Venue lies within this Court pursuant to 28 U.S.C. Sections 1391(b)(1) –

24  (3), 1391(c), 1391(d), and 1400(a) in that one or more defendants reside in this district

25  or have agents that reside in the district and/or are found in the district.

26

27

28

PLAINTIFF'S SECOND AMENDED COMPLAINT

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Direct Copyright Infringement

(Against All Defendants)

309.   Plaintiff hereby incorporates by reference the preceding paragraphs and repeats and realleges each of the allegations as if fully set forth here.

310.   Plaintiff own all rights in the musical composition and sound recording "Dancing with a Stranger" also known as "Dancing with Strangers" which is an original and novel copyrightable composition and sound recording.

311.   To be liable for direct copyright infringement a defendant must have had access to the work allegedly copied, and there must be substantial similarity between the infringing work and the infringed work.

312.   Access can be established by showing with direct or circumstantial evidence that the work in question was actually copied. Access can also be established by demonstrating that the two works are strikingly similar.

313.   Here, access is proven as alleged above.

314.   As noted above, the compositions and sound recordings of the songs are substantially similar both in the lyrics and musical notes, especially in the hook of the song. See Attached Report of Dr. Alexander Stewart.

315.   The songs' similarity is especially apparent in the selection and arrangement of the musical composition and sound recording elements, particularly the identical lyrics "Dancing With a Stranger" overlaying the nearly identical melodies, in both songs' hooks. This selection and arrangement of the musical elements in Plaintiff's song was copied in Defendants' song.

316.   Without authorization or permission, Defendants have exploited Plaintiff's composition and sound recording, reaping tremendous financial rewards and other pecuniary benefits to the detriment of Plaintiff's.

PLAINTIFF'S SECOND AMENDED COMPLAINT

317.   Defendants violated Plaintiff's exclusive rights by, including but not limited to, doing the following:

a.     copying and reproducing Plaintiff's music composition and sound recording copyrights without permission,

b.     preparing derivative works based upon Plaintiff's music composition and sound recording copyrights which are substantially similar to Plaintiff's works,

c.     distributing copies of the copyrighted works to the public,

d.     performing the works publicly.

318.   Defendants have also encouraged and otherwise induced third parties to infringe on Plaintiff's composition and sound recording copyrights on a widespread basis.

319.   The initial and predicate acts of copying of "Dancing With a Stranger" occurred in the United States in Los Angeles, CA at The Stellar House studio on or around August 7, 2018.

320.   As a result of Defendants' conduct, acts, and/or omissions Plaintiff is entitled to relief, including but not limited to actual damages, direct profits, and indirect profits. This includes but is not limited to licensing fees, mechanical royalties, advertising revenue, streaming revenue, and concert revenue—and any other revenue derived from the exploitation of the infringing song "Dancing With a Stranger."

## SECOND CAUSE OF ACTION

### Vicarious Copyright Infringement

(Against All Defendants)

321.   Plaintiff hereby incorporates by reference the preceding paragraphs and repeats and realleges each of the allegations as if fully set forth here.

322.   To state a claim for vicarious copyright infringement the defendants must vicariously profit from the direct infringement while declining to exercise a right to stop or limit the direct infringement.

PLAINTIFF'S SECOND AMENDED COMPLAINT

323. Here, as described in detail throughout this complaint, the Defendants all own, publish, or administer the copyright "Dancing With A Stranger" and thus have complete control over how the work is exploited and receive a great deal of monies in return. Defendants, as producers, publishers, songwriters, and copyright holders, all have control over the dissemination, sale, distribution, and licensing of the infringing song "Dancing With A Stranger."

324. In the event that some or all of Defendants' actions and inactions are determined to not be directly infringing, but another third party is directly infringing, then they are alleged to be vicariously infringing. For instance, as this complaint details, Defendants have the right and ability to stop or limit the exploitation of the infringing song on streaming and download services on YouTube, Apple, Amazon, and other websites, but have declined to do so. They receive remuneration for the exploitation of the song on these services.

325. Defendants have the right and ability to supervise and control the licensing of the radio plays for Defendants' song. They have not stopped the infringement.

326. Defendants have the right and ability to control whether Defendants' song is performed and broadcast on television, or at a concert. They have not stopped the infringement.

327. It is impossible to list every alleged infringement as the exploitation of Defendants' song has been massive; however, if the Defendants are not directly liable for the streaming, downloading, sales, radio play, and performances they licensed then they are certainly vicariously liable.

328. As owners, publishers, or administrators, all Defendants profit from the dissemination, sale, distribution, and licensing of the infringing song "Dancing With A Stranger" that they have licensed. Given the massive amount of alleged infringements that have taken place it is impossible without discovery to trace back every dime each Defendant has received for a particular infringement—especially

48

without having access to the underlying contracts. However, alleging that the owners and beneficial owners of Defendants' song received monies for the licensing of Defendants' composition which led to its commercial satisfies the causal and financial elements of vicarious liability at the pleading stage.

329.  Defendants, as producers, publishers, songwriters, and copyright holders, all have control over the dissemination, sale, distribution, and licensing of the song "Dancing With A Stranger" but have not stopped the exploitation of the infringing work.

330. Without authorization or permission, Defendants continue to exploit Plaintiff's song "Dancing With A Stranger" as "Dancing With A Stranger," reaping tremendous financial rewards and other pecuniary benefits, to the detriment of Plaintiff.

331.  As a result of Defendants' conduct, acts, and/or omissions Plaintiff is entitled to relief, including but not limited to actual damages, direct profits, and indirect profits. This includes but is not limited to licensing fees, mechanical royalties, advertising revenue, streaming revenue, and concert revenue—and any other revenue derived from the exploitation of the infringing song "Dancing With A Stranger."

## CLAIMS FOR RELIEF

Wherefore, Plaintiff demands judgment in its favor on all Counts and against all Defendants for an amount well in excess of the jurisdictional amount required to guarantee a jury trial. Plaintiff requests that this Court determine and declare that Plaintiff is additionally awarded and afforded on all Counts from Defendants, jointly and severally:

(a)    Compensatory damages, together with interest and delay damages;

(b)    Actual damages, direct profits, and/or indirect profits

a. Including but not limited to licensing fees, mechanical royalties, advertising revenue, streaming revenue, concert revenue.

(c) Declarations of authorship and ownership;

(d) Accounting and constructive trust;

(e) Equitable and injunctive relief pursuant to 17 U.S. Code § 502 and § 503, inclusive of but not limited to impoundment, destruction, and halting of sales of the infringing material; and

(f) Such other and further relief as the Court deems just, necessary, and appropriate under the circumstances or allowed by statute.


*****

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ AJ Fluehr*

Alfred J. Fluehr, Esquire
Attorney ID No.:  316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 341-1063
F:  (215) 500-1005
E: aj@francisalexander.com
*Law Firm / Lawyer for Plaintiff*
*Pro Hac Vice*


Lowe & Associates
Steven T. Lowe, Esq.
8383 Wilshire Boulevard, Suite 1038
Beverly Hills, CA 90211
E: steven@lowelaw.com


*/d/ March 21, 2023*

PLAINTIFF'S SECOND AMENDED COMPLAINT

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

\*\*\*\*\*

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ AJ Fluehr*_____
Alfred J. Fluehr, Esquire
Attorney ID No.:  316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 341-1063
F:  (215) 500-1005
E: aj@francisalexander.com
*Law Firm / Lawyer for Plaintiff*
*Pro Hac Vice*

Lowe & Associates
Steven T. Lowe, Esq.
8383 Wilshire Boulevard, Suite 1038
Beverly Hills, CA 90211
E: steven@lowelaw.com

*/d/ March 21, 2023*

PLAINTIFF'S SECOND AMENDED COMPLAINT

## SPOLIATION CLAUSE

Plaintiff demands that Defendants take necessary actions to ensure the preservation of all documents and things related to the case—in any format—hardcopy, electronic, audio, and visual, inclusive of but not limited to: the Master recording of the allegedly infringing song "Dancing with a Stranger", prior recordings of "Dancing with a Stranger," the individual audio tracks (both from prior recordings and initial/early takes), and any and all session audio, tracks, and takes (whether or not used in the final Master). Defendants should also preserve all ProTools files related to "Dancing with a Stranger." All material Defendants have related to Plaintiff's song "Dancing with a Stranger" should also be preserved. Defendants should also preserve any and all video, takes, scripting, notes, cards, or anything else relating to the "Dancing with a Stranger" music video. Defendants should also preserve anything related to Plaintiff's "Dancing with a Stranger" music video.

Defendants are also put on notice to preserve all things including but not limited to information, materials, communications, or other content/data related to the averments in this case.

****

PLAINTIFF'S SECOND AMENDED COMPLAINT

# EXHIBIT 1

**Copyright**
United States Copyright Office

| Help | Search | History | Titles | Start Over |

---

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = vincent jordan
Search Results: Displaying 1 of 1 entries

[ previous ] [ next ]

---

Labeled View

*Dancing With Strangers.*

| | |
|---|---|
| **Type of Work:** | Sound Recording and Music |
| **Registration Number / Date:** | SR0000847699 / 2019-05-27 |
| **Application Title:** | Dancing With Strangers. |
| **Title:** | Dancing With Strangers. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Jordan Vincent, 1984- . Address: 1051 n. gardner st., #9, West Hollywood, CA, 90046. |
| | Christopher Miranda, 1983- . Address: 1051 n gardner st, #9, West Hollywood, CA, 90046. |
| **Date of Creation:** | 2015 |
| **Date of Publication:** | 2015-06-10 |
| **Nation of First Publication:** | United States |
| **Alternative Title on Application:** | Dancing With A Stranger |
| **Authorship on Application:** | Jordan Vincent, 1984- ; Domicile: United States; Citizenship: United States. Authorship: sound recording, lyrics and music. |
| | Christopher Miranda, 1983- ; Domicile: United States; Citizenship: United States. Authorship: sound recording, lyrics and music. |
| **Rights and Permissions:** | Jordan Vincent, Sound and Color, LLC, 1051 n gardner st, #9, #9, West hollywood, CA, 90046, United States, (302) 388-9646, soundandcolorav@gmail.com |
| **Names:** | Vincent, Jordan, 1984- |
| | Miranda, Christopher, 1983- |

[ previous ] [ next ]

---

| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format [ Full Record ▼ ] [ Format for Print/Save ] |
| Enter your email address: [_____] [ Email ] |

---

| Help | Search | History | Titles | Start Over |

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |  Copyright Office Home Page  |  Library of Congress Home Page

# EXHIBIT 2

**Alexander Stewart, Ph.D. LLC**
**Preliminary Musicology Report**
**January 3, 2022**

**Re: "Dancing with a Stranger" and "Dancing with Strangers"**

## 1.      Background

I am Professor of Music, the founder and coordinator of the Jazz Studies Program, and former Director of Latin American and Caribbean Studies at the University of Vermont. I collaborated in the design and implementation of our successful Music Technology and Business Program. I have contributed to numerous peer-reviewed journals and other publications, and I am author of a book, *Making the Scene: Contemporary New York City Big Band Jazz*, published by University of California Press (2007). My article on drumming and rhythms, "Funky Drummer," first published in the British journal *Popular Music* in 2000, has been reprinted in several anthologies and has been widely cited. My scholarly work encompasses extensive music transcriptions, musicological analysis, historical research, and other activities, particularly in popular music. I earned a Ph.D. in Music (Ethnomusicology Concentration) from the Graduate Center of the City University of New York (CUNY) and a Master of Music in Jazz and Commercial Music from Manhattan School of Music. During 2006-7 I was a Fulbright scholar researching traditional and popular music in Mexico. As an active professional musician for more than forty years I have performed and recorded with leading musicians in jazz and popular music such as Lionel Hampton, Wynton Marsalis, and Ray Charles. I have provided expert opinions and analysis and lectured widely on music copyright matters for nearly twenty years. A C.V. attached to this report lists my professional activities in more detail.

## 2.      Assignment

I have been asked to examine, compare and research two songs: "Dancing with a Stranger" by Sam Smith ((henceforth "SS") and "Dancing with a Stranger" (aka "Dancing with Strangers") by Jordan Vincent (henceforth "JV").[1] I was provided media and links to the recordings by Francis

---

[1] My understanding is that Jordan Vincent's original title was "Dancing with a Stranger" and that, after the release of the Smith song, he altered the title in order to distinguish his work from the later song.

Malofiy, Esq. The media included two versions of JV (the deposit copy audio and a YouTube video – henceforth "JVvid"). These two versions are the same composition – they differ only in certain structural elements discussed below. While this report provides analysis of both versions, its primary focus is the deposit copy version and, unless otherwise noted, all references are to this version.  Additionally, I downloaded the sheet music to SS from Musicnotes.com. I was also asked to perform a preliminary search for other songs containing similar expression ("prior art"). Finally, I was charged with providing a preliminary assessment of the importance of any similar expression to each composition.

## 3.     Methodology

I begin with close listening to each song in its entirety. I take note of the general characteristics of each composition. I then transcribe (put into music notation) similar passages and compare this expression. While primary emphasis is on melodic content, other expression and details (lyrics, underlying harmony, accompaniment patterns, etc.) are also taken into consideration. If important similarities are found, I then conduct a prior art search to look for any other songs containing similar expression. I then assess the quantitative importance as well as the qualitative significance of this expression to each song.

## 4.     Summary of Findings

My investigation and analysis have found that the compositions SS and JV are substantially similar in the lyrics, melodic content (including rhythmic and metric placement), and structural setting and supportive harmonies of their main themes and choruses. The creative selection and arrangement of the melody, lyrics and other elements in JV as discussed below are distinctive and original and this expression forms the musical core of SS. A prior art search turned up no compositions with anywhere near the degree of similarity as contained in these songs.

## 5.     Analysis

a) General
Although SS is slightly slower than JV, both songs are very similar in style and production. Other than the acoustic piano sound during the intro and percussion interlude of of JVvid, both works rely heavily on synthesized instrumental sounds common in contemporary popular dance music. Harmonically, SS and JV are built on four-chord cycles of major and minor chords resulting in some ambiguity[2] as to key center (particularly in SS). As discussed further below,

---

[2] Tonal ambiguity has become fairly common in contemporary popular music, especially in songs based on repeating four-chord cycles such as heard in these songs. Current scholarship in music theory has taken note of this trend as evidenced in articles and books by Christopher Doll (2017 *Hearing Harmony: Toward a Tonal Theory for the Rock Era*. University of Michigan Press); Asaf Peres, (2016 "(Dys)Functional Harmony: How Sound Production in Twenty-First-Century Pop Music Liberates Harmony from Its Functional Role," paper presented at the annual

these four-chord cycles repeat throughout much of each song. Overall, I hear the third minor chord as the "tonic" or key center in SS. My reasons are provided below in the discussion of the chord progressions.

| | Key | Tempo |
|---|---|---|
| SS | F minor (Aeolian) | 109 bpm |
| JV | G minor (Aeolian) | 120 bpm |

The Aeolian mode or natural minor is a minor scale with a flattened sixth.  On the piano keyboard an example would be the seven white keys beginning with A.

b) Harmony[3]
Basic chord sequences

| SS (transposed) | Eb | | F | G- | Bb |
|---|---|---|---|---|---|
| JV | | G- | D- | Eb | F |

| SS | Eb | | D- | G- | Bb |
|---|---|---|---|---|---|
| JV | | G- | D- | Eb | F |

As will be seen in example 2 below, a simple rotation of the chords yields an almost identical cycle over eight bars.

| SS (transposed) | Eb | F | G- | Bb | Eb | | D- | G- | | Bb |
|---|---|---|---|---|---|---|---|---|---|---|
| JV | Eb | F | G- | D- | Eb | F | G- | D- |

It should be noted that the only different chords here are closely related: D- and F and D- and Bb share two of the three pitches that make up their triads. The progression D- to G- (v-i) in SS reinforces the sense of a G minor tonality. Moreover, the bVI-bVII-i (Eb F G-) with the borrowed IV V chords from the relative major (Bb) is a common cadence in rock and popular music. Finally, the melodic movement to the pitch G, especially in the opening phrases establishes a strong sense of G minor at the beginning of the song.

c) Basic Structure and occurrences of choruses

The basic structure of each song is similar. Each begins with several iterations of the chord cycle before the drums and rhythm section kicks in. Each contains three choruses although in the video the second and third choruses of JV are separated by a brief percussion interlude.

_____

meeting of the Society for Music Theory, Vancouver, BC); Mark Spicer (2017 "Fragile, Emergent, and Absent Tonics in Pop and Rock Songs." *Music Theory Online* [*MTO*] 23 (2)); and Mark Richards (2017 "Tonal Ambiguity in Popular Music's Axis Progressions" [*MTO*] 23 (3)). *Music Theory Online* is described as "one of the flagship journals of the Society for Music Theory. It is a peer-reviewed open-access electronic journal of research and scholarship in music theory, music analysis, and related disciplines." https://www.mtosmt.org/index.php

[3] In this and all subsequent analysis, examples have been transposed to the same key signature as explained in 5d.

SS
0:00    intro (out of time)
0:23    intro (time and vocalizations)
0:30    verse
1:09    chorus
1:35    verse
1:55    chorus
2:32    chorus (variation)

JV
0:00    intro (vocalizations)
0:30    verse
1:03    chorus
1:34    verse
2:05    chorus
2:39    intro/interlude
3:56    chorus

JVvid
0:00    intro (piano, out of time)
0:21    intro (time and vocalizations)
0:51    verse
1:23    chorus
1:56    verse
2:26    chorus
[3:00   interlude – video only]
3:40    chorus

d) Melodies, signature themes, and structure
Following standard musicological procedure when comparing two or more works, I have
transcribed or put into music notation the relevant passages. In order to facilitate this comparison
I have transposed JV up a whole step in order to place each song in the same key signature.
Interestingly, this same alteration occurs when JV is slowed to the same tempo as SS (without
using software to maintain a constant pitch level) – the melodic and harmonic content converge
as in my transcriptions below.  In the melodies at issue in this case, the lyrics reference the titles
of the songs and they can be considered the title or signature themes in each song. They clearly
form the "hooks"[4] in the choruses of each composition. As can be seen below, these phrases
appear thirteen times in SS and twelve times in JV.
Occurrences of signature phrase:

---

[4] In popular music, a "hook" is the most catchy and memorable part of a song. In the music
industry, it is widely believed that, in order to be successful, a song must have at least one
"hook."

| SS | JV | JVvid |
|---|---|---|
| 1:15 | 1:04 | 1:26 |
| 1:25 | 1:12 | 1:34 |
| 1:30 | 1:20 | 1:41 |
| 2:02 | 1:28 | 1:49 |
| 2:12 | 2:07 | 2:29 |
| 2:16 | 2:15 | 2:37 |
| 2:21 | 2:23 | 2:44 |
| 2:26 (partial) | 2:30 | 2:52 |
| 2:39 | 3:27 | 3:43 |
| 2:49 | 3:35 | 3:51 |
| 2:59 | 3:43 | 3:59 |
| 3:04 | 3:51 | 4:07 |
| 3:09 | 3:59 | |
| | 4:07 | |
| | 4:15 | |
| | 4:23 | |

As discussed in greater detail below, the phrase "dancing with a stranger" is heard four times in each chorus except for the first chorus of SS (where it is heard 3 times) and in the second (where there is a partial fifth iteration) and third chorus of SS and the last chorus, where the signature phrase is repeated to end the song. The phrase is heard four times during the interlude of JV (but not during the JVvid percussion interlude).

e) Melodic analysis
As can be seen in Example 1, these passages are nearly identical in melodic contour, rhythm, and metric placement and the pitch sequences are very similar.[5]

Example 1      signature phrases



---

[5] The most authoritative reference work on music in the English language, the *New Grove*, defines melody as "pitched sounds in musical time" and the *Oxford Companion to Music* describes it as the "interaction of rhythm and pitch." The *Harvard* and *Oxford* dictionaries of music further explain that, along with pitch, duration (rhythm) is an essential element in the formation and recognition of melodies.

While the pitch sequences are not identical, the identity of these passages is also defined by their identical lyrics, rhythmic durations, metric placement and structural significance. Both phrases begin with an anticipation of beat one with the syllable "dan-" and descend by regular eighth notes to the syllable "stran-" which is held for a full beat before resolving on a chord tone on the final syllable ("-ger"). One slight difference is that this resolution occurs a half beat later in JV.

f) Structural importance in chorus

Example 2 provides transcriptions of the choruses of both songs. The signature phrases and common chord changes are depicted in red. As can be seen, both choruses are based on a four-chord cycle. In both choruses the signature phrase appears four times in each within each four bars chorus (except for the first chorus of SS where it appears three times).

Example 2. Signature phrases in the choruses
Smith  1:55
JV      0:58
JVvid  1:20



**6.     Prior Art**

A search for other songs containing the words "dancing with a stranger" unearthed only a dozen songs that predate the songs at issue in this case. Most are obscure and written in entirely different styles and genres. In none of these songs is the phrase even remotely similar in melodic contour, pitch content and rhythm as these phrases in SS and JV are to each other. In many, the phrase occurs in isolation. The lyric figures importantly as a repeated structural motive (motif) in only three. As can be seen in example 3, in each of these three earlier songs the phrases are completely different from the phrases at issue in this case.

Example 3.  Prior art



**7.     Quantitative Analysis**

The signature phrase of the choruses provides the main theme of the choruses and appears thirteen times in SS, sixteen times in JV and twelve times in JVvid. In SS the choruses comprise a total of 1:45 of the 3:15 song (105 of 195 seconds) or 54%. In JV the phrase at issue provides the main theme of the choruses which, along with the four iterations in the interlude, account for 2:15 or approximately 56% of the four-minute song. In the video version of JV the choruses comprise 1:43 or approximately 40% of the total length of the song (4:16). The proportion of the song in which the choruses and other iterations appear in the deposit copy of JV (without the 40 second percussion interlude) is nearly the same as in SS. While the choruses are constructed around the signature phrases, these phrases are not present throughout the entire choruses, so the quantitative percentages could arguably be somewhat lower. The words "dancing with a stranger" also comprise a significant proportion of the lyrics in both songs (see Attachment 1).

Since these lyrics occupy the same musical space as the melodic themes, the percentages of the
lyrical similarities can be considered equal to those found in the melodic analysis.


## 8.      Qualitative Analysis

Calculating the amount of time that musical expression is present in a composition is at best a
crude measurement of the value of that expression to the overall song. Qualitative analysis
measures the importance of this musical expression to the larger work. In forensic musicology
the quantitative value is adjusted upward or downward according to its overall significance to the
composition. Qualitatively, these themes are the most important expression in each composition.
The lyrics reference the titles of both songs. In the popular music industry, it is an article of faith
that, to become successful, a song must have at least one "hook" or memorable passage. As the
title or signature phrases of each song, these distinctive phrases must be considered the "hooks"
or most valuable parts of the song. In both songs the phrases are the last music the listener hears.
In this case, because this expression is the most important in each song, the quantitative value
must be adjusted upward significantly. In fact, it is difficult to imagine either song existing
without these signature phrases.


## 9.      Conclusions

The musical expression at issue in this case is substantially similar and is significant both
quantitatively and qualitatively to each song. These signature phrases are distinctive and a prior
art search has uncovered no other songs as similar to these songs as they are to each other. None
of the earlier works exhibit the creative selection and arrangement of elements as originally
heard in JV and later appearing in SS.  Indeed, none of this prior art is even remotely similar to
these two songs. As discussed above, the phrases occur repeatedly in both JV and SS in
important places and contain the lyrics referencing the titles. Clearly, they form the most
valuable expression in these compositions.  Given the degree of similarity in these distinctive
passages and other details, I consider it extremely unlikely that SS was created independently
from JV.

As a preliminary inquiry, this report is not intended to be exhaustive, and I retain the right to
amend or supplement it should further information become available.


Respectfully submitted,

Alexander Stewart, Ph.D. LLC

Attachments
1)      Lyric comparison
2)      Alexander Stewart, Ph.D. Curriculum Vitae

**Attachment 1 Lyrics**

Dancing with a Stranger
Jordan Vincent

Verse I
That girl was on fire from the get go
Never had to let go
She said time passes so slow
Everything in slow mo
Over and over again
Over and over
Over and over
Over and over

Chorus
She said I'm gonna die
Dancing with a stranger
She said I'm gonna die
Dancing with a stranger
She said I'm gonna die
Dancing with a stranger
She said I'm gonna die
Dancing with a stranger

Verse II
Just one more time before I go home
Baby move me go go
It's a feeling that's how I know
Someday I'm gonna fly baby, Ooh

Chorus
She said I'm gonna die
Dancing with a stranger
She said I'm gonna die
Dancing with a stranger
She said I'm gonna die
Dancing with a stranger
She said I'm gonna die
Dancing with a stranger

Interlude
Dancing with a stranger
Dancing with a stranger
Dancing with a stranger
Dancing with a stranger

Dancing with a Stranger
Sam Smith

Verse I
I don't want to be alone tonight
It's pretty clear that I'm not over you
I'm still thinking 'bout the things you do
So I don't want to be alone tonight
Can you light the fire
I need somebody who can take control
I know exactly what I need to do
'Cause I don't want to be alone tonight,
alone tonight, alone tonight

Chorus
Look what you made me do
I'm with somebody new
Ooh, baby, baby I'm dancing with a stranger
Look what you made me do
I'm with somebody new
Ooh, baby, baby I'm dancing with a stranger
Dancing with a stranger

Verse II
I wasn't even going out tonight
But boy I need to get you off my mind
I know exactly what I have to do
I don't want to be alone tonight, alone
tonight, alone tonight

Chorus
Look what you made me do
I'm with somebody new
Ooh, baby, baby I'm
Dancing with a stranger
Look what you made me do
I'm with somebody new
Ooh, baby, baby I'm
Dancing with a stranger

Dancing with a stranger
Dancing with a stranger
Dancing, yeah, ooh

**Attachment 1 Lyrics**

Chorus
She said I'm gonna die
<mark>Dancing with a stranger</mark>
She said I'm gonna die
<mark>Dancing with a stranger</mark>
She said I'm gonna die
<mark>Dancing with a stranger</mark>
She said I'm gonna die
<mark>Dancing with a stranger</mark>

Chorus
Look what you made me do
I'm with somebody new
Ooh, baby, baby I'm
<mark>Dancing with a stranger</mark>
Look what you made me do
I'm with somebody new
Ooh, baby, baby I'm
<mark>Dancing with a stranger</mark>
<mark>Dancing with a stranger</mark>
<mark>Dancing with a stranger</mark>

# Alexander Stewart

Department of Music
University of Vermont
Burlington, VT 05405

E-mail: astewart@uvm.edu
Office: (802) 656-7766
Mobile: (802) 310-2009

---

## EDUCATION

GRADUATE CENTER: THE CITY UNIVERSITY OF NEW YORK
    Ph.D. in Music (Ethnomusicology Concentration), 2000
    Dissertation: *Composition and Performance in Contemporary New York City Big Bands (1989-1999)* Advisor: Stephen Blum

MANHATTAN SCHOOL OF MUSIC
    Master of Music, Jazz and Commercial, 1991

LONG ISLAND UNIVERSITY, C.W. POST
    B.F.A., *summa cum laude,* in Music Education, 1988

## TEACHING EXPERIENCE

UNIVERSITY OF VERMONT
    Professor, 2012-present
    Associate Professor, 2005-2012
    Assistant Professor, 1999-2005
    Jazz Studies Coordinator, 2003-present
    Director, Integrated Fine Arts Program, 2008-2012
    Director, Latin American Studies Program, Spring 2006; 2011-16

LONG ISLAND UNIVERSITY, C.W. POST
    Instructor in Music, 1988-1999
    Director of Jazz Studies

Additional courses at:
    The New School (Jazz and American Culture), 1995-1997
    John Jay College of CUNY (History of Jazz and Rock)**,** 1995

## COURSES TAUGHT

Jazz History
Jazz Improvisation I & II
World Music Cultures
Seminar in Ethnomusicology

Alex Stewart

Music Business & Copyright
Music Theory
Musical Avant-Gardes
Music of Cuba, Puerto Rico, and the Dominican Republic
Duke Ellington
Jazz Ensembles (Big Band and Combos)
Seminar in World Music (Honors College)
Music of Latin America and the Caribbean
Latin Jazz Summer Immersion
Culture and Politics of Latin American Protest Music (team taught with professors from Political
     Science, Romance Languages, and Global Studies)

## PUBLICATIONS

### Books

*Making the Scene: Contemporary New York City Big Band Jazz,* Berkeley: University of
California Press, 2007.

Spanish translation from the French and German: Hans Bodenmann, *El ABC de la Flauta Dulce.*
Zurich: Anton Peterer Music & Books, 2003 (Recorder method book).

### Forthcoming

 "Music, Media, and Anarchism in the 'Oaxaca Commune,'" In *Oxford Handbook of Protest
Music,* edited by Noriko Manabe and Eric Drott, New York: Oxford University Press [2021].

### Articles, Book Chapters, Reviews, Entries

"Been Caught Stealing": A Musicologist's Perspective on Unlicensed Sampling Disputes"
*University of Missouri Kansas City Law Review* 83(2): 340-61 (Winter 2014).

"Make It Funky: Fela Kuti, James Brown and the Invention of Afrobeat." *American Studies*
52(4) (2013): 99-118.

"*La chilena mexicana es peruana*: Multiculturalism, Regionalism, and Transnational Musical
Currents in the Hispanic Pacific." *Latin American Music Review/Revista de Música
Latinoamericana* 34(1) (Spring 2013) Austin: University of Texas Press.

"'Funky Drummer': New Orleans, James Brown and the Rhythmic Transformation of American
Popular Music." Reprinted in *Roots Music,* edited by Mark F. DeWitt. London: Ashgate, 2011
(originally published in *Popular Music* 19(3) October 2000 Cambridge University Press).

Review of Ben Ratliff, *Coltrane: The Story of a Sound*. *Jazz Perspectives* 2(1):103-109 (2008).

"Contemporary New York City Big Bands: Composition, Arranging, and Individuality in
Orchestral Jazz," *Ethnomusicology* 48(2) (Spring/Summer 2004): 169-202.

2

Alex Stewart

Review of *The New Grove Dictionary of Jazz* in *Ethnomusicology* 47(3) (Fall 2003):376-80.

"Second Line," *Encyclopedia of Popular Music of the World*. London: Cassell 2003.

Essay review of Lewis Porter, *John Coltrane: His Life and Music*. *Annual Review of Jazz Studies 11*, 2000-1 [2002]: 237-52.

"'Funky Drummer': New Orleans, James Brown and the Rhythmic Transformation of American Popular Music," *Popular Music* 19(3) (Winter 2000): 293-318.

Review of Scott DeVeaux, *The Birth of Bebop*. *Yearbook of Traditional Music* 30 (1998): 135-7.

## LECTURES, COLLOQUIA, CONFERENCE PAPERS

"Blurred Lines IV: Legal Considerations When Writing." Canadian Film Centre Slaight Music Residency Panel Talk. Toronto, Canada. May 27, 2021

"Melody, 'Beats,' and Minimalism: Copyright in Contemporary Popular Music." *Substantial Similarity and the Role of Forensic Musicology in Music Copyright Litigation*. American Musicological Society/Society for Music Theory Annual Meeting, Virtual Conference, Minneapolis, MN. November 15, 2020.

Silicon Flatirons Conference: *The Future of Copyright Infringement Analysis in Music*. Invited panelist and Speaker. March 5, 2020, Colorado Law, University of Colorado, Boulder, CO.

Composition, Jazz Improvisation, and Copyright," Jazz Educators Network (JEN) annual conference, New Orleans, January 8, 2020

"Blurred Lines III: Legal Considerations When Writing." Canadian Film Centre Slaight Music Residency Panel Talk. Toronto, Canada. August 7, 2019

"Blurred Lines II: Legal Considerations When Writing." Canadian Film Centre Slaight Music Residency Panel Talk. Toronto, Canada. August 13, 2018

"The Future of Sampling: Transformative Art or Copyright Infringement?" Alexander von Humboldt Institute for Internet and Society, Berlin, Germany. February 28, 2018.

"Blurred Lines: Legal Considerations When Writing." Canadian Film Centre Slaight Music Residency Panel Talk. Toronto, Canada. August 2, 2017

"Creativity and Copyright," Champlain College, November 11, 2015

Invited Keynote Speaker: Symposium on Hip Hop, Technology, and Copyright. Utah State University. (March 28, 2015).

"Make It Funky: Fela Kuti, James Brown and the Invention of Afrobeat." Annual Conference of the American Studies Association. Washington DC, November 23, 2013.

3

Alex Stewart

"Creativity and Copyright," Champlain College, October 25, 2013

"Lila Downs: Music, Culture, and Politics in Oaxaca, Mexico." Pre-Concert Lecture. Flynn Center for the Performing Arts. Burlington, VT. April 26, 2013.

"Music, Media, and Anarchism in the Oaxaca Commune" Paper presented at Music and War Panel. AMS/SEM/SMT Annual Conference. New Orleans. Nov. 2, 2012.

"*Pasos cromáticos en la improvisación del jazz* (Chromatic Passing Tones in Jazz Improvisation)." Lecture/workshop (in Spanish) at Instituto Projazz, Santiago, Chile. May 31, 2012.

 "Musicology CSI: Sampling, Interpolation, and Copyright." Thursdays at One Performance/Lecture Series, UVM Music Department.

"Music, Media, and Anarchism in the 'Oaxaca Commune,'" Presentation to University of Vermont Global Village, 15 February 2011.

"*Son de las barricadas*: Protest song and revolution on Oaxaca's Radio APPO." Paper read at the annual conference of Society for Ethnomusicology (SEM) in Los Angeles, CA, Nov. 2010.

"*Son mexicano*" OLLI (Osher Life Long Learning Institute). Pre-Concert Lecture Sones de México, Lane Series 8 October 2010.

"*Música popular* and the Ideology of *mestizaje* in Postrevolutionary Mexico." 1 October 2010, UVM Hispanic Forum.

Musicology CSI: Sampling, Interpolation, and Copyright." Invited lecture, State University of New York (SUNY) Albany, 28 April 2010.

"La Chilena Mexicana: Transnational Musical Currents in the Hispanic Pacific" Global and Regional Studies Lecture, 17 March 2010 Billings Marsh Lounge.

"Copyrights and Copywrongs: Introduction to Forensic Musicology" Invited lecture, State University of New York (SUNY) Plattsburgh, 11 March 2010.

FLYNNsights: Lecture on Charles Mingus opening the residency of the Mingus Repertory Ensembles (Mingus Dynasty, Mingus Orchestra, and Mingus Big Band along with dance troupe choreographed by Danny Buraczeski at the Flynn Center for the Performing Arts. 17 October 2010.

"Supergenre, genre, subgenre: Mexican *son* and the *chilena* complex."  Paper presented at the annual conference of the Society for Ethnomusicology (SEM) in Mexico City, November 2009.

"*Socialismo con pachanga*: Music in Revolutionary Cuba." Hispanic Forum, University of Vermont, 22 October 2009.

4

Alex Stewart

"Performing Race: Afro-Mexicans and Multiculturalism in Oaxaca's Guelaguetza." Paper presented at the Latin American Studies Association (LASA) XXVIII International Congress, "Rethinking Inequalities" Rio de Janeiro, Brazil, 12 June 2009.

*La chilena oaxaqueña: "El gusto de mi region*." Paper presented at the annual conference of the Sonneck Society for American Music (SAM), Denver, CO, 19-22 March 2009.

Insights FlynnArts. Pre-concert lecture on Maria Schneider and her Orchestra. 22 January 2009. Amy E. Tarrant Gallery at the Flynn Center for the Performing Arts.

"Performing Race: Afro-Mexicans and Multiculturalism in Oaxaca's Guelaguetza Festival." Paper presented at the annual meeting of the Society for Ethnomusicology (SEM), Wesleyan University, Middletown, CT, 28 October 2008.

"*La Danza de las Diablas*"? Race, Gender, and Local Identity in Afro-mestizo communities of Mexico's Costa Chica. Paper presented at the annual meeting of the Society for Ethnomusicology (SEM), Columbus, OH, 28 October 2007.

"*Son de las Barricadas*": Songs of Protest from the Spanish Civil War to the Present on Oaxaca's Radio APPO." Hispanic Forum, University of Vermont, 10 October 2007.

"Cross-Cultural Learning through Music and Dance: A UVM Class in Guantánamo, Cuba." Presentation to the UVM College of Arts and Sciences Advisory Board, April 2004.

"Beauty and the Beast: Maria Schneider's *Wyrgly*." Paper presented at special session of the joint meetings of Society for Music Theory (SMT) and the American Musicological Society (AMS), "Women in Jazz: Voices and Roles," Columbus, OH, 1 November 2002.

"On the Edge: Sue Mingus and the Mingus Big Band." Colloquium at the University of Illinois (Urbana and Champaign), 6 March 2002.

"*Blood on the Fields:* Wynton Marsalis and the Transformation of the Lincoln Center Jazz Orchestra." Paper read at the 2001 annual meeting of the Society for Ethnomusicology (SEM), Detroit, October 2001.

"The Jazz Concerto as Collaborative Work: Jim McNeely's 'Sticks.'" Paper read at the joint meeting of the Society for Music Theory (SMT) and other major music societies in Toronto, 4 November 2000.

"New York City Big Bands and the Professional Jazz Musician." Paper read at the annual meeting of the Society for Ethnomusicology (SEM) in Bloomington, IN, 24 October 1998.

"From Mardi Gras to Funk: Professor Longhair, James Brown and the Transformation of Rhythm and Blues." Paper read at joint meeting of the Society for Ethnomusicology (SEM) and the International Association for the Study of Popular Music (IASPM) in Pittsburgh, PA, October 1997.

Alex Stewart

## GRANTS AND AWARDS

Coor Collaborative Fellowship, Rethinking African Art. 2020-2021.

UVM Humanities Center Public Humanities Fellowship for sabbatical travel to Uganda. 2019.

International Travel Funds Award. College of Arts and Sciences. Travel to and residency in Uganda. Jazz Performance and Workshops; Research in Traditional Music. October and November 2019.

Interdisciplinary Experiential Engagement Award for course proposal, *Culture and Politics of Latin American Protest Music*, to be taught in collaboration with Political Science, Romance Languages, Global Studies, and Music Departments. January 2013.

Lattie F. Coor Award for International Travel to present paper and chair panel at the Society for Ethnomusicology conference (SEM) Mexico City. November 2009.

Joan Smith Faculty Research Support Award *Performing Race: Afro-Mexicans, Multiculturalism, and the "Black Pacific."*

Lattie F. Coor Award for International Travel to present paper at the Latin American  Studies Association (LASA) Congress in Rio de Janeiro, Brazil. June 2009.

Fulbright Research Fellowship to Mexico, Afro-Mexican music, 2006-7.

Award for Contribution to Vermont Jazz Education, presented by Wynton Marsalis and the Flynn Center for the Performing Arts, October 2005.

UVM Arts and Sciences Dean's Fund for Faculty Development (to initiate fieldwork in the Costa Chica of Mexico), Fall 2005.

UVM Humanities Center Research Grant, Spring 2004.

UVM Global Outreach Committee Grant, March 2003.

UVM Arts and Sciences Faculty Development Grant for study in Cuba, May 2002.

2001 Barry S. Brook Award for best dissertation in music CUNY.

CUNY Dissertation Year Fellowship 1998-1999.


## MUSIC COPYRIGHT & RELATED

Expert Report in Bridgeport Music, Inc. v. Dimension Films, 410 F.3d 792 (6th Cir. 2005). Case recognized as setting new "bright line" standard for use of samples of copyrighted recordings.

Alex Stewart

Testimony in trial in Federal District Court, Nashville TN, Case No. 3:01-780, Bridgeport Music v. Universal Music. February 2007. "Atomic Dog" and "D.O.G. in Me." Affirmed by US Sixth Circuit Court of Appeals, No. 07-5596, November 4 2009. Case examined issues concerning fragmented literal similarity, originality, and fair use.

Testimony in Federal District Court, Nashville, TN Case No. 3:01-0155 involving rap artist, the Notorious B.I.G and the Ohio Players. (March 2006). Affirmed by US Sixth Circuit Court of Appeals, No. 06-6294, October 17 2007.

Testimony by Deposition (for the Plaintiff), Case No. 1:09-cv-21597-DLG (Florida Southern District Court) Kernel Records Oy v. Timothy Z. Mosley p/k/a Timbaland, UMG Recordings, Inc, et al. New York City, May 27, 2010.

Testimony by Deposition (for the Defense), Case No. 37-2008-00098508-CU-BT CTL (California Southern District Court) Sixuvus v. Victor Willis, New York City, July 7, 2010.

Testimony by Deposition (Los Angeles, September 2011). Case No. 10-CV-08123 Phoenix Phenom v. William Adams, Jr. Stacy Ferguson, et. al.

Testimony by Deposition (New York City, January 2012). Case No. SACV10-1656JST(RZx) Pringle v. William Adams, Jr. Stacy Ferguson, et. al.

Testimony by Deposition (New York City, June 3, 21, 2013). Case No. CV12-5967 VMG Salsoul, LLC v. Madonna Ciccone, Shep Pettibone, et al.

Testimony by Deposition (New York City, September 11, 2013). 11-cv-6811. Marino v. Usher.

Testimony by Deposition (Burlington, VT, May 20, 2015). RALEIGH, NC #301280 Absent Element v. Daughtry.

Testimony by Deposition (Burlington, VT, May 17, 2016) and in Trial (June 17, 2016) Federal District Court, Los Angeles Case No. 15-cv-03462 RGK (AGRx). Skidmore v. Led Zeppelin, et al.

Testimony by Deposition (New York, NY, November 3, 2017) Supreme Court of the State of New York, Index No. 650427/2016. Pai v Blue Man Group Publishing, LLC, et al.

Testimony by Deposition (New York, NY, May 30, 2018) Griffin v. Sheeran. 1:17-cv-05221 New York Southern District Court

Testimony by Deposition (Burlington, VT, January 2, 2020). Beatbox Music Pty, Ltd. v. Labrador Entertainment, et al. Case No. 2:17-cv-6108. Central District of California.

Testimony by Deposition (Burlington, VT, May 27, 2020). Smith v. Tesfaye. Case No. 2:19-cv-02507-PA-MRWx Central District of California.

Alex Stewart

**Los Angeles**: Warner Bros. Entertainment Inc.; Hiscox Insurance Co.; Clair G. Burrill P.C.; Sheppard Mullin Richter & Hampton LLP; Doniger Burroughs, APC; Pen Music Group; Microhits; Robert S. Besser Law Offices; etc.

**New York**: BMG Group; Schwartz Ponterio & Levenson, PLLC; Grubman Shire & Meiselas, P.C.; Eisenberg Tanchum & Levy; Sample Clearance Limited; Lastrada Entertainment Company; etc.

**Nashville**: King and Ballow; Riser House Entertainment, LLC; DeSalvo Law Firm, PLLC; Beckett Law Office; etc.

**Elsewhere**: K & L Gates (London); Schwartz Cooper (Chicago); Brooks Pierce (Raleigh NC); Frank & Rice (Florida); Francis Alexander, LLC (Philadelphia); Rawson Merrigan & Litner (Boston); Koepple Traylor (New Orleans); JPMC (Burlington VT); Kile Goekjian McManus (Washington DC); Arent Fox LLP (Washington DC) Gould Law Group (Chicago); Richardson Patrick Westbrook & Brickman, LLC (Mt. Pleasant SC); Hall Booth Smith & Slover (Atlanta); Miller Canfield Paddock & Stone (Detroit); King Mesdag Music Publishing Limited (United Kingdom); as well as clients in Canada, Australia, Indonesia, Hong Kong, India, United Arab Emirates, Latin America and Europe.

Classes and seminars in Music Business and Copyright (see above for details)

Symposium on Music Copyright. University of Vermont, January 2003.


## SELECTED RECORDINGS

*Early Heroes, Dan Silverman*. Section playing and solo on Chares Mingus' *The Shoes of the Fisherman's Wife*…Around the Slide Recordings 02 (2018).

Rick Davies *Thugtet* – Tenor saxophone Emlyn Music EM 1003 (2017)

Rick Davies and Jazzismo, *Salsa Norteña*, - Tenor saxophone (Recorded in Montreal 2011 (2012).

New York Jazz Repertory Orchestra, *Le Jazz Hot*, featuring Dave Liebman and Vic Juris. Planet Arts 310976 - Baritone saxophone, bass clarinet (2009).

Rick Davies and Jazzismo, *Siempre Salsa*, featuring Wayne Gorbea. Emlyn Music EM1001 - Tenor saxophone (2006).

Anne Hampton Callaway, *To Ella with Love,* featuring Wynton Marsalis, Christian McBride, Lewis Nash, Cyrus Chestnut. Touchwood Records TWCD 2006 - Tenor saxophone and clarinet (1998).

Peter Herborn, *Large*, featuring Gene Jackson, Greg Osby, Robin Eubanks, and others. Jazzline JL1154-2 – Baritone saxophone and bass clarinet (1998).

Alex Stewart

Billy Stritch, *Waters of March: The Brazilian Album*. Sin Drome SD8950 - Tenor saxophone and flute (1998).

Dave Stryker, *Nomad*, featuring Randy Brecker and Steve Slagle. Steeplechase Records SCCD31371 - Baritone saxophone and bass clarinet  (1997).

Frankie Lane: *Wheels of a Dream*. Touchwood Records TWCD 2020 - Tenor saxophone, flute, and alto flute (1997).

The Bill Warfield Band, *The City Never Sleeps*.  Seabreeze Records CDSB 2048 - Baritone saxophone and bass clarinet (1996).


## SELECTED PERFORMANCES: JAZZ AND LATIN

***Burlington Discover Jazz Festival Big Band*** (Music Director, Contractor, Performer)

*Birth of the Cool: Music by the Miles Davis Nonet*. Featuring Ray Vega, trumpet. Performances in June 2012 (BDJF), and in September 2012 (UVM), and  May 2013 (SUNY Plattsburgh).

*Textures: Jim Hall with Brass featuring the Jim Hall Trio (Jim* Hall, guitar, Scott Colley, bass and Joey Baron, drums) with brass ensemble, Alex Stewart, conductor.  Flynn MainStage, 2010 Burlington Discover Jazz Festival.

*Paquito D'Rivera Funk Tango*. Produced, co-directed, and played saxophone in concert on Flynn MainStage with 17-piece orchestra with guests: Paquito D'Rivera, alto saxophone; Diego Urcola, trumpet; Alex Brown, piano; Massimo Biocalti, bass; Mark Walker, drums; and special guest Ray Vega, trumpet. Burlington Discover Jazz Festival (1 June 2008). Reviews in *Free Press*, AllAboutJazz, and other media.

*Mary Lou Williams Resurgence* with Cecilia Smith, vibraphone and Amina Claudine, piano, 2007 Burlington Discover Jazz Festival, Flynn Center.

*Music of Jim McNeely* with special guest Jim McNeely, piano 2006 Burlington Discover Jazz Festival, Flynn Center.

*Sketches of Spain: Celebrating the Miles Davis/Gil Evans Collaboration* with trumpeter Randy Brecker and guest conductor, Joe Muccioli 2005 Burlington Discover Jazz  Festival, Flynn Center.

*The Grand Wazoo: Music of Frank Zappa*, with Ernie Watts, Napoleon Murphy Brock, Ike Willis, and Ed Palermo 2004 Burlington Discover Jazz  Festival, Flynn Center.

*Duke Ellington Sacred Concert*, with David Berger, Priscilla Baskerville, Paul Broadnax, and 100-voice Choir, 2003 Burlington Discover Jazz Festival, Flynn Center

Alex Stewart

### Jazz and Latin

Solo Recital: Chasin' the 'Trane: Music of John Coltrane. UVM Southwick Recital Hall, Septenber 27, 2018.

Concert: Ray Vega & the Burlington Latin Jazz Orchestra, FlynnSpace, August 9, 2018.

Recital: Ray Vega & the Burlington Latin Jazz Orchestra, UVM Southwick Recital Hall, October 21, 2018.

Chasin' the Trane: Homage to John Coltrane, with Ray Vega, trumpet. Juniper, Hotel Vermont, 2018 Burlington Discover Jazz Festival June 7 and July 18, 2018.

Chasin' the Trane: Homage to John Coltrane, with Ray Vega, trumpet. Light Club Lamp Shop, Burlington VT, July 26, 2018

Performances of Alex Stewart Quartet on Jazz Wednesdays at Juniper (Hotel Vermont), Lamp Shop Light Club (some performances featured special guest Ray Vega, trumpet), 2018.

Featured soloist – SUNY Plattsburgh Jazz Festival December 2013.

James Harvey and Garuda – opening act for Randy Weston in Discover Jazz Festival (2004); numerous other performances around region.

Beboparaka (featuring poetry of Amiri Baraka) andJazzLit.com – jazz and poetry collaborations with UVM professors Major Jackson, Tina Escaja, John Gennari  and UVM students. Performances at the Discover Jazz Festival and local venues. Coverage in the *Burlington Free Press* and *Vermont Quarterly* (2005, 2006).

Grupo Sabor (Salsa and Merengue) – Performances in UVM's Grand Maple Ballroom and Brennan's Pub for Alianza Latina (2010), Higher Ground, Burlington; Red Square; Eclipse Theater, Waitsfield; Onteora Club, New York; Burlington Latino Festival (2001-present).

Performances with UVM jazz faculty (Jeff Salisbury, Joe Capps, Paul Asbell, Patricia Julien, Ray Vega, John Rivers, Tom Cleary, Rick Davies, Steve Ferraris) at recitals, concerts, and other events (1999-present).

The Lionel Hampton Orchestra; featured artists: Dizzy Gillespie, Dee Dee Bridgewater, and others. Extensive tours of Europe and North America and appearances at major jazz festivals including: North Sea, Nice, Montreal, Newport (NY and Saratoga), Biarritz (1989-1991).
The Bill Warfield Band, The Dorsey Brothers Orchestra, David Berger, Paquito D'Rivera, Clem DeRosa, Bobby Shew, David Liebman, Andy Farber, Stan Rubin, Lew Anderson, Billy Mitchell, Roland Hanna, Lew Soloff, Randy Brecker and many more (1985-1999).

The Lehigh Valley Repertory Jazz Orchestra: *Sketches of Spain* featuring Randy Brecker, *An Evening with David Liebman*, *A Tribute to Benny Goodman* featuring Buddy DeFranco, and *Celebrating Louis Armstrong* featuring Jon Faddis (1997-2000).

Alex Stewart

*Rick Davies  & Jazzismo*

Burlington Latin Jazz Orchestra, directed by Ray Vega, FlynnSpace, August 9, 2018

Featured Performer: Jazz Education Network Conference, San Diego, CA January 2015.

Workshops and concerts, Colectivo Central, Oaxaca, Mexico. June, July 2011.

With guest pianist/composer Arturo O'Farrill (and sons, Zachary, percussion and Adam, trumpet), FlynnSpace. 2010, 2011, 2012, 2013, 2014, 2015, 2017, 2017. With Jonathan Maldonado, drums, and Papo Ross, vocals and alto saxophone, 2009.

With guest artist Ray Vega, FlynnSpace (July 2003, 2004, 2005, 2006, 2007, 2008).

Appearances at SUNY Plattsburgh Jazz Festival (with Harvie S., 2002; with Chocolate Armenteros 2003; with Ray Vega 2008, 2011; with Curtis Fowlkes 2010 ); Red Square and other venues.

Oaxaca, Mexico: Colegio Teizcali, Colectivo Central, Spring 2007.


## SELECTED PERFORMANCES: POPULAR AND BLUES

Frankie Valli, Ray Charles (Sweden 1999), Mary Wells, Frankie Avalon (Atlantic City), The Drifters, Funk Filharmonik, The Funk Collection, Nick Apollo Forte, Little Wilson, Sandra Wright Band, Jimmy Branca and the Red Hot Instant Combo, Dave Grippo Funk Band, and others (1985-present).

Contractor, musical director. *Joan Rivers*. Flynn Center for the Performing Arts. April 26, 2012.

Orchestra contractor with Bernadette Peters at the Flynn Center of the Arts October 2011.


## CLINICS AND GUEST CONDUCTING

Guest Conductor, Connecticut Valley District Jazz Festival, January 30-31, 2015.

Guest Conductor, Winooski Valley Jazz Festival, February 4-5, 2010.

Adjudicator/Clinician, Vermont All-State Festival, International Association of Jazz Educators (IAJE): 2000-2003.

Guest Conductor, Nassau County (Long Island) All-County Jazz Festival, 1997.

11

Alex Stewart

## MEMBERSHIPS

American Musicological Society (AMS)

Society for Ethnomusicology (SEM)

Society for American Music (Sonneck)

Latin American Studies Association (LASA)

Friends of Indian Music and Dance (FIMD), Burlington VT

Burlington Discover Jazz Festival Advisory Board

EXHIBIT 3



United States Copyright Office

The Library has opened access to the reading rooms by appointment only. **More**. The Jefferson Building has reopened to visitors via timed, ticketed entry. **More**.

| Help | Search | History | Titles | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = dancing with a stranger
Search Results: Displaying 4 of 39 entries

◀ previous    next ▶

**Labeled View**

*Dancing With A Stranger.*

| | |
|---|---|
| **Type of Work:** | Music |
| **Registration Number / Date:** | PA0002260139 / 2020-08-21 |
| **Application Title:** | Dancing With A Stranger. |
| **Title:** | Dancing With A Stranger. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Jimmy Napes, Transfer: By written agreement. Address: street Unknown, city Unknown. |
| | EMI Music Publishing LTD, Transfer: By written agreement. Address: c/o Sony/ATV Music Publishing LLC, 424 Church Street, Suite 1200, Nashville, TN, 37219, United States. |
| | EMI Blackwood Music Inc., Transfer: By written agreement. Address: c/o Sony/ATV Music Publishing LLC, 424 Church Street, Suite 1200, Nashville, TN, 37219, United States. |
| | Songs Of NKH, Transfer: By written agreement. Address: c/o Sony/ATV Music Publishing LLC, 424 Church Street, Suite 1200, Nashville, TN, 37219, United States. |
| | Stellar Songs Limited, Transfer: By written agreement. Address: c/o Sony/ATV Music Publishing LLC, 424 Church Street, Suite 1200, Nashville, TN, 37219, United States. |
| | Naughty Words Limited, Transfer: By written agreement. Address: c/o Sony/ATV Music Publishing LLC, 424 Church Street, Suite 1200, Nashville, TN, 37219, United States. |
| **Date of Creation:** | 2019 |
| **Date of Publication:** | 2019-01-11 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Tor Hermansen; Domicile: United States; Citizenship: Norway. Authorship: music, lyrics. |
| | Mikkel Eriksen; Domicile: United States; Citizenship: Norway. Authorship: music, lyrics. |
| | Normani Kordei Hamilton; Domicile: United States; Citizenship: United States. Authorship: music, lyrics. |
| | Sam Smith; Domicile: United Kingdom; Citizenship: United Kingdom. Authorship: music, lyrics. |
| | Jimmy Napes; Domicile: United Kingdom; Citizenship: United Kingdom. Authorship: music, lyrics. |
| **Rights and Permissions:** | Zachary Culp, Sony/ATV Music Publishing LLC, Sony/ATV Music Publishing LLC, 424 Church Street, Suite 1200, Nashville, TN, 37219, United States, zachary.culp@sonyatv.com |
| **Names:** | Hermansen, Tor |
| | Eriksen, Mikkel |
| | Hamilton, Normani Kordei |
| | Smith, Sam |
| | Napes, Jimmy |
| | EMI Music Publishing LTD |
| | EMI Blackwood Music Inc. |
| | Songs Of NKH |
| | Stellar Songs Limited |
| | Naughty Words Limited |

◀ previous    next ▶



| **Save, Print and Email (Help Page)** | |
|---|---|
| Select Download Format | Full Record ▾   Format for Print/Save |
| Enter your email address: | _____ Email |

| Help | Search | History | Titles | Start Over |

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page



| | Help | Search | History | Titles | Start Over |

---

**Public Catalog**

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = dancing with a stranger
Search Results: Displaying 2 of 32 entries

previous    next

Labeled View

*DANCING WITH A STRANGER.*

| | |
|---|---|
| **Type of Work:** | Music |
| **Registration Number / Date:** | PA0002185007 / 2019-05-13 |
| **Application Title:** | DANCING WITH A STRANGER. |
| **Title:** | DANCING WITH A STRANGER. |
| **ISRC:** | GB-UM7-18-07386 |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | MIKKEL STORLEER ERIKSEN. Address: street UNKNOWN, city UNKNOWN.
| | NORMANI HAMILTON. Address: street UNKNOWN, city UNKNOWN
| | TOR ERIK HERMANSEN. Address: street UNKNOWN, city UNKNOWN.
| | SAMUEL FREDERICK SMITH. Address: street UNKNOWN, city UNKNOWN.
| | SALLI ISAAK SONGS LTD., Transfer: By written agreement. Address: C/O DOWNTOWN MUSIC PUBLISHING LLC, 485 BROADWAY FL 3, NEW YORK, NY, 10013, United States. |
| **Date of Creation:** | 2018 |
| **Date of Publication:** | 2019-01-11 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | MIKKEL STORLEER ERIKSEN; Domicile: not known; Citizenship: not known. Authorship: music, lyrics.
| | NORMANI HAMILTON; Citizenship: not known. Authorship: music, lyrics.
| | TOR ERIK HERMANSEN; Citizenship: not known. Authorship: music, lyrics.
| | JAMES JOHN NAPIER; Citizenship: not known. Authorship: music, lyrics.
| | SAMUEL FREDERICK SMITH; Citizenship: not known. Authorship: music, lyrics. |
| **Rights and Permissions:** | jbarnes@dmgroup.com |
| **Names:** | ERIKSEN, MIKKEL STORLEER
| | HAMILTON, NORMANI
| | HERMANSEN, TOR ERIK
| | NAPIER, JAMES JOHN
| | SMITH, SAMUEL FREDERICK
| | SALLI ISAAK SONGS LTD. |



previous    next

| **Save, Print and Email (Help Page)** |
|---|
| Select Download Format  Full Record ▼   Format for Print/Save |
| Enter your email address: [          ]  Email |

---

Help | Search | History | Titles | Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page



**Public Catalog**

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = dancing with a stranger
Search Results: Displaying 3 of 32 entries

| | previous | next | |

Labeled View

*Dancing With A Stranger.*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002182851 / 2019-04-02 |
| **Application Title:** | Dancing With A Stranger, Artist: Sam Smith / Normani, GBUV71801970 (eSingle Video) |
| **Title:** | Dancing With A Stranger. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Universal Music Operations Limited. Address: c/o Capitol Records / UMG Recordings, Inc., 2220 Colorado Ave., Santa Monica, CA, 90404, United States. |
| **Date of Creation:** | 2018 |
| **Date of Publication:** | 2019-01-27 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Universal Music Operations Limited, employer for hire; Domicile: United Kingdom. Authorship: entire motion picture. |
| **Pre-existing Material:** | Sound Recording: "Dancing With A Stranger" (00602577394140) |
| **Basis of Claim:** | Motion Picture. |
| **Rights and Permissions:** | Universal Music Group |
| **Names:** | Universal Music Operations Limited |

| | previous | next | |

| **Save, Print and Email (Help Page)** |
|---|
| Select Download Format [Full Record ▾] [Format for Print/Save] |
| Enter your email address: [ ] [Email] |

Help   Search   History   Titles   Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |  Copyright Office Home Page  |  Library of Congress Home Page

## DANCING WITH A STRANGER
Total Current ASCAP Share: 49.5%

ISWC: T9273291320
Work ID: 896612215

### Writers

| ASCAP controls 24.75% | PRO | IPI |
|---|---|---|
| ERIKSEN MIKKEL STORLEER | ASCAP | 233491970 |
| HAMILTON NORMANI KORDEI | BMI | 739089995 |
| HERMANSEN TOR ERIK | ASCAP | 258732246 |
| NAPIER JAMES JOHN | PRS | 567090532 |
| SMITH SAMUEL | PRS | 686735297 |

### Publishers

| ASCAP controls 24.75% | PRO | IPI |
|---|---|---|
| EMI MUSIC PUBLISHING LTD<br>Contact Info ⌄ | PRS | 87019563 |

Additional Non-ASCAP Publishers

### Performers

| | |
|---|---|
| JONAS DOORM | NORMANI SAM SMITH |
| RICK JAYSON FEAT. HOLLY LUTZ | SAM SMITH |
| SAM SMITH NORMANI | SAM SMITH-NORMANI |

### Alternate Titles

| | |
|---|---|
| DANCING WITH A STRANGER (ACOUSTIC) | DANCING WITH A STRANGER (FEAT. HOLLY LUTZ) [S |
| DANCING WITH A STRANGER (WITH NORMANI) | DANCING WITH A STRANGER (WITH NORMANI) - ACOU |
| DANCING WITH A STRANGER (WITH NORMANI) - CHEA | DANCING WITH A STRANGER - DANCE REMIX |



**BMI**

ABOUT  CREATORS  MUSIC USERS  NEWS  VIDEO  ADVOCACY

**SONGVIEW** ✔

A combined view of ASCAP and BMI musical works.

Title ⌄   | dancing with a stranger

Please ... ⌄ | Enter part or all of a name (optional)

SEARCH IN...  What is this?
○ Songview
● BMI Repertoire
○ 100% BMI Works

**Search**

NOW VIEWING...

## BMI Repertoire

**23 results found**

All 100% BMI works are considered reconciled, though some will not show a green check mark at this time as we continue to process our full repertoire through the Songview platform.

**Help**  **Print All**  **Expand All**

⭐ **DANCING WITH A STRANGER**  ⊗

◈ Reconciled  ?   | TOTAL % CONTROLLED WORK ID
| ASCAP   49.50%   896612215
| BMI     25.75%   29351750
| Other   24.75%

ISWC
T9273291320

### Writers / Composers

% CONTROLLED   BMI: 12.87%   ASCAP: 24.75%   OTHER: 12.38%

| WRITERS / COMPOSERS | CURRENT AFFILIATION | IPI # |
|---|---|---|
| ERIKSEN MIKKEL STORLEER | ASCAP | 00233491970 |
| HAMILTON NORMANI KORDEI | BMI | 00739089995 |
| HERMANSEN TOR ERIK | ASCAP | 00258732246 |
| NAPIER JAMES JOHN | PRS | 00567090532 |
| SMITH SAMUEL FREDERICK | PRS | 00686735199 |

### Performers

ALI BRUSTOFSKI
DSHARP
JONAS DOORM
NOAH JACOB
NORMANI
NORMANI SAM SMITH
PAGENTRI
RICK JAYSON FEAT HOLLY LUTZ
SAM SMITH
SAM SMITH AND NORMANI
SAM SMITH NORMANI
SAM SMITH WITH NORMANI
SAM SMITH-NORMANI

### Publishers

| % CONTROLLED | BMI: 12.88% | ASCAP: 24.75% | OTHER: 12.37% |

| PUBLISHERS | CURRENT AFFILIATION | IPI # |
|---|---|---|
| ▸ EMI BLACKWOOD MUSIC INC | BMI | 00223437493 |
| EMI MUSIC PUBLISHING LTD | PRS | 00087019563 |
| EMI APRIL MUSIC INC | ASCAP | 00128633767 |
| ▸ NAUGHTY WORDS LIMITED | NS | 00636398806 |
| ▾ SONY ATV SONGS LLC | BMI | 00187095633 |

SONY/ATV SONGS LLC
8 MUSIC SQUARE W
NASHVILLE, TN 37203-3204
(615) 726-8300
INFO@SONYATV.COM
HTTP://WWW.SONYATV.COM

[ View Catalog ]

| ▾ SONGS OF NKH | BMI | 00863691500 |

C/O EMI BLACKWOOD MUSIC INC
8 MUSIC SQ W
NASHVILLE, TN 37203-3204 INFO@SONYATV.COM
HTTP://WWW.EMIMUSICPUB.COM

[ View Catalog ]

| ▾ STELLAR SONGS LIMITED | BMI | 00633304676 |

C/O EMI BLACKWOOD MUSIC INC
8 MUSIC SQ W
NASHVILLE, TN 37203-3204 INFO@SONYATV.COM
HTTP://WWW.EMIMUSICPUB.COM

[ View Catalog ]

*Other Non-ASCAP and Non-BMI Publishers*

## Alternate Titles

*No Data Available*

⭐ BMI Award Winning Song                                        [ Print ]

### DANCING WITH A STRANGER                                    ⊕

WRITER / COMPOSER
FULKERSON RONDEL GREGG

### DANCING WITH A STRANGER                                    ⊕

WRITER / COMPOSER
KOSLOFF IRA
MYSELS GEORGE

### DANCING WITH A STRANGER                                    ⊕

WRITER / COMPOSER
WALKER CINDY

### DANCING WITH A STRANGER                                    ⊕

WRITER / COMPOSER
HILAL GEORGE ANTOINE

### DANCING WITH A STRANGER                                    ⊕

WRITER / COMPOSER
DE LUCA THOMAS GENNARO
NILE WILLIE

▼ **Digital Media 1**

| # | Title | Artist | Rating | Length |
|---|-------|--------|--------|--------|
| 1 | Dancing With a Stranger | Sam Smith & Normani | ★★★☆☆ | 2:51 |

    recording engineer: 👤 Mikkel S. Eriksen and 👤 Thomas Warren

    programming: 👤 Mikkel S. Eriksen and 👤 Tor Hermansen

    executive producer: 👤 Tim Blacksmith (of Tim & Danny Music) and 👤 Danny D (of Tim & Danny Music)

    producer: 👤 Jimmy Napes and 👤 Stargate (Norwegian production/songwriting duo)

    mixer: 👤 Kevin "KD" Davis (US producer/engineer "KD" Davis)

    guitar [guitar overdubbing]: 👤 Ben Jones (UK session multi-instrumentalist)

    instruments: 👤 Mikkel S. Eriksen and 👤 Tor Hermansen

    vocals: 👤 Normani Hamilton (Normani Kordei Hamilton, of Fifth Harmony) and 👤 Sam Smith (English singer and songwriter)

    phonographic copyright by: 📀 Universal Music Operations Limited (not for release label use! UK&IE subsidiary of UMG, legal name of Universal Music UK) (in 2019)

    executive produced for: 📀 Tim & Danny Music LLC

    produced for: 📀 45th & 3rd Music LLC

    recorded at: 📍 The Stellar House in 🌐 Venice, Los Angeles, California, 🇺🇸 United States

    mixed at: 📍 Pacifique Studios in 🌐 North Hollywood, Los Angeles, California, 🇺🇸 United States

    part of: ☰ Mediabase CHR/Top 40 Year-End 2019 (number: 5) and ☰ Billboard Year-End Hot 100 singles of 2019 (number: 14)

    recording of: 🎵 Dancing With a Stranger

        writer: 👤 James Napier, 👤 Mikkel S. Eriksen, 👤 Normani Hamilton (Normani Kordei Hamilton, of Fifth Harmony), 👤 Sam Smith (English singer and songwriter) and 👤 Tor Hermansen

        publisher: 📀 Downtown Music Publishing, 📀 EMI April Music Inc., 📀 Sony/ATV Music Publishing Ltd and 📀 Stellar Songs

EXHIBIT 4

# Comparison Video Between Plaintiff and Defendants' Music Videos

# PREVIOUSLY LODGED WITH THE COURT

EXHIBIT 5

# Music Video for Plaintiff's Song

# PREVIOUSLY LODGED WITH THE COURT

EXHIBIT 6

# Music Video for Defendants' Song

# PREVIOUSLY LODGED WITH THE COURT

EXHIBIT 7

# Plaintiff's Registered Deposit Copy Sound Recording

# TO BE LODGED WITH THE COURT

# EXHIBIT 8

**THIS INTERCOMPANY AGREEMENT (the "Agreement")** is entered into as of July 1, 2019 by and between the contracting parties detailed on Schedule 5 acting as Publisher and on Schedule 6 acting as Affiliate (the "Party" and "Parties").

**WHEREAS**

(1)     The Parties hereto now own, control or manage and will hereafter own, control or manage certain IPR's and are beneficiaries under IPR Agreements for territories throughout the world;

(2)     All previous arrangements excluding Long Term Agreements for the representation, administration and licensing of all such IPR's including but without limitation all rights to collect and receive income derived therefrom have expired and/or been terminated as of June 30, 2019; and

(3)     The Parties hereto wish to grant to each other rights in and to the IPR's within their control and to acquire licenses from the other to exercise such rights in certain territories on the terms and conditions set out in this Agreement.

**NOW IT IS HEREBY AGREED as follows:**

**1.     DEFINITIONS**

In this Agreement, the following terms have the respective meanings set out below, unless the context requires otherwise;

1.1     "Affiliate" means the Party, as the case may be, in that party's capacity as grantee of Intellectual Property Rights as detailed in Schedule 6 together with all the companies listed in Schedule 3, where applicable. Notwithstanding the foregoing the Schedule may be amended during the Term in writing between the Parties;

1.2     "SOLAR Digital Rights" shall mean

1.3     "Compositions" means the words and music of all musical composition;

1.4     "Cover Recording" means a second or subsequent recording of a Composition featuring the performance of or a production by a person other than the writer thereof;

1.5     "Digital Rights" means the right to issue licenses in respect of performing (making available) and/or reproduction rights for exploitation (streaming, downloading and/or otherwise) on the Internet or other means of online and/or mobile digital

4

delivery of the IPRs with or without any associated data such as text and/or still or moving visual images and shall include all digital transcriptions, duplications, encoding or any other method, now known or hereafter devised, which can now or may be used to duplicate, distribute, copy or perform publicly the said IPR via digital means including, but not limited to, streaming and/or downloading (as such terms are customarily used in the industry), ringtones, videos (user generated or otherwise), karaoke or otherwise and shall include distribution by means of automated retailing systems which use the Internet, the World Wide Web, any wireless satellite or mobile telephone transfer or electronic bulletin board services to distribute and/or sell music product or any similar means of distribution;

1.6     "EMI MP" shall mean all the companies detailed under EMI Music Publishing in Schedule 4;

1.7     "EMI SMP" shall mean all the companies detailed under EMI Songs in Schedule 4;

1.8     "EMI CAT" shall mean all the companies detailed under EMI Catalogue Partnership in Schedule 4;

1.9     "EMI VMP" shall mean all companies detailed under EMI Consortium (formerly known as EMI Virgin Music Publishing in Schedule 4;

1.10    "Gross Revenues"



1.11    "Intellectual Property Rights" or "IPR" means any intellectual property or associated rights, literary, artistic or musical materials, including, but not limited to Compositions and Master Recordings owned, controlled, administered or managed by the Publisher respectively directly or indirectly through a subsidiary or other affiliate and/or a third party at the commencement of the Term or so acquired (or re-acquired) by the Publisher as appropriate during the Term subject always to the termination of any rights therein by any IPR Holder by way of contract or otherwise or any rights flowing to the IPR Agreements excluding "Neighboring Rights" and "Library Music" as defined, respectively, in the following sentences.

"Neighbouring Rights" means those rights granted to a Publisher, pursuant to an agreement between a Publisher and a third party performer and/or master recording owner, to authorize the public performance via any and all means of recorded performances and/or master recordings and/or to receive remuneration in respect of the same.

"Library Music" means recorded music and musical compositions licensed to customers for use in film, television, radio and other media which is to be specifically exploited as production music.

1.12    "IPR Agreement" means the agreement between Publisher and the IPR Holder pursuant to which Publisher is granted Intellectual Property Rights;

1.13    "IPR Holders" means third party owners, recording artists, author(s) and/or composer(s) of Compositions and Master Recordings or parties that otherwise control rights granted to Publisher pursuant to an IPR Agreement;

1.14    "Licensed Territory" means the territory detailed on Schedule 6;

1.15    "Long Term Agreement" means IPR Agreements entered into on an arm's length basis which are not capable of being unilaterally terminated by the party granting rights in IPR's to the other party;

1.16    "Master Digital Rights" mean the Digital Rights for the IPR owned and/or controlled from time to time by the Publisher in respect to Master Recordings;

1.17    "Master Recording" means every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, or other means by which sounds, whether or not coupled with a visual image, may be reproduced, in either case whether now or hereafter known and is owned or controlled by Publisher which is used or useful in the recording, production and/or manufacture of records or for any other commercial exploitation;

1.18    "Master Rights" means those rights referred to in Schedule 2 hereto, but subject to clause 2.5 below;

1.19    "Publisher" means the Party, as the case may be, in that party's capacity as grantor of Intellectual Property Rights as detailed on Schedule 5 together with all the companies listed in Schedule 3. Notwithstanding the foregoing the Schedule may be amended during the Term in writing between the Parties;

1.20    "Sub-publishing Rights" means those rights referred to in the Schedule 1 hereto;

1.21    "Synchronization Rights" or "Synch Rights" means those rights referred to in the Schedule 1 (f) hereto;

1.22    "Term" means the period of

1.23    "Termination Date" means the effective date of the end of the Term in accordance with the terms of this Agreement;

1.24    "Third Party Licenses" means the agreements between Publisher and third parties whereas Publisher grants to third parties certain exploitation rights in the Intellectual Property Rights. Such Third Party Licensees include without limitation granted to collection societies;

1.25    In this Agreement, and its recitals and schedules, unless the context otherwise requires:

    1.25.1    reference to the singular includes a reference to the plural and vice versa;

    1.2.2    reference to any paragraph of the recitals, schedule, clause or sub-clause is to a paragraph of the recitals, schedule, clause or sub-clause (as the case may be) of or to this Agreement as the same may be amended, novated or supplemented from time to time;

    1.25.3    reference to any gender includes a reference to all other genders;

    1.25.4    references to persons in this Agreement include bodies corporate, unincorporated associations and partnerships and any reference to any party who is an individual is also deemed (where applicable) to include their respective legal personal representatives);

    1.25.5    the word "including" shall be construed as being by way of illustration only and shall not limit or prejudice the generality of any preceding word or words and accordingly the word "including" shall be read and construed as meaning "including but expressly without limitation";

    1.25.6    words following the word "other" or "otherwise" are not to be limited by any words preceding them; and

    1.25.7    references to any party shall, unless the context otherwise requires, include that party's lawful successors and permitted assigns.

1.26    Except to the extent that the context requires otherwise any reference in this Agreement to a "law" includes common or customary law and any constitution, decree, judgment, legislation, order, ordinance, regulation, statute, treaty or other legislative measure, in each case of any jurisdiction whatsoever (and "lawful" and "unlawful" shall be construed accordingly).

1.27    The recitals and the schedules to this Agreement form part of this Agreement and shall have the same force and effect as if expressly set out in the body of this Agreement. Accordingly, any reference to this Agreement shall include the body of this Agreement and its recitals and its schedules as amended, novated or supplemented from time to time.

## 2.    APPOINTMENT AND GRANT OF RIGHTS

2.1    Publisher grants to Affiliate all Sub Publishing Rights and Master Rights granted to Publisher under each applicable IPR Agreement (subject to all relevant Third Party Licensees) including, without limitation, the sole and exclusive right or as detailed in Schedule 6, during the Term, in the Licensed Territory subject to any limitations in the IPR Agreement and subject to Third Party Licenses, to administer, control, use, exploit, and otherwise deal in and license the IPR, all of which Affiliate hereby agrees to do in accordance with prevailing business practices in the music publishing industry on the terms and conditions set forth in this Agreement.

2.2    Publisher grants to Affiliate during the Term in respect of the rights set out in clause 2.1 above the exclusive right to collect all monies earned prior to the commencement of the Term but not yet paid with respect to the exploitation of the IPR in Publisher's catalogue.

2.3    All grants of rights herein made are subject to any and all restrictions and reservations that may govern the use of such rights contained in the applicable IPR Agreement provided that the Affiliate shall have received notice of such restrictions and reservations. In the event that any rights shall require the consent or approval of any third party prior to the use in question being licensed Publisher will take all necessary steps to obtain such consent or approval and if the same is not forthcoming the use in question will not be licensed provided that notice of the requirement to obtain approval or consent shall have been given in writing.

2.4    To the extent that any grant or assignment of the rights expressed to be granted and assigned hereunder is subject to a legal restriction or a condition then until such restriction is lifted or condition satisfied, the Affiliate shall in all respects possible be beneficially entitled to the benefit of IPR Agreements and Third Party Licenses notwithstanding that the legal entitlements pursuant to such agreements shall remain with the Publishers.

2.5    **Restrictions to Grant of Rights**

The Affiliate (and, where applicable, its licensees and sub-licensees) shall not, without the consent of the Publisher:

2.5.1    license the IPR for use in motion pictures, television films, TV series, and/or in    other audiovisual productions, videogrammes, radio ads, TV spots, any other kind of commercials and other original works to which the IPR may be incorporated and originating in the Licensed Territory, except as covered by any blanket licensing, collective licensing or statutory licensing regime or scheme relating to the broadcast or reproduction of Compositions or Master Recordings;

2.5.2    release a Master Recording where the dealer price is less than ▮▮▮ of the published price to dealers or wholesale price of the recording concerned in the country in question a so called "budget record" or "mid-price record"

8

until such time as the Publisher has itself released such Master Recording as a budget record or mid-price records (as applicable);

2.5.3 edit, mix, remix, remaster or otherwise alter a Master Recording;

2.5.4 re-sequence or otherwise change the content of any Master Recording from the version of such Master Recording released by Publisher;

2.5.5 couple a Master Recording with other recordings for release on any compilation records;

2.5.6 authorize the exploitation of Master Recording by way of a direct sale of a record to a consumer by a third party record club [redacted] a so called "*club sale*"; or

2.5.7 produce any promotional video, "long form" video or other audiovisual work.

## 3. TERM

3.1 The prior arrangements between the Publishers and Affiliates excluding Long Term Agreements shall be deemed expired and/or terminated as of June 30, 2019.

3.2 Each Publisher shall be able to terminate their participation in this Agreement by giving written notice to Affiliate of its intention to terminate as set forth in clause 1.23.

3.3 On the Termination Date all rights assigned or otherwise granted to Affiliate in the IPR will automatically revert to Publisher and Affiliate will have no rights in and to the IPR thereafter or to any monies earned or payable in respect of such IPR after the Termination Date.

3.4 As soon as practically possible after the Termination Date Affiliate will execute or cause to be executed such documents as Publisher deems necessary to affect the re-assignment or expiry or termination of all rights held by Affiliate in the IPR.

## 4. SPECIAL CONDITIONS

4.1 For the countries of Australia and New Zealand, [redacted]

4.2.1 For the country of Colombia, [redacted]

4.2.2   Subject to the provisions in 4.2.1,

4.3   For the country of France,

4.4

## 5.   ROYALTIES

5.1   Sub Publishing Royalties

5.1.1   Mechanical royalties paid in respect of the IPR shall be divided as follows:

(i)

5.1.2

5.1.3

5.1.4

5.1.5

5.1.6  Affiliate also agrees to pay:
(i)

(ii)

5.1.7

(i)

(ii)

5.2     Master Royalties

5.2.1

5.2.2

5.3

5.4

**6.    ROYALTY ACCOUNTING**

6.1

6.2

6.3

**7.    COPYRIGHT PROTECTION**

7.1

Affiliate agrees that it will (where necessary for the legal protection of the copyright) register the copyright in each IPR licensed to Affiliate hereunder and will register the IPR with all applicable collection agencies.

7.2

7.3

## 8. NOTICES

Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by personal delivery, registered or certified mail or telegraph (prepaid), at the addresses detailed below, or such other address or addresses as may be designated by either party and marked for the attention of the Managing Director with separate courtesy copies sent simultaneously for the attention of the Company Secretary and the Director of Legal & Business Affairs at the same address.

TO PUBLISHER:    The address shown on Schedule 5.

TO AFFILIATE:    The address shown on Schedule 6.

Notices shall be deemed given when mailed or when transmitted by telegraph, except that notice of change of address shall be effective only from the date of its receipt.

## 9. OBLIGATIONS OF AFFILIATE

9.1    Affiliate shall use all reasonable endeavors to exploit the IPR in the Licensed Territory for the benefit of Publisher and all third parties connected with them.

9.2    Affiliate shall use all reasonable endeavors to collect promptly all royalties and fees from exploitation of the IPR and shall remit to Publisher Publisher's share thereof at the next accounting date pursuant to the terms hereof.

## 10. MISCELLANEOUS

10.1    This agreement contains the entire understanding of the Parties relating to its subject matter. No change or termination of this agreement will be binding upon either party unless it is made by an instrument signed by an officer of that party. A waiver by either party of any provision of this agreement in any instance shall not be deemed to waive it for the future. All remedies, rights, undertakings, and obligations contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, or obligation of either party. The captions of the Articles in this agreement are included for convenience only and will not affect the interpretation of any provision.

10.2    Publisher may assign its rights under this agreement in whole or in part.

10.3    Neither party shall be entitled to recover damages by reason of any breach by the other party of its material obligations hereunder, unless such other party has failed to remedy such breach within a reasonable time following receipt of notice thereof.

10.4    THIS AGREEMENT HAS BEEN ENTERED INTO IN THE STATE OF NEW

YORK, AND THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAWS PRINCIPLES UNDER NEW YORK LAW). THE NEW YORK COURTS (STATE AND FEDERAL), ONLY, WILL HAVE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY WILL BE BROUGHT IN THOSE COURTS, IN NEW YORK COUNTY, AND NOT ELSEWHERE. THE PARTIES WAIVE ANY AND ALL OBJECTIONS TO VENUE IN THOSE COURTS AND HEREBY SUBMIT TO THE JURISDICTION OF THOSE COURTS. ANY PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY, AMONG OTHER METHODS, BE SERVED BY DELIVERING IT OR MAILING IT, BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESSES DETAILED IN CLAUSE 8 OR SUCH OTHER ADDRESS AS EITHER PARTY MAY DESIGNATE PURSUANT TO CLAUSE 8. ANY SUCH DELIVERY OR MAIL SERVICE SHALL BE DEEMED TO HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE WITHIN THE STATE OF NEW YORK.

10.5.1 This agreement shall not become effective until executed by all proposed Parties hereto.

**AS WITNESS** the hands of the Parties the day and year first above written.

SIGNED by: _____
For and on behalf of
**Sony/ATV Music Publishing (Hong Kong)**
(duly authorised for each company listed under Hong Kong in Schedule 3)


SIGNED by: _____
For and on behalf of
**Sony/ATV Music Publishing (Hong Kong) – Korea Branch**
(duly authorised for each company listed under Korea in Schedule 3)


SIGNED by: _____
For and on behalf of
**Sony Music Publishing Sdn Bhd**
(duly authorised for each company listed under Malaysia in Schedule 3)


SIGNED by: _____
For and on behalf of
**Sony Music Publishing (Pte.) Limited**
(duly authorised for each company listed under Singapore in Schedule 3)


SIGNED by: _____
For and on behalf of
**Sony Music Publishing (Pte.) Limited, Taiwan Branch**
(duly authorised for each company listed under Taiwan in Schedule 3)


SIGNED by: _____
For and on behalf of
**Sony Music Publishing (Japan) Inc.**
(duly authorised for each company listed under Japan in Schedule 3)

**AS WITNESS** the hands of the Parties the day and year first above written.


SIGNED by:_____
For and on behalf of
**Sony/ATV Music Publishing (Hong Kong)**
(duly authorised for each company listed under Hong Kong in Schedule 3)


SIGNED by:_____
For and on behalf of
**Sony/ATV Music Publishing (Hong Kong) - Korea Branch**
(duly authorised for each company listed under Korea in Schedule 3)


SIGNED by:_____
For and on behalf of
**Sony Music Publishing Sdn Bhd**
(duly authorised for each company listed under Malaysia in Schedule 3)


SIGNED by:_____
For and on behalf of
**Sony Music Publishing (Pte.) Limited**
(duly authorised for each company listed under Singapore in Schedule 3)


SIGNED by:_____
For and on behalf of
**Sony Music Publishing (Pte.) Limited, Taiwan Branch**
(duly authorised for each company listed under Taiwan in Schedule 3)


SIGNED by: *Charles Milent*
For and on behalf of
**Sony Music Publishing (Japan) Inc.**
(duly authorised for each company listed under Japan in Schedule 3)


17

SIGNED by:
For and on behalf of
**SM Publishing Argentina S.R.L**
(duly authorised for each company listed under Argentina in Schedule 3)


SIGNED by:
For and on behalf of
**SM Publishing (Brazil) Edicoes Musicas Limitada**
(duly authorised for each company listed under Brazil in Schedule 3)


SIGNED by:
For and on behalf of
**Editorial SM Publishing Chile Limitada**
(duly authorised for each company listed under Chile in Schedule 3)


SIGNED by:
For and on behalf of
**SAMP Colombia Limitada**
(duly authorised for each company listed under Colombia, Costa Rica and Venezuela in Schedule 3)


SIGNED by:
For and on behalf of
**Sony DADC Mexico S.A. de C.V**
(duly authorised for each company listed under Mexico in Schedule 3)

SIGNED by:
For and on behalf of
**EMI Music Publishing (Belgium) BVBA**
(duly authorised for each company listed under Belgium in Schedule 3)

SIGNED by:
For and on behalf of
**Sony/ATV Music Publishing B.V.**
(duly authorised for each company listed under Netherlands in Schedule 3)

SIGNED by:
For and on behalf of
**EMI Music Publishing Services Holland B.V.**
(duly authorised)

SIGNED by:
For and on behalf of
**Sony/ATV Music Publishing (Belgium) BV**
(duly authorised)

SIGNED by:
For and on behalf of
**EMI Music Publishing Services Belgium BVBA**
(duly authorised)

SIGNED by:
For and on behalf of
**SM Publishing (France) SAS**
(duly authorised for each company listed under France in Schedule 3)

SIGNED by: _____
For and on behalf of
**SMPG Publishing Germany GmbH**
(duly authorised for each company listed under Germany in Schedule 3)


SIGNED by: _____
For and on behalf of
**SM Publishing (Italy) S.R.L.**
(duly authorised for each company listed under Italy in Schedule 3)


SIGNED by: _Anna Leskovska_
For and on behalf of
**SM Publishing (Poland) Sp. Z.o.o.**
(duly authorised for each company listed under Poland, Czech Republic and Hungary in Schedule 3)


SIGNED by: _____
For and on behalf of
**EMI Music Publishing Portugal Ediçoes Musicais Lda**
(duly authorised for each company listed under Portugal in Schedule 3)


SIGNED by: _____
For and on behalf of
**SM Publishing (Iberia) S.R.L.**
(duly authorised for each company listed under Spain in Schedule 3)


SIGNED by: _____
For and on behalf of
**SM Publishing Scandinavia AB**
(duly authorised for each company listed under Sweden, Denmark, Finland and Norway in Schedule 3)

SIGNED by: _____
For and on behalf of
**Sony/ATV Music Publishing (Australia) Pty Limited**
(duly authorised for each company listed under Australia in Schedule 3)

SIGNED by: _____
For and on behalf of
**SM Publishing South Africa (Proprietary) Limited**
(duly authorised for each company listed under South Africa in Schedule 3)

SIGNED by: _____
For and on behalf of
**SM Publishing (UK) Limited**
(duly authorised for each company listed under United Kingdom in Schedule 3)

SIGNED by: _____
For and on behalf of
**Sony/ATV Music Publishing Europe Limited**
(duly authorised for each company listed under Europe in Schedule 3)

SIGNED by: _____
For and on behalf of
**Sony/ATV Music Publishing (Canada) Incorporated**
(duly authorised for each company listed under Canada in Schedule 3)

SIGNED by: _____
For and on behalf of
**Sony/ATV Music Publishing LLC**
(duly authorised for each company listed under United States of America, China, Greece
and India in Schedule 3)

SIGNED by:_____
For and on behalf of
**Sony/ATV Music Publishing (Australia) Pty Limited**
(duly authorised for each company listed under Australia in Schedule 3)

SIGNED by:_____
For and on behalf of
**SM Publishing South Africa (Proprietary) Limited**
(duly authorised for each company listed under South Africa in Schedule 3)

SIGNED by:_____
For and on behalf of
**SM Publishing (UK) Limited**
(duly authorised for each company listed under United Kingdom in Schedule 3)

SIGNED by:_____
For and on behalf of
**Sony/ATV Music Publishing Europe Limited**
(duly authorised for each company listed under Europe in Schedule 3)

SIGNED by:_____
For and on behalf of
**Sony/ATV Music Publishing (Canada) Incorporated**
(duly authorised for each company listed under Canada in Schedule 3)

SIGNED by:_____
For and on behalf of
**Sony/ATV Music Publishing LLC**
(duly authorised for each company listed under United States of America, China, Greece and India in Schedule 3)

## SCHEDULE 1

## SUB PUBLISHING RIGHTS

Sub-publishing Rights subject always to the same being available and to clause 2.3 of this Agreement all rights of copyright and related rights in each of the Compositions whether now known or in the future created owned, controlled, administered or managed by the Publisher for the Licensed Territory, including all vested and contingent rights of whatever nature including but without limitation the rights specified below:

(a)     The exclusive rights to use and license mechanical and electrical transcriptions (including in audiovisual devices for home use) of the Compositions for sale to, and use by, the general public in the Licensed Territory and to collect the royalties and fees to become payable from the sale thereof in the Licensed Territory.

(b)     The exclusive right to perform publicly and license public performance of the Compositions in the Licensed Territory and to collect royalties and fees payable by reason thereof. The exclusive right in the Licensed Territory to license and to broadcast and transmit by air, cable, satellite, wire and wireless the Compositions and to make the Compositions available by any other means.

(c)     The exclusive right to print, reproduce and multiply copies of the Compositions and to publish distributes and sell same in the Licensed Territory.

(d)     The exclusive right in the Licensed Territory to make any and all arrangements and adaptations of any and/or all of the Compositions of any kind and nature, to procure any lyric thereto or a translation of the original lyrics thereof, or of any new lyric thereto, to change the title thereof, and to do every other act and thing in respect of any and/or all of the Compositions to make the same suitable and proper for publication in the Licensed Territory.

(e)     The exclusive right to use and allow others to use in the Licensed Territory the name(s), image(s), likeness(es) and biographical material concerning any and all songwriter(s) of Compositions for advertising and trade purposes in connection with the Compositions (whether or not such Compositions are modified in whole or in part) and in advertising and publicity for Affiliate.

(f)     The non-exclusive right to authorize the non-exclusive use in the Licensed Territory of the Compositions in theatrical motion pictures, television films, TV series, and/or in        other audiovisual productions, videogrammes, radio ads, TV spots, any other kind of commercials and other original works to which the Compositions may be incorporated and originating in the Licensed Territory.

## SCHEDULE 2

## MASTER RIGHTS

Without limiting the generality of the grant of rights in clause 2 of this Agreement Affiliate shall have the exclusive rights, throughout the Licensed Territory:

(a)   to manufacture records, in any form and by any method now or hereafter known, derived from such Master Recordings;

(b)   to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing;

(c)   to reproduce, adapt, transmit, distribute, import, authorise the rental of, communicate, make available (including but not limited to by means of Digital Rights) and otherwise use such Master Recordings in any medium and in any manner;

(d)   to perform publicly, exhibit, display publicly, communicate, broadcast or to permit the public performance, exhibition, display, broadcast or communication of the Master Recordings by means of radio broadcast, cable transmission, satellite transmission, television broadcast, Digital Rights or any other method now or hereafter known, and to collect any income relating to such performance, exhibition, display, broadcast or communication in the Licensed Territory; and

(e)   the exclusive right to reproduce, print, publish, and disseminate in any medium, the names, portraits, pictures, and likenesses of each artist whose performance is contained in, and all other persons performing services in connection with the Master Recordings made therefrom, and biographical material concerning them, as news or information, for purposes of trade and for advertising purposes, provided that the Publisher has furnished to the Affiliate for such use or that Publisher has approved the same for such use.

(f)   the non-exclusive right to authorize the non-exclusive use in the Licensed Territory of the IPR in theatrical motion pictures, television films, TV series, and/or in other audiovisual productions, videogrammes, radio ads, TV spots, any other kind of commercials and other original works to which the IPR may be incorporated and originating in the Licensed Territory.

## SCHEDULE 3
## COMPANIES IN EACH TERRITORY

**ARGENTINA**

**AUSTRALIA**

**BELGIUM**

**BRAZIL**

**CANADA**

**CHINA**

**CHILE**

**COLOMBIA**

**COSTA RICA**

## SCHEDULE 3 - COMPANIES IN EACH TERRITORY continued

**CZECH REPUBLIC**

**DENMARK**

**FINLAND**

**FRANCE**

**GERMANY**

**GREECE**

## SCHEDULE 3 - COMPANIES IN EACH TERRITORY continued

**HONG KONG**

**HUNGARY**

**INDIA**

**ITALY**

**JAPAN**

**KOREA**

**MALAYSIA**

**MEXICO**

**NETHERLANDS**

## SCHEDULE 3 - COMPANIES IN EACH TERRITORY continued

**NORWAY**

**POLAND**

**PORTUGAL**

**SINGAPORE**

**SOUTH AFRICA**

**SPAIN**

**SCANDINAVIA**

**TAIWAN**

## SCHEDULE 3 - COMPANIES IN EACH TERRITORY continued

**UNITED KINGDOM**

Sony/ATV Music Publishing (UK) Limited

EMI Music Publishing Limited

## SCHEDULE 3 – COMPANIES IN EACH TERRITORY
**UNITED KINGDOM continued**

**EUROPE**

**UNITED STATES OF AMERICA**
**Sony/ATV Music Publishing LLC**      **(Main company)**

EMI Blackwood Music Inc.

## SCHEDULE 3 - COMPANIES IN EACH TERRITORY
### UNITED STATES OF AMERICA continued

EMI April Music Inc.

## SCHEDULE 3 - COMPANIES IN EACH TERRITORY
**UNITED STATES OF AMERICA continued**

**VENEZUELA**

## SCHEDULE 4
## COMPANIES PER CATALOGUE

**EMI MUSIC PUBLISHING list of Companies ("EMI MP")**

**SCHEDULE 4**
**EMI MUSIC PUBLISHING list of Companies ("EMI MP") continued**

**SCHEDULE 4**
**EMI MUSIC PUBLISHING list of Companies ("EMI MP") continued**

**SCHEDULE 4**
**EMI MUSIC PUBLISHING list of Companies ("EMI MP") continued**

**SCHEDULE 4**
**EMI MUSIC PUBLISHING list of Companies ("EMI MP") continued**

**SCHEDULE 4**
**EMI CATALOGUE PARTNERSHIP List of Companies ("EMI CAT")**

SCHEDULE 5  - <u>CONTRACTING PARTY AS **PUBLISHER**</u>

| Country | Main Publisher Company (see relevant territory in Schedule 3 for all companies identified as Publisher) | Registered Address | Territory Granted | Currency |
|---|---|---|---|---|
| Argentina | | | | ARS $ |
| Australia | | | | AUD $ |
| Belgium | | | | EUR € |
| Belgium | | | | EUR € |
| Brazil | | | | BRL R$ |
| Canada | | | | CAN $ |
| Chile | | | | CLP $ |

| Colombia | COP $ |
| France | EUR € |
| Germany | EUR € |
| Hong Kong | HKD HK$ |
| Italy | EUR € |
| Japan | YEN ¥ |
| Korea | KRW ₩ |

| Malaysia | | MYR RM |
| Mexico | | MXN $ |
| Netherlands | | EUR € |
| Poland | | PLN zł |
| Singapore | | SGD S$ |
| South Africa | | ZAR R |
| Spain | | EUR € |
| Sweden | | EUR € |
| Taiwan | | TWD NT$ |

| | | | | GBP £ |
|---|---|---|---|---|
| United Kingdom | SM Publishing (UK) Limited | 30 Golden Square, London W1F 9LD | WORLD excluding The United Kingdom (incl. Isle of Man, Channel Islands), Eire (Republic of Ireland), Anguilla, Ascension Island, Bahamas, Bermuda, British Antarctic Territory, British Indian Ocean Territory, British Virgin Islands, Cayman Islands, Cyprus, Falkland Islands, Gibraltar, Malta, Pitcairn Islands, South Georgia, South Sandwich Islands, St. Helena, Tristan da Cunha, Turks and Caicos Islands, Montserrat, Antigua and Barbuda, Barbados, Central and Southern Line Islands, Dominica, Grenada, Guyana, Jamaica, Redonda, St. Kitts-Nevis, St. Lucia, St. Vincent, Trinidad and Tobago and other countries, territories and islands not listed elsewhere in this Annex. | |
| UK (Europe) | | | | GBP £ |
| United States of America | Sony/ATV Music Publishing LLC | a Delaware Limited Liability Company, with its principal place of business at 550 Madison Avenue, New York, New York 10022, United States of America | WORLD excluding The United States of America (incl. its territories, dependencies and possessions), Guam, U.S. Virgin Islands, Puerto-Rico, Greece, Belize, China<br><br>With effect from 1 January 2020 the territories of India, Nepal, Bangladesh, Afghanistan, Bhutan, Maldives, Pakistan and Sri Lanka are included in the above exclusion list | US $ |

SCHEDULE 6   - <u>CONTRACTING PARTY AS **AFFILIATE**</u>

Rights granted are either - Exclusive, Non Exclusive or Not Included

| Country | Main Affiliate Company (see relevant territory in Schedule 3 for all companies identified as Affiliates, where applicable) | Registered Address | Licensed Territory | Rights Granted to Affiliates | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Sub Publishing Rights - Schedule 1 (a) to (e) And Master Rights - Schedule 2 | Synch Rights – Schedule1 (f) | SOLAR Digital Rights | Master Digital Rights |
| Argentina | | | | | | | |
| Australia | | | | | | | |
| Belgium | | | | | | | |

| Belgium | |
| Belgium (Synch) | |
| Brazil | |
| Canada | |
| Chile | |
| Colombia | |

| France |  |
|--------|--|
| Germany | |
| Hong Kong | |
| Italy | |
| Japan | |
| Korea | |

| Malaysia | |
| Mexico | |
| Netherlands | |
| Netherlands (Synch) | |
| Poland | |
| Singapore | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| South Africa | | | | | | | |
| Spain | | | | | | | |
| Sweden | | | | | | | |
| Taiwan | | | | | | | |
| United Kingdom | SM Publishing (UK) Limited | 30 Golden Square, London W1F 9LD | The United Kingdom (incl. Isle of Man, Channel Islands), Eire (Republic of Ireland), Anguilla, Ascension Island, Bahamas, Bermuda, British Antarctic Territory, British Indian Ocean Territory, British Virgin Islands, Cayman Islands, Cyprus, Falkland Islands, Gibraltar, Malta, Pitcairn Islands, South Georgia, South Sandwich Islands, St. Helena, Tristan da Cunha, Turks and Caicos Islands, Montserrat, Antigua and Barbuda, Barbados, Central and Southern Line Islands, Dominica, Grenada, Guyana, Jamaica, Redonda, St. Kitts-Nevis, St. Lucia, St. Vincent, Trinidad and Tobago and other countries, territories and islands not listed elsewhere in this Annex. | Exclusive | Non-Exclusive | Not Included | Non-Exclusive |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| UK (Europe) | | | | | | | |
| United States of America | Sony/ATV Music Publishing LLC | a Delaware Limited Liability Company, with its principal place of business at 550 Madison Avenue, New York, New York 10022, United States of America | The United States of America (incl. its territories, dependencies and possessions), Guam, U.S. Virgin Islands, Puerto-Rico, Greece, Belize, China; and <br><br> With effect from 1 January 2020 the territories of India, Nepal, Bangladesh, Afghanistan, Bhutan, Maldives, Pakistan and Sri Lanka are included. | Exclusive | Non-Exclusive | Non-Exclusive | Non-Exclusive for territory of World |

EXHIBIT 9

 



### Sam Smith, Normani - Dancing With A Stranger (Official Music Video)

 **SAM SMITH** 
16.2M subscribers
Subscribe

 3.3M  |  Share

755,870,648 views  Jan 29, 2019   #SamSmith #DancingWithAStranger #Normani
The official 'Dancing With A Stranger' music video.

'Gloria', the album - out now: http://samsmith.world/GloriaID

Unholy (ft. Kim Petras) out now: http://samsmith.world/UnholyID

Listen to Sam Smith's Complete Collection here:
http://samsmith.world/CatalogueID

Stay up to date with Sam Smith music, tours and exclusives here: http://samsmith.world/RegisterID

Follow Sam Smith
Website http://samsmith.world/WebsiteID
Facebook http://samsmith.world/FacebookID
Instagram http://samsmith.world/InstagramID
Twitter http://samsmith.world/TwitterID
TikTok http://samsmith.world/TikTokID

Directed by Vaughan Arnell
Produced by Sue Caldwell

I don't want to be alone tonight
It's pretty clear that I'm not over you
I'm still thinking 'bout the things you do
So I don't want to be alone tonight

Can you light the fire
I need somebody who can take control
I know exactly what I need to do
Cos I don't want to be alone tonight, alone tonight, alone tonight

Look what you made me do



☰  ▶ YouTube                                                                    🔍  🎤  📷  🔔

I'm with somebody new
Ooh, baby, baby I'm dancing with a stranger
Dancing with a stranger

I wasn't even going out tonight
But boy I need to get you off my mind
I know exactly what I have to do
I don't want to be alone tonight, alone tonight, alone tonight

Look what you made me do
I'm with somebody new
Ooh, baby, baby I'm dancing with a stranger
Look what you made me do
I'm with somebody new
Ooh, baby, baby I'm dancing with a stranger
Dancing with a stranger
Dancing with a stranger
Dancing, yeah

Look what you made me do
I'm with somebody new
I'm dancing with a stranger
Look what you made me do
I'm with somebody new
Ooh, baby, baby I'm dancing with a stranger
Dancing with a stranger

Listen to Sam Smith's Complete Collection here: http://samsmith.world/CatalogueID
Follow Sam Smith:
http://samsmithworld.com
http://facebook.com/samsmithworld
http://instagram.com/samsmith
http://twitter.com/samsmith

http://instagram.com/normani
http://twitter.com/normani
http://facebook.com/normanikordei/

#SamSmith #Normani #DancingWithAStranger

## Music

| SONG | Dancing With A Stranger |
|------|------------------------|
| ARTIST | Sam Smith, Normani |
| ALBUM | Dancing With A Stranger |
| LICENSES | UMG (on behalf of Capitol); LatinAutor - SonyATV, LatinAutor, UNIAO BRASILEIRA DE EDITORAS DE MUSICA - UBEM, CMRRA, LatinAutorPerf, ASCAP, BMI - Broadcast Music Inc., Concord CSPAC, Sony Music Publishing, SOLAR Music Rights Management, and 12 Music Rights Societies |

**Get YouTube Premium**

| 🎵  Music | > |
|-----------|---|

Show less

SAM SMITH - Event Tickets  ⓘ



SPACE OMITTED



3/21/23, 5:53 PM    Sam Smith & Normani's Dancing With a Stranger Lyrics | Billboard | Billboard
Case 2:22-cv-01508-WLH-AS   Document 114   Filed 03/21/23   Page 146 of 157   Page ID
#:3208

**billboard**

**billboard**

LYRICS                                                                 03/21/2019

# Here Are the Lyrics to Sam Smith & Normani's 'Dancing With a Stranger'

Sam Smith has another hit track he can add to his collection. The 26-year-old from London's latest song, "Dancing With A Stranger," is an R&B-influenced pop number featuring Fifth Harmony member...

By Michael Silver



Sam Smith and Normani's "Dancing With a Stranger" M...

Sam Smith and Normani's "Dancing With a Stranger" video has made its debut via Apple M...



Listen to this article

youtube.com/watch?v=Q2V85b0aCbc&ab_channel=LUSAINT-Topic



Search



ACOUSTIC

## Dancing with a Stranger (Acoustic)

 Lusaint Music ♪
26.3K subscribers

Subscribe

👍 246  👎  ↗ Share  ⬇ Download  ✂ Clip  ⊞+ Save  ⋯

22,004 views  Feb 6, 2019
Provided to YouTube by The state51 Conspiracy

Dancing with a Stranger (Acoustic) · Lusaint

Dancing with a Stranger

℗ 2019 Tristar Records

Released on: 2019-02-04

Music  Publisher: Downtown Music Publishing Llc
Music  Publisher: Downtown Music Uk Limited
Composer: James John Napier
Composer: Mikkel Storleer Eriksen
Music  Publisher: Salli Isaak Songs Ltd
Composer: Samuel Frederick Smith
Composer: Tor Erik Hermansen

Auto-generated by YouTube.

[Sam Smith (/music/sam-smith)](/music/sam-smith) and [Normani (/music/normani-kordei)](/music/normani-kordei) have a hit on their hands. The UK singer and Fifth Harmony member's "Dancing With a Stranger" R&B-influenced pop number. The song finds Smith and [Normani (https://www.billboard.com/t/normani/)](https://www.billboard.com/t/normani/) reminiscing about the difficulties of juggling their personal life with being on tour months at a time.



**+ EXPLORE**

**[(/artist/sam-smith)](/artist/sam-smith)**

**Sam Smith [(/artist/sam-smith)](/artist/sam-smith)**

**SEE LATEST VIDEOS, CHARTS AND NEWS**

The two artists crossed paths while recording in adjacent studios, and a connection was instantly formed. The song is currently riding high on the Billboard Hot 100.

Check out the full lyrics and video for the song below.

Hmm, hmm

I don't wanna be alone tonight
It's pretty clear that I'm not over you
I'm still thinking 'bout the things you do
So I don't want to be alone tonight, alone tonight, alone tonight
Can you light the fire?
I need somebody who can take control
I know exactly what I need to do
'Cause I don't wanna be alone tonight, alone tonight, alone tonight

Look what you made me do, I'm with somebody new
Ooh, baby, baby, I'm dancing with a stranger
Look what you made me do, I'm with somebody new
Ooh, baby, baby, I'm dancing with a stranger
Dancing with a stranger

I wasn't even goin' out tonight

But, boy, I need to get you off of my mind

I know exactly what I have to do

I don't wanna be alone tonight, alone tonight, alone tonight


Look what you made me do, I'm with somebody new

Ooh, baby, baby, I'm dancing with a stranger

Look what you made me do, I'm with somebody new

Ooh, baby, baby, I'm dancing with a stranger

Dancing with a stranger

Dancing with a stranger

Dancing, yeah, ooh


Look what you made me do (ooh), I'm with somebody new

Ooh, baby, baby, I'm dancing with a stranger

Look what you made me do, I'm with somebody new

Ooh, baby, baby, I'm dancing with a stranger

I'm dancing, I'm dancing (ooh)

I'm dancing, I'm dancing (dancing with a stranger)

I'm dancing, I'm dancing (dancing with a stranger)

I'm dancing, I'm dancing (dancing with a stranger)


*Lyrics licensed & provided by LyricFind (http://www.lyricfind.com)*

*Lyrics © Sony/ATV Music Publishing LLC, Downtown Music Publishing*

*Written by: James John Napier, Mikkel Storleer Eriksen, Normani Kordei Hamilton, Samuel Frederick Smith, Tor Erik Hermansen*

EXHIBIT 10





# SAM SMITH & NORMANI ANNOUNCE "DANCING WITH A STRANGER" OUT JANUARY 11

JAN 4 2019

**SAM SMITH & NORMANI ANNOUNCE "DANCING WITH A STRANGER" OUT JANUARY 11th**

**Sam Smith & Normani** announce their joint single **"Dancing With A Stranger,"** to be released worldwide via Capitol Records on Friday, January 11th. Presave link to download/stream the single here.

"Dancing With a Stranger" is a smooth slice of sultry, R'n'B influenced pop where Sam and Normani's vocals effortlessly glide over the production. The collaboration between the two came about through a chance encounter at the studio in LA as Sam was writing with pop legends Stargate and Jimmy Napes, Normani was in the studio next door and with both artists being long-term fans of each other it was a no-brainer for her to team up with Sam to create the new single"

Sam Smith has spent the past year travelling around the world on tour in support of his sophomore album, *The Thrill Of It All*, which debuted at No. 1 on the *Billboard* 200 and also topped the charts in the U.K, Ireland, New Zealand, Norway, Sweden, the Netherlands and Belgium. *Rolling Stone* awarded *The Thrill Of It All* four stars and hailed Smith as "one of the mightiest, most expressive singers of his generation." "Dancing With a Stranger" is the first new music from Sam Smith in 2019 and follows on from his global hit with Calvin Harris "Promises" which stormed the charts last summer. Since the release of his 2014 debut album, *In The Lonely Hour*, Smith has sold over 17 million album equivalent units worldwide. He has won four GRAMMY awards, an Oscar, a Golden Globe, three Billboard Music Awards and three BRIT Awards, among others.

On the new single Sam Smith says, "I'm so excited for everyone to hear "Dancing With a Stranger," which I wrote on *The Thrill Of It All* tour last year. For me it bottles everything I was feeling whilst juggling my personal life and touring. It is also such a beautiful moment for me as I'm a huge, huge fan of Normani and everything she is. I'm so excited to watch her light shine. I hope everyone enjoys hearing this song as much as I do."

Normani launched her solo career last year with her debut solo single "Love Lies" with Khalid. "Love Lies" soared to #1 at Top 40 Radio in the US and was the first single Normani released following her global success with multi-platinum group Fifth Harmony. Since then, she has gone on to release a number of new tracks including two tracks with Calvin Harris and her recent single, "Waves" feat. 6LACK. In addition to working with Calvin Harris, Khalid, and 6LACK, Normani has also recently collaborated with Quavo and Kehlani. Normani is currently working on her debut solo album and this March will see her join Ariana Grande on the North American leg of The Sweetener World tour.

Normani explains about the collaboration, "I'm truly blessed having the opportunity to create with one of the greatest vocalists of this decade. I think about the artists that I frequently listen to daily and Sam Smith has definitely been one of them for some time now. I never thought in a trillion years that I would be able to state that I have a record with this extremely gifted being. I'm super proud to share this song with Sam and cannot wait for the rest of the world to experience it – from the first moment that I heard the song I knew how special it was. I'm deeply in love with this body of work and I hope that you all will be too. I'm so thankful that Sam put his trust in me to help him bring this song to life. To my fans, thank you for all of your continued support. I love y'all!!! I pray you guys enjoy this."

**Follow Sam Smith**: FACEBOOK **|** TWITTER **|** INSTAGRAM
**Follow Normani**: FACEBOOK **|** INSTAGRAM **|** TWITTER

FOLLOW 

 NEWSLETTER SIGN UP

© 2023 CAPITOL
TERMS
DO NOT SELL MY PERSONAL INFORMATION
STORE TERMS
CONTACT US
FAQ
PRIVACY



HOME      ARTISTS      NEWS      MUSIC      VIDEOS      STORE



EXHIBIT 11

# Dancing with a Stranger

by

JAMES NAPIER, SAM SMITH, MIKKEL STORLEER ERIKSEN,
TOR ERIK HERMANSEN and NORMANI KORDEI HAMILTON

Published Under License From

Sony/ATV Music Publishing

© 2018 Salli Isaak Songs Ltd, Songs Of NKH, Stellar Songs Limited, EMI Blackwood Music Inc and Naughty Words Limited
Downtown Music UK Limited, EMI Music Publishing Ltd and Sony/ATV Music Publishing (UK) Ltd
All Rights Reserved

Available at *Musicnotes.com*
search for: **MN0192585**

NOTICE: Purchasers of this musical file are entitled to use it for their personal enjoyment and musical fulfillment.
However, any duplication, adaptation, arranging and/or transmission of this copyrighted music requires the written
consent of the copyright owner(s) and of Musicnotes.com. Unauthorized uses are infringements of the copyright
laws of the United States and other countries and may subject the user to civil and/or criminal penalties.

# Dancing With A Stranger

Words and Music by James Napier, Sam Smith,
Mikkel Eriksen, Tor Erik Hermansen and Normani Hamilton



© 2018 Salli Isaak Songs Ltd, Songs Of NKH, Stellar Songs Limited, EMI Blackwood Music Inc, and Naughty Words Limited
Downtown Music UK Limited, EMI Music Publishing Ltd, and Sony/ATV Music Publishing (UK) Ltd
All Rights Reserved