1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUND AND COLOR, LLC,

          Plaintiff,

v.

SAMUEL SMITH, et al.,

          Defendants.

Case No. 2:22-cv-01508-WLH-AS

**ORDER RE DEFENDANTS'
MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION
[120], DEFENDANTS' MOTION TO
DISMISS CLAIM FOR VICARIOUS
LIABILITY FOR FAILURE TO
STATE A CLAIM [122] AND
DEFENDANTS' MOTION TO
BIFURCATE DISCOVERY [174]**

     The Court is in receipt of Defendants Naughty Words Limited ("NW"), Sony Music Publishing (UK) Limited ("SMP UK") and EMI Music Publishing Limited's ("EMI UK") (collectively, the "UK Defendants") Motion to Dismiss due to Lack of Personal Jurisdiction (the "PJ MTD"). (PJ MTD, Docket No. 120). The Court is also in receipt of all Defendants' Motion to Dismiss the Claim for Vicarious Copyright Infringement for Failure to State a Claim (the "12(b)(6) MTD," together with the PJ MTD, the "MTD Motions"). (12(b)(6) MTD, Docket No. 122). Finally, the Court is also in receipt of all Defendants' Motion to Bifurcate Discovery (the "MTB"). (MTB, Docket No. 174). No party filed a written request for oral argument stating that an attorney with five years or less of experience would be arguing the matter. (*See*

Standing Order, Docket No. 140 at 16).  Further, pursuant to Federal Rule of Civil Procedure 78 and Local Rule 7-15, the Court finds this matter appropriate for decision without oral argument.  The hearing calendared for September 5, 2025, is **VACATED**, and the matter is taken off calendar.  For the reasons explained herein, the Court **GRANTS** the PJ MTD – thereby dismissing the UK Defendants with prejudice – **GRANTS** the 12(b)(6) MTD – thereby dismissing the claim for vicarious liability with prejudice – and **GRANTS** the MTB – thereby bifurcating liability and damages discovery.

## I.    BACKGROUND

### A.    Factual Background

Plaintiff Sound and Color, LLC ("Plaintiff") brings this action for copyright infringement and vicarious copyright infringement related to Defendants' 2019 song *Dancing with a Stranger* (the "Infringing Song"), which is alleged to infringe on Plaintiff's song by the same name (the "Song").  (*See* Sec. Am. Compl. ("SAC"), Docket No. 114).  Defendants include Samuel Smith ("Smith"), Normani Hamilton ("Hamilton"), Mikkel Storleer Eriksen ("Eriksen"), Tor Erik Hermansen ("Hermansen"), Stargate,[1] Tim & Danny Music LLC ("TDM"), 45th & 3rd Music LLC ("45th & 3rd"), Universal Music Group ("UMG"), UMG Recordings Inc. ("UMG Recordings"), Universal Music Operations Limited ("UMO"), Sony Corporation of America ("Sony Corp."), Sony/ATV Music Publishing LLC ("SMP LLC"), Sony/ATV Music Publishing Limited ("SMP UK"), Sony/ATV Songs LLC ("SAS LLC"), EMI Music Publishing Limited ("EMI UK"), EMI April Music Inc. ("EMI AMI"), EMI Blackwood Music Inc. ("EMI BMI"), Downtown Music Publishing LLC ("DMP"), Naughty Words Limited ("NW") and Songs of NKH ("NKH").  (*Id.*).

The pertinent, factual background is detailed in the Court's prior Order (the "MTD Order"), in which it granted Defendants' prior motions to dismiss targeting the

---

[1] Stargate "is a production due composed of [] Eriksen and [] Hermansen."  (SAC ¶ 121).

First Amended Complaint (the "FAC"). (MTD Order, Docket No. 102 at 2-4). To the extent possible, therefore, the Court only includes those allegations newly added to the Second Amended Complaint (the "SAC"). (SAC, Docket No. 114).

Many of Plaintiff's newly added allegations pertain to what conduct purportedly amounts to direct copyright infringement and which Defendants participated in such conduct. (SAC ¶¶ 80-96). The Court begins by examining the allegations as to the Defendants alleged to have created the Infringing Song (the "Creator Defendants"). According to Plaintiff's allegations, Defendants Smith, Hamilton, Napier, Eriksen, Hermansen and Stargate are the authors of the Infringing Song, and Defendants TDM and 45th & 3rd are the executive producer and producer, respectively, of the Infringing Song. (*Id.*). According to Plaintiff's allegations, the Creator Defendants are "directly liable for copyright [infringement] as they participated in copying Plaintiff's work." (*Id.* ¶ 80).

Turning to the Defendants alleged to license the Infringing Song (the "Licensing Defendants"), Plaintiff avers that, according to information on "the streaming services[,]" this group includes UMG, UMG Recordings and SMP LLC, (*Id*. ¶ 84), as well as NKH, EMI BMI, NW, DMP, EMI UK and SMP UK, according to "the sheet music[.]"[2] (*Id.* ¶ 85). Plaintiff alleges that the Licensing Defendants are liable for direct copyright infringement "in that they licensed the [Infringing Song] to be performed and reproduced without authorization by Plaintiff." (*Id.* ¶ 86). Plaintiff contends that "if such licensing is not direct [copyright] infringement, then it is alleged to be vicarious [copyright] infringement (because Defendants are receiving monies as a result of the infringement[] and have the ability as the licensor to stop the infringement but are not doing so." (*Id.* ¶ 87).

---

[2] This group also allegedly includes Salli Isaak Songs Limited ("SIS") and Stellar Songs Limited ("SSL"), who have not appeared in this action. SIS is the "publishing entity for Defendant Napier," and SSL is "a publishing entity for Stargate, Eriksen, and Hermansen." (SAC ¶¶ 183, 237).

Finally, as to the administering and publishing Defendants (the "AP

Defendants"), Plaintiff alleges that this group includes SMP LLC, NKH, EMI BMI,

NW, DMP, EMI UK and SMP UK.[3]  (*Id.* ¶¶ 88, 91-92).  Plaintiff alleges that the AP

Defendants are liable for direct copyright infringement "in that they promoted the

exploitation of the [Infringing Song][] and collected royalties for the performance and

reproduction of the work." (*Id.* ¶ 93).  Plaintiff contends that "if such administration

and publishing is not direct infringement, then it is alleged to be vicarious

infringement (because Defendants are receiving monies as a result of the

infringement[] and have the ability as the licensor to stop the infringement but are not

doing so)." (*Id.* ¶ 94).[4]

Plaintiff also added allegations regarding the Sony Intercompany Agreement

(the "SIA").  Plaintiff attached a redacted version of the SIA as Exhibit 8[5] to the SAC,

which the Court therefore considers to be part of the SAC.[6]  *See Durning v. First*

*Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987) (finding documents attached to the

complaint to be part of the complaint).  Plaintiff alleges that "Sony has an

intercompany agreement whereby its divisions or subsidiaries in particular territories

will administer and exploit a copyright *in their territory* on behalf of publishers or

---

[3] This group also allegedly includes SIS and SSL.

[4] The Court notes that certain Defendants are not mentioned in these new allegations
at all, including UMO, Sony Corp., SAS LLC and EMI AMI.  Throughout the SAC,
however, all four of these entities are described identically as "own[ing] and/or
publish[ing] and/or administer[ing]" the Infringing Song. (*See* SAC ¶¶ 197-98, 276-
77, 270, 272-73, 169-72).  For the sake of this Order, the Court presumes them to be
both Licensing and AP Defendants (or Non-Creator Defendants, as explained further
below).

[5] The SIA is not attached as a *separate* exhibit but rather is embedded within the same
document as the SAC.  For convenience, the Court will refer to Exhibit 8's page
numbers, which run from 4 to 48, when referring directly to the SIA, and will include
section numbers where relevant.

[6] The FAC contained no references to the SIA.  The SIA was discussed, however, in
the MTD Order, as Defendants referred to it in declarations submitted in support of
their motion to dismiss for lack of personal jurisdiction. (*See* MTD Order at 17-18,
20, 24).

subsidiaries." (SAC ¶ 66) (emphasis added).  Defendants to whom the SIA "explicitly applies" – as they are signatories – are allegedly Defendants SMP LLC, SMP UK, EMI UK, EMI AMI and EMI BMI (the "Sony Defendants").  (*Id.* ¶ 75).  Schedule 3 of the SIA provides the companies bound by the SIA in each territory.  (SAC, Ex. 8 at 25-32).  As is relevant to this action, the companies in the United Kingdom include SMP UK and EMI UK.  (*Id.* at 29).  The companies in the United States include SMP LLC – noted as the "main company" – EMI BMI and EMI AMI.  (*Id.* at 30-31).

The SIA governs the "parties detailed on Schedule 5 acting as Publisher and on Schedule 6 acting as Affiliate."  (SAC, Ex. 8 at 4).  "Publisher" is defined as "grantor of Intellectual Property Rights [("IPRs")] as detailed on Schedule 5 together with all the companies listed in Schedule 3."  (*Id.* at 6 § 1.19).  Publishers are granted IPRs pursuant to IPR Agreements with the IPR Holders – which are the recording artists, authors, composers and "parties that otherwise control rights granted to Publisher[s]." (*Id.* at 6 §§ 1.12-13).  "Affiliate" is defined as "grantee of [IPRs] as detailed in Schedule 6 together with all the companies listed in Schedule 3, where applicable." (*Id.* at 4 § 1.1).

The SIA's Appointment and Grant of Rights states that "Publisher grants to Affiliate" the rights granted to Publisher "under each applicable IPR Agreement."  (*Id.* at 8 § 2.1).  This includes the "sole and exclusive right . . . to administer, control, use exploit and otherwise deal in and license the IPRs" within the Affiliate's licensed territory (the "Licensed Territory"), which is established in Schedule 6.  (*Id.* at 8 § 2.1).  Schedule 6 lists the "Main Affiliate" for each country.  (*Id.* at 43-48).  As is relevant to this Order, the Main Affiliate for the United Kingdom is SMP UK, and its Licensed Territory includes the United Kingdom, Anguilla, Ireland, Ascension Islands, Bahamas and other such UK territories.  (*Id.* at 47).  The United States is *not* included in SMP UK's Licensed Territory.  The Main Affiliate for the United States is SMP LLC, and its Licensed Territory includes the United States, Guam, U.S. Virgin

Islands, Puerto-Rico, Greece, Belize and China.[7]  (*Id.* at 48).  Affiliates are obliged to "use all reasonable endeavors to exploit the IPR *in the Licensed Territory . . .*"  (*Id.* at 14 § 9.1) (emphasis added).

Schedule 5 lists the Main Publisher Company for each country, as well as the territory granted.  (*Id.* at 39-42).  As is relevant to this Order, the Main Publisher Company for the United Kingdom is SMP UK, and the Main Publisher Company for the United States is SMP LLC.  (*Id.* at 42).  For SMP UK, its territory granted as a Publisher includes the "world, excluding" SMP UK's Licensed Territory.  (*Id.*).  For SMP LLC, its territory granted as a Publisher includes the "world, excluding" SMP LLC's Licensed Territory. (*Id.*).  In other words, Schedule 5 suggests that SMP UK as a Publisher may enter into IPR Agreements with IPR Holders from around the world, with the exception of IPR Holders from SMP UK's Licensed Territory, and SMP LLC as a Publisher may enter into IPR Agreements with IPR Holders from around the world, with the exception of IPR Holders from SMP LLC's Licensed Territory.[8]

## B.    Procedural Background

The pertinent, procedural background is detailed in the Court's Order granting Defendants' motion for summary judgment (the "MSJ Order"), which the Court incorporates by reference.  (*See* MSJ Order, Docket No. 146 at 1-2).  The Court, therefore, only details the procedural history – as is relevant to the Motions before the Court – since the date of the MSJ Order on September 6, 2023.

On October 6, 2023, Plaintiff filed a notice of appeal as to the grant of summary judgment in Defendants' favor.  (Notice of Appeal, Docket No. 156).  On April 16, 2024, Plaintiff filed a first amended notice of appeal.  (First Am. Notice of Appeal, Docket No. 169).  On April 29, 2025, the Ninth Circuit issued its Memorandum,

---

[7] As of January 1, 2020, the Licensed Territory for SMP LLC also includes India, Nepal, Bangladesh, Afghanistan, Bhutan, Maldives, Pakistan and Sri Lanka.  (*Id.*).
[8] The Court suspects that this is because where SMP UK and SMP LLC each act as both the Publisher *and* the Affiliate for their Licensed Territory, they cannot transfer IPRs *to themselves* as Affiliates when acting as Publisher.

6

reversing and remanding the action. (Mem., Docket No. 170). On June 30, 2025, the Ninth Circuit issued its Mandate. (Mandate, Docket No. 171).

On July 8, 2025, the Court issued an order setting a status conference for August 1, 2025, and requesting a joint statement from the parties (the "Parties") as to their views on "what steps, if any, must be taken prior to any trial, as well as a proposed schedule." (Order re Ninth Circuit Mem. & Mandate, Docket No. 172). On July 21, 2025, the parties filed a joint statement. (Joint Statement, Docket No. 173). The parties indicated that "an initial step on remand" would be for the Court to rule on the two MTD Motions now before the Court, which had been taken under submission on August 21, 2023, prior to the Court's ruling on the motion for summary judgment. (*Id.* at 1-2). The MTD Motions are fully briefed.[9]

On July 25, 2025, Defendants filed the MTB, seeking to bifurcate discovery into a liability phase and a damages phase. (*See* MTB). The Motion is also fully briefed.

## II.    DISCUSSION

Before the Court are the PJ MTD, brought by the UK Defendants – which includes Defendants SMP UK and EMI UK (collectively, the "UK Publisher Defendants" or the "UK Publishers"), as well as Defendant NW – and the 12(b)(6) MTD, brought by all Defendants. The Court begins with the PJ MTD before turning to the 12(b)(6) MTD, which exclusively targets the claim for vicarious infringement. Also before the Court is the MTB, seeking to bifurcate discovery into a liability phase and a damages phase. For the reasons explained herein, the Court **GRANTS** the PJ

---

[9] Additionally, in light of the interceding change in law – given the Ninth Circuit's holding in *Briskin v. Shopify, Inc.*, 135 F.4th 739, 758 (9th Cir. 2025) ("*Briskin*"), which expressly overruled in part *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201 (9th Cir. 2020) ("*AMA Multimedia*") – the Court provided the UK Defendants and Plaintiff the opportunity to submit supplemental briefing by August 11, 2025. (Minute Order re Supp. Briefing, Docket No. 175). The UK Defendants and Plaintiff each filed their supplemental briefing on August 11, 2025. (*See* Docket Nos. 179, 180).

MTD – thereby dismissing the UK Defendants with prejudice – **GRANTS** the 12(b)(6) MTD – thereby dismissing the claim for vicarious infringement with prejudice – and **GRANTS** the MTB.

### A. The Court GRANTS the PJ MTD with Prejudice

#### 1. Rule 12(b)(2) Legal Standard

A defendant may move to dismiss a complaint for lack of personal jurisdiction under Rule 12(b)(2).  "The court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001), *overruled on other grounds as discussed in Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1024 (9th Cir. 2017). A district court must accept the uncontroverted allegations in the plaintiff's complaint as true.  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).  The court "may not assume the truth of allegations in a pleading which are contradicted by affidavit," but resolves factual disputes in the plaintiff's favor.  *Id.*

"When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need make only a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).  "That is, the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant.'" *Id.*

To establish personal jurisdiction over a defendant, the plaintiff must show the forum state's long arm statute is satisfied and that the exercise of jurisdiction over the nonresident defendant comports with due process.  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).  "Because California's long-arm jurisdictional statute is co-extensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004).

Due process requires that the nonresident defendant has minimum contacts with the forum state such that "maintenance of the suit does not offend traditional notions

of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316. Federal Rule of
Civil Procedure 4(k)(2) ("Rule 4(k)(2)") is the long-arm statute that allows federal
courts to assert jurisdiction over a defendant who is not otherwise subject to personal
jurisdiction in any court of general jurisdiction, though maintains contacts with the
United States. *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th
Cir. 2007). Under Rule 4(k)(2), a defendant is subject to personal jurisdiction if
"(1) the claim arises from federal law; (2) the defendants are not subject to any state's
courts of general jurisdiction; and (3) invoking jurisdiction upholds due process
(namely, that jurisdiction is not unreasonable)." *Lang Van, Inc. v. VNG Corp.* ("*Lang
Van*"), 40 F.4th 1034, 1040 (9th Cir. 2022) (quoting *Pebble Beach Co. v. Caddy*, 453
F.3d 1151, 1159 (9th Cir. 2006)). "The due process analysis under Rule 4(k)(2) is
nearly identical to traditional personal jurisdiction analysis with one significant
difference: rather than considering contacts between [the defendant] and the forum
state, [courts] consider contacts with the nation as a whole." *Holland Am. Line*, 485
F.3d at 462; *Axiom Foods, Inc. v. Acerchem Int'l, Inc.* ("*Axiom Foods*"), 874 F.3d
1064, 1072 (9th Cir. 2017).

Here, it is undisputed by the Parties that the claim arises under federal law (the
Lanham Act) and that the UK Defendants are not subject to general personal
jurisdiction in any state. (*See* PJ MTD at 4). Accordingly, the question before the
Court is whether exercise of specific personal jurisdiction over the UK Defendants
comports with due process.

For a court to exercise specific jurisdiction that comports with due process,
"'the *suit'* must 'arise out of or relate to the defendant's contacts with the *forum*.'"
*Bristol-Myers*, 582 U.S. at 272 (emphasis in original, brackets omitted). "In other
words, there must be 'an affiliation between the forum and the underlying
controversy, principally, an activity or an occurrence that takes place in the forum
State and is therefore subject to the State's regulation.'" *Id.* (brackets omitted). "For
this reason, specific jurisdiction is confined to adjudication of issues deriving from, or

connected with, the very controversy that establishes jurisdiction." *Id.* (quotation marks omitted).

The Ninth Circuit has established a three-part test for analyzing a claim of specific personal jurisdiction. *Schwarzenegger*, 374 F.3d at 802.

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Id.* "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*

The first prong requires either personal availment for claims sounding in contract or purposeful direction for claims sounding in tort. *Schwarzenegger*, 374 F.3d at 802. "In actions for claims such as copyright infringement, there must be 'purposeful direction' under the '[*Calder*] effects test.'" *Lang Van*, 40 F.4th at 1038 (quoting *Axiom Foods*, 874 F.3d at 1069). To satisfy the *Calder* effects test (the "Effects Test"), "the defendant must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Axiom Foods*, 874 F.3d at 1069.

### 2. Application

The Court first begins by assessing the supplemental briefing regarding *Briskin* and the extent to which it changes the jurisdictional analysis as applied to the UK

Defendants.  The Court agrees with the UK Defendants' assessment that, because

*Briskin* "does not alter, and in fact reaffirms, the core requirement that purposeful

direction must be based on the defendant's *own* intentional, forum-directed

conduct[,]" the jurisdictional analysis in this context is largely unchanged.  (Defs.'

Supp. Briefing ("DSB"), Docket No. 179 at 1) (emphasis in original).  Turning next to

the UK Defendants' arguments, the Court first addresses the extent to which Plaintiff

has established personal jurisdiction over Defendant NW before turning to the UK

Publishers.  Finding that the SAC fails to cure the deficiencies previously identified

by the Court – and, therefore, granting further leave to amend would be futile – the

Court **GRANTS** the PJ MTD, thereby dismissing the UK Defendants from the action

with prejudice.  The Court also **DENIES** Plaintiff's request for jurisdictional

discovery, finding Plaintiff has failed to demonstrate how it would meaningfully

supplement the jurisdictional allegations in the SAC.

> a. <u>*Briskin* Does Not Meaningfully Alter the Jurisdictional
> Analysis as Applied to the UK Defendants</u>

The Court begins by summarizing *Briskin*.  In *Briskin*, the plaintiff was a

California resident who had utilized his iPhone to make a purchase from the website

of a clothing brand.  *Id.* at 747.  The plaintiff completed the purchase by submitting a

payment form, believing he was submitting his information directly to the clothing

brand.  *Id.*  That clothing brand, however, had contracted with Shopify,[10] the

defendant "e-commerce platform that facilitates online sales for merchants with whom

it contracts."  *Id.*  When merchants contract with Shopify, Shopify "collects and

validates the consumer's payment . . . indefinitely storing the sensitive personal

information it collects through the payment form."  *Id.*  In this case, neither the

website's checkout process nor the payment form itself mentioned Shopify or the

---

[10] The defendants in the case included Shopify, Inc and two of its wholly-owned
subsidiaries, Shopify (USA), Inc. and Shopify Payments (USA), Inc., which the court
in *Briskin* referred to collectively as Shopify.

partnership.  *Id.*  Thus, entirely unbeknownst to the plaintiff, it was *Shopify* that generated the payment form, which involved Shopify's "downloading eight separate files on [the plaintiff's] cell phone to generate the form."  *Id.*  Once the plaintiff hit the "pay now" button, the "newly installed Shopify software code sent [the plaintiff's] name and payment details to Shopify's servers."  *Id.*  The plaintiff sued, alleging that Shopify's practices "violate California data privacy and access laws[.]"  *Id.* at 749.  The district court dismissed based on lack of specific personal jurisdiction over Shopify, which the plaintiff then appealed.  *Id.*  Though a three-judge panel initially affirmed the district court's ruling, a majority of the active judges voted to rehear the appeal *en banc*.  *Id.*  Thereafter, the Ninth Circuit reversed and remanded, having concluded that specific personal jurisdiction was satisfied as to Shopify.  *Id.*  In doing so, the Court focused extensively on the second factor of the Effects Test, revisiting its seminal cases to trace the outer limits of specific personal jurisdiction in the context of the internet age.  *Id.* at 752-56.

Shopify had argued that "because it operates nationwide and thus is agnostic as to the location in which it data-mines the consumers' personal identifying information[,]" its conduct was not expressly aimed at California.  *Id.* at 757.  The Ninth Circuit disagreed, emphasizing that, as a global company, it was "Shopify's business model [] to perform the payment processing services it contracts to provide for its merchants and, in the course of doing so, to obtain valuable personal data about California consumers for its own commercial gain."  *Id.* at 756.  The Court concluded, therefore, that the California-based plaintiff's harm was not "mere happenstance arising from the California consumers' choice to do business with a merchant that has contracted with Shopify[.]"  *Id.* at 756.  Rather, it was implicitly part of Shopify's business model to have operations in all fifty states.

The Court relied on its prior ruling in *Mavrix Photo, Inc. v. Brand Techs., Inc.* ("*Mavrix Photo*"), in which the Ninth Circuit had held that a "company's internet activity may subject the company to specific personal jurisdiction in a given forum if

the company 'knows – either actually or constructively' about its customer base there
and 'exploits that base for commercial gain.'" *Id.* (quoting *Mavrix Photo*, 647 F.3d
1218, 1230 (9th Cir. 2011)).  The Court in *Briskin* highlighted that Shopify "knew the
location of consumers like [the plaintiff] either prior to or shortly after installing its
initial tracking software onto their devices[,]" as Shopify's software is able to secure
geolocation data even before any transaction is completed.  *Id.*  The Court
emphasized, therefore, that "Shopify knows about its California residents, interacts
with them as an intermediary for its merchants, installs its software onto their devices
in California, and continues to track their activities." *Id.*  at 759.  As such, Shopify's
"'conduct connects [Shopify] to [California] in a meaningful way.'" *Id.* (quoting
*Walden v. Fiore*, 571 U.S. 277, 290 (2014)).

From a policy perspective, the Court also emphasized that "requiring
differential targeting would have the perverse effect of allowing a corporation to direct
its activities toward all 50 states yet to escape specific personal jurisdiction in each of
those states for claims arising from or relating to their relevant contacts in the forum
state that injure that state's residents." *Id.*  Accordingly, in this context, the Court
explicitly overruled the prerequisite of "a 'forum-specific focus' or differential
targeting[.]'" *Id*.  The Court concluded, in sum, that "an interactive platform
'expressly aims' its wrongful conduct toward a forum state when its contacts are its
own choice and not random, isolated, or fortuitous, *even if* that platform cultivates a
nation-wide audience for commercial gain." *Id.* at 758 (quotations and citations
omitted) (emphasis added).  In short, the only aspect of the Effects Test that the Court
explicitly disturbed was the express prerequisite of differential targeting of the forum
state – which it concluded was a "misread[ing]" from its inception that was
unsupported by precedent. *Id.* at 757.  In the age of massive national and global
corporations such as Shopify, such a perquisite would be illogical.

The UK Defendants argue "the now-abrogated 'differential targeting' rule is
irrelevant" to the analysis at hand.  (DSB at 1).  Essentially, the UK Defendants

13

contend that, primarily, *Briskin* "reaffirms that express aiming requires proof that the
defendant's *own* conduct be purposefully directed to the forum state[.]"  (DSB at 2).
Given that the Plaintiff's bases for asserting personal jurisdiction over the UK
Defendants continue to be based on their purported relationships with US-based
entities, "the change in law . . . in no way establishes jurisdiction over the UK
Defendants." (*Id.* at 2) (emphasis in original).  Plaintiff, on the other hand, contends
that *Briskin* "undercuts a key legal proposition relied upon by Defendants[.]"  (Pl.'s
Supp. Briefing ("PSB"), Docket No. 180 at 5).  As explained herein, the Court agrees
with the UK Defendants' reading.

First, the Court agrees that *Briskin* "reaffirms that express aiming requires proof
that the defendant's *own* conduct be purposefully directed to the forum state and that
the conduct 'connect [] [the defendant] to [the forum] in a meaningful way.'" (DSB at
2) (quoting *Briskin*, 135 F.4th at 759).  In other words, nothing in *Briskin* altered the
fact that personal jurisdiction *cannot* be based on a defendant's merely having a
relationship with a forum-based entity.  *See Kellytoy Worldwide, Inc. v. Jay at Play
Int'l Hong Kong Ltd.*, No. 19-cv-07831-AB, 2019 WL 8064196, at *5 (C.D. Cal. Dec.
5, 2019) (emphasizing that "jurisdiction must arise out of the contacts that 'defendant
himself creates with the forum state,' and not defendant's contacts with entities that do
business or reside there"); *see also Heiting v. Marriot Int'l, Inc.*, No. 2:23-cv-10822-
JLS-MAA, 2024 WL 3751276, at *4 (C.D. Cal. Aug. 5, 2024) ("And, given that
Salesforce is not a defendant in this lawsuit, [the plaintiff's] arguments regarding
third-party connections to the forum are similarly insufficient").  In fact, the Court in
*Briskin* explicitly noted that it was simply "[a]pplying [the] traditional personal
jurisdiction precedent to the ever-evolving world of e-commerce[.]"  *Briskin*, 135
F.4th at 746.  To that end, the Court specifically revisited its prior rulings, explaining
how *Briskin* is *consistent* those holdings.  *Briskin*, 135 F.4th at 751-56.  The Court,
therefore, agrees that *Briskin* largely left the Effects Test undisturbed.

1    Second, the UK Defendants highlight that *Briskin*'s holding is specifically

2    applicable "in the context of nationally or globally accessible websites[.]" (DSB at 2).

3    To the extent that the Court overruled the need for "'forum-specific focus' or

4    'differential targeting,'" this holding appears to be limited to the context described

5    above – those situations where an online company operates globally *equally* and may

6    be agnostic as to targeting one, specific forum more so than others. *Id.* at 757.  Unlike

7    in *Briskin*, the UK Defendants do not operate globally[11] – instead, they are either

8    alleged to partner with entities that have global operations or entities that have United

9    States operations.[12] (*See* SAC ¶¶ 212, 214-15, 218, 222, 260, 263-64, 156-57, 159,

10   161, 164).  Neither is sufficient.

11   Defendant NW is an English LLC that has one single office, which is located in

12   England.  (Decl. of Shahid Khan ISO PJ MTD ("Khan Decl."), Docket No. 121 ¶ 4).

13   Both of the UK Publishers are LLCs registered in England and Wales, which "share a

14   registered office and principal place of business in London."  (Decl. of Andrew

15   Spence ISO PJ MTD ("Spence Decl."), Docket No. 120-2 ¶¶ 4).  There is no (non-

16   conclusory) suggestion that these Defendants are such global players – akin to Shopify

17

18   [11] The Court briefly notes that the *ability* for SMP UK to enter into IPR Agreements
     with IPR Holders from around the world (*see* SAC, Ex. 8 at 42) does not suggest to
19   the Court that SMP UK is operating as a global organization.  It merely suggests that
     it is not precluded from entering into contracts with any IPR Holders from around the
20   world, except those from SMP UK's Licensed Territory.  As noted above, the Court
     suspects that this limitation is in place because, where SMP UK is *both* the Publisher
21   and Affiliate for the United Kingdom, it cannot transfer IPRs to *itself* to then exploit
     in the Licensed Territory.  If anything, the SIA suggests that these individual entities
22   do *not* operate globally and are, instead, confined to their Licensed Territory.
     [12] The SAC alleges that Defendant EMI UK's "business model primarily targets the
23   United States market *because it is the largest market for selling, streaming,
     distributing, and publishing music*." (SAC ¶ 158) (emphasis added).  The SAC also
24   alleges that, despite being a UK-based company, Defendant NW's "business plan is to
     target and exploit the United States music market."  (*Id.* ¶ 211).  The Court considers
25   these allegations both "speculative" entirely conclusory – as already noted in the MTD
     Order (*see* MTD Order at 11) (referring to this allegations as "speculative and
26   unsupported") – and, thus, disregards them.  *See Williams*, 851 F.3d at 1025 n.5
27   (citing *Iqbal*, 556 U.S. at 678) (emphasizing that the court will not "credit" any
     "conclusory legal statement unsupported by any factual assertion").

28

– that there need not be differential targeting of the forum for there to be the *presumption* that the forum was targeted (here, the United States at large). Nor does Plaintiff attempt to explain how the UK Defendants are an in analogous position to Shopify, an online operator with massive global reach.[13] Therefore, in addition to *Briskin* leaving much of the Effects Test unaltered, the Court finds that *Briskin* is factually distinguishable and, therefore, fails to meaningfully bear upon the present matter.

As such, regardless of the Ninth Circuit's overruling the requirement of "differential targeting," the Court finds the personal jurisdictional analysis with respect to the UK Defendants is unchanged. The Court, therefore, proceeds to the UK Defendants' arguments, which continue to apply in full force.

### b. The SAC Fails to Establish Personal Jurisdiction over Defendant NW, as the Effects Test Is Not Satisfied

"The second prong of [the] [Effects] test, express aiming, asks whether the defendant's allegedly tortious action was expressly aimed at the forum." *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (quotation marks and citation omitted). "Express aiming requires more than the defendant's awareness that the plaintiff is alleged to have harmed residents in or has strong ties to the forum, because 'the plaintiff cannot be the only link between the defendant and the forum.'" *Ayla LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 980 (9th Cir. 2021) (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). "'[S]omething more – conduct directly targeting the forum' – is required to confer personal jurisdiction." *Id.* (quoting *Mavrix*, 647 F.3d at 1229).

The Court in its MTD Order found that Plaintiff failed to satisfy the Effects Test as to Defendant NW, such that the first prong of the test for specific personal

---

[13] Plaintiff merely argues in a conclusory fashion that the holding in *Briskin* clearly applies to the UK Defendants as they "intentionally exploit[] intellectual property in all 50 United States as part of a calculated corporate joint venture[.]" (PSB at 5). Again, the Court finds this argument to be entirely speculative. Nor is this allegation supported by the SIA itself, as further explained below.

jurisdiction was not met.  (MTD Order at 8-16).  Though the Court concluded that Plaintiff's FAC sufficiently demonstrated an intentional act – presuming the alleged copyright infringement to be the intentional act – the Court found the second element of the Effects Test, which is "express aiming" was not satisfied.  (*Id.* at 8-10).  For the reasons explained herein, the Court, again, concludes that the second element of the Effects Test remains unmet, such that Plaintiff has failed to establish personal jurisdiction over Defendant NW.

It appears Plaintiff raises "four claimed grounds for specific jurisdiction: (a) [Defendant NW's] agreement with Sam Smith; (b) [Defendant NW's] grant of worldwide rights to SMP UK; (c) a purported agency relationship between [Defendant NW] and the US Publishers, who exploit *Dancing with a Stranger* in the United States; and (d) [Defendant NW's] business relationship with [DMP]."  (PJ MTD at 5; *see* SAC ¶¶ 211-12, 214-16, 218, 221-22, 227).  Notably, most of these grounds were already considered and rejected by the Court as being insufficient to demonstrate express aiming.  (MTD Order at 11-16, 20-21).  The Court assesses each basis briefly in turn.

### i.  *Defendant NW's Agreement with Sam Smith*

As the Court has already noted in the MTD Order, merely "entering into a contract to be Smith's publishing entity does not support exercising jurisdiction over [Defendant NW]."[14]  (MTD Order at 11); *see also Walden*, 571 U.S. at 284 ("We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between plaintiff (or third parties) and the forum state").

Plaintiff alleges that "future songs written by Sam Smith, on which [NW] served as publishers, would be exploited primarily in the United States."  (*Id.* ¶ 215).  Plaintiff reiterates these conclusory statements in its Opposition, arguing that that

---

[14] This is particularly so where the contract itself was executed not in the United States, but in London in 2013.  (Khan Decl. ¶ 7).

"Smith and [Defendant] NW intended to exploit the infringing song . . . across the
United States." (Opp'n to PJ MTD, Docket No. 128 at 15). But as the UK
Defendants emphasize, "[t]hese allegations merely rehash Plaintiff's previous
allegations . . . which the Court rejected as 'speculative and unsupported.'"[15] (PJ
MTD at 7) (quoting MTD Order at 11). Moreover, *Walden* requires that jurisdiction
must arise out of the contacts that 'defendant himself creates with the forum,' and not
defendant's contacts with entities that do business or reside there." (*Id.*) (quoting
*Walden*, 571 U.S. at 284). The Court agrees. Accordingly, Plaintiff's relationship
with Smith – as an artist residing "part-time in Los Angeles" (Opp'n to PJ MTD at
15), who has a large fan base in the United States – fails to establish personal
jurisdiction over Defendant NW.

### ii. Defendant NW's Relationship with SMP UK

Defendant NW's relationship with SMP UK is also insufficient to establish
personal jurisdiction over Defendant NW for the same reason. As already noted,
"*Walden* requires that jurisdiction must arise out of the contacts that 'defendant
himself creates with the forum,' and not defendant's contacts with entities that do
business or reside there." (PJ MTD at 11) (quoting *Walden*, 571 U.S. at 284).
Accordingly, Plaintiff's relationship with SMP UK – even if SMP UK, in theory,
"ha[s] direct US contacts" (Opp'n to PJ MTD at 20) – fails to establish personal
jurisdiction over Defendant NW.

### iii. Purported Agency Relationship between Defendant NW and US Publishers of the Infringing Song

In the MTD Order, the Court assessed Plaintiff's argument that "Sony entities
in the United States are [Defendant NW's] agents and [that] therefore their alleged

---

[15] The Court briefly notes that Plaintiff's FAC did not actually explicitly contain these
allegations; rather, these were arguments presented in Plaintiff's Opposition, which
the Court considered on the merits and rejected. That this allegation now appears in
the SAC – instead of only in the opposing brief – does not change the Court's
conclusion.

1    conduct should be imputed to [Defendant NW] for jurisdictional purposes." (MTD

2    Order at 14). In other words, Plaintiff argued that the licensing activities of the

3    various US-based Sony entities party to the SIA (the "US Publishers") could be

4    imputed to the UK Defendants, including Defendant NW, due to an agency

5    relationship. The Court concluded that Plaintiff had not sufficiently alleged the

6    existence of an agency relationship because it alleged no facts "showing that

7    [Defendant NW] manifested assent to any entity or individual to act on [Defendant

8    NW's] behalf and subject to [Defendant NW's] substantial control. *See Williams*, 851

9    F.3d at 1025."[16] (*Id.*).

10       Plaintiff renews its argument that a purported agency relationship between

11   Defendant NW and US Publishers imputes the US Publishers' conduct to Defendant

12   NW for jurisdictional purposes. (Opp'n to PJ MTD at 13-14; *see also* SAC ¶¶ 76-77,

13   220-21, 227).[17] The Court has already rejected Plaintiff's exact line of argument, and

14   Plaintiff has done nothing to expand upon its allegations suggesting Defendant NW

15   exerts substantial control over any Sony entities.[18] (MTD Order at 14-16). Where

16   Plaintiff has done little – if anything – to address these very deficiencies, the Court

17   need not expend additional analysis.

18

19   ─────────────────────

     [16] The Court also analyzed whether the copyright registration itself (*see* FAC, Docket
20   No. 45, Ex. 3, No. PA0002260139) for the Infringing Song supported personal
     jurisdiction over Defendant NW. (MTD Order at 12-13). The Court concluded both
21   that the copyright registration fails to suggest that Defendant NW "'submitted'" it (*see*
     MTD Order at 12) and also expressed doubt that, even if it *had*, that merely
22   submitting a copyright registration would suffice as minimum contacts for
     jurisdictional purposes. (*Id.* at 13 n.3). Plaintiff provided no legal support for that
23   proposition, nor is the Court aware of any.
     [17] The UK Defendants highlight that, even if these specific "allegations are new to
24   Plaintiff's SAC, they restate arguments Plaintiff already raised and the Court already
     rejected." (PJ MTD at 9) (citing MTD Order at 14-15). The Court agrees.
25   [18] Furthermore, as the UK Defendants emphasize in their Reply, Defendant NW "is
     not a Sony Music Publishing entity, not party to the [SIA], and has not 'signed a deal'
26   with a U.S. Sony entity regarding [the Infringing Song]." (Reply at 5; *see* Khan Decl.
27   ¶¶ 8-10). Nor has Plaintiff rebutted this evidence. In short, no facts support the
     inference of any agency relationship.
28

                                          19

1      iv. *Purported Business Relationship with DMP*

2    Plaintiff contends that a "news report and press release[] from 2017 indicate

3 that [Defendant NW] and [] [DMP], a US Company with a Los Angeles office,

4 entered into a multiyear contract to have [DMP] administer the company's copyrights

5 and build the company's brand worldwide." (Opp'n to PJ MTD at 15-16).  The UK

6 Defendants argue that any relationship with DMP is "irrelevant," as they have already

7 established "that this agreement is with an Isle of Man company, not a U.S. company,

8 [which] does not pertain to U.S. rights, and does not include [the Infringing Song]."

9 (Reply, Docket No. 134 at 5-6; *see also* PJ MTD at 11; Khan Decl. ¶ 11).  The Court

10 agrees with the UK Defendants.

11    The relationship is irrelevant for an additional reason, even if DMP *were* a US-

12 based company as Plaintiff avers.  As the Court has already noted, the hyperlink that

13 Plaintiff cites to "purporting to be a 2017 press release" about Defendant NW's

14 relationship with DMP "[a]t most [] shows that in 2017 . . . [Defendant NW] entered

15 into a 'worldwide publishing agreement' with a company headquartered in the United

16 States." (MTD Order at 11, 12).  Even if this were true, as the Court has already noted

17 above, "*Walden* requires that jurisdiction must arise out of the contacts that 'defendant

18 himself creates with the forum,' and not defendant's contacts with entities that do

19 business or reside there." (*Id.* at 11) (quoting *Walden*, 571 U.S. at 284).  Furthermore,

20 "it was not foreseeable that DMP would administer the Infringing Song, which was

21 not allegedly written until 2018 or released until January 2019." (*Id.* at 12).  In other

22 words, even if this relationship were sufficient to satisfy the second element of the

23 Effects Test, it would fail on the third, where the relationship began before the

24 Infringing Song was in existence.  *Axiom Foods*, 874 F.3d at 1069 (emphasizing that

25 satisfying the third element of the Effects Test requires demonstrating that defendant

26 knew that the harm caused by its intentional act, aimed at the forum, was "likely to be

27 suffered in the forum state").  Accordingly, Plaintiff's relationship with DMP – even

28 if it were a US-based company – fails to establish personal jurisdiction over

1  Defendant NW.  In sum, Plaintiff has presented no bases to exercise personal

2  jurisdiction over Defendant NW.

3          c.  The SAC Still Fails to Establish Personal Jurisdiction over the

4              UK Publisher Defendants, as Effects Test Not Satisfied

5          It appears Plaintiff raises "four claimed grounds for asserting specific

6  jurisdiction [over the UK Publishers]: ([a]) the UK Publishers' agreements with

7  songwriters and related entities; ([b]) the rights and obligations under the [SIA];

8  ([c]) the existence of a purported agency relationship between the UK Publishers and

9  the US Publishers; and ([d]) a claimed 'alter ego' relationship between the UK

10 Publishers and their US affiliates or parent entities."  (PJ MTD at 12; *see* SAC ¶¶ 146-

11 47, 152-54, 155-59, 161, 258, 260-61, 263-65).  Notably, most of these grounds were

12 already considered and rejected by the Court as being insufficient to demonstrate

13 express aiming.  (MTD Order at 17-19, 21-24).  The Court assesses each basis briefly

14 in turn and finds that Plaintiff has failed to address the deficiencies already identified

15 by the Court.

16              i.  *UK Publishers' Agreements with Songwriters and*

17                  *Related Entities*

18          In the MTD Order, the Court assessed whether the UK Publishers' agreements

19 with Defendants Smith, Hermansen and Erikson was sufficient to establish express

20 aiming.  (MTD Order at 18-19).  The Court, citing to *Walden*, 571 U.S. at 284,

21 explained that the alleged relationships the UK Publishers have with Smith, Eriksen

22 and Hermansen "does not support a finding that [SMP UK or EMI UK] expressly

23 aimed conduct toward the United States."  (*Id.* at 19).  Despite this unambiguous

24 conclusion, Plaintiff renews its very same argument.  (Opp'n to PJ MTD at 16-17).

25          Plaintiff contends that because the UK Publishers entered into agreements with

26 Defendants Smith, Eriksen and Hermansen, who have United States contacts, that this

27 establishes that the UK Publishers "entered into these contracts specifically to target

28 the United States music market[.]"  (*Id.* at 17).  First, the Court agrees with the UK

Publishers that it is entirely speculative that the UK Publishers entered into these agreements *to target* the United States market. (PJ MTD at 13). Second, even if they were not speculative allegations, the Court reiterates that "*Walden* requires that jurisdiction must arise out of the contacts that 'defendant himself creates with the forum,' and not defendant's contacts with entities that do business or reside there." (PJ MTD at 11) (quoting *Walden*, 571 U.S. at 284). Accordingly, the Court rejects these relationships or agreements as a basis to exercise personal jurisdiction over the UK Publishers.

ii.   *Rights and Obligations Under the SIA*

Plaintiff did not specifically refer to the SIA by name in its FAC. The Court, however, was able to infer from Plaintiff's arguments that it contended that the UK Publishers could be subjected to personal jurisdiction based on their contractual relationship with the US Publishers. (*See* MTD Order at 24) ("To the extent that Plaintiff is referring to the [SIA] . . . [t]he fact that affiliates in the United States would foreseeably exploit various musical compositions in the United States does not alone justify exercising jurisdiction over the UK Publishers"). The Court concluded, however, that that the declarations submitted by Defendants' counsel showed unambiguously that the "[UK Publishers] do not license or exploit the Infringing Song in the United States[,]" nor had Plaintiff submitted evidence to the contrary. (*Id.*).

Now, with the benefit of the SIA attached to the SAC, the Court reaches the same conclusion. As the Court explains herein, it disagrees with Plaintiff's contention that the UK Publishers are subjected to personal jurisdiction in the United States merely by virtue of being a signatory to the SIA. (Opp'n to PJ MTD at 20).

Plaintiff alleges that "Sony has an intercompany agreement whereby its divisions or subsidiaries in particular territories will administer and exploit a copyright *in their territory* on behalf of publishers or subsidiaries." (SAC ¶ 66) (emphasis added). Schedule 3 of the SIA provides the companies in each territory. (SAC, Ex. 8 at 25-32). As is relevant to this action, the companies in the United Kingdom include

22

1  SMP UK and EMI UK.  (*Id.* at 29).  The companies in the United States include SMP

2  LLC – noted as the "main company" – EMI BMI and EMI AMI.  (*Id.* at 30-31).

3       The SIA governs the "parties detailed on Schedule 5 acting as Publisher and on

4  Schedule 6 acting as Affiliate."  (SAC, Ex. 8 at 4).  "Publisher" is defined as "grantor

5  of Intellectual Property Rights [("IPRs")] as detailed on Schedule 5 together with all

6  the companies listed in Schedule 3."  (*Id.* at 6 § 1.19).  Publishers are granted IPRs

7  pursuant to IPR Agreements with the IPR Holders – which are the recording artists,

8  authors, composers and "parties that otherwise control rights granted to Publisher[s]."

9  (*Id.* at 6 §§ 1.12-13).  "Affiliate" is defined as "grantee of [IPRs] as detailed in

10  Schedule 6 together with all the companies listed in Schedule 3, where applicable."

11  (*Id.* at 4 § 1.1).

12       The SIA's Appointment and Grant of Rights states that "Publisher grants to

13  Affiliate" the rights granted to Publisher "under each applicable IPR Agreement."  (*Id.*

14  at 8 § 2.1).  This includes the "sole and exclusive right . . . to administer, control, use

15  exploit and otherwise deal in and license the IPRs" within the Affiliate's licensed

16  territory ("Licensed Territory"), which are established in Schedule 6.  (*Id.* at 8 § 2.1).

17  Schedule 6 lists the "Main Affiliate" for each country.  (*Id.* at 43-48).  As is relevant

18  to this Order, the Main Affiliate for the United Kingdom is SMP UK, and its Licensed

19  Territory includes the United Kingdom, Anguilla, Ireland, Ascension Islands,

20  Bahamas and other UK territories.  (*Id.* at 47).  The United States is *not* included in

21  SMP UK's Licensed Territory.  The Main Affiliate for the United States is SMP LLC,

22  and its Licensed Territory includes the United States, Guam, U.S. Virgin Islands,

23  Puerto-Rico, Greece, Belize and China.[19]  (*Id.* at 48).  Affiliates are obliged to "use all

24  reasonable endeavors to exploit the IPR *in the Licensed Territory* . . ."  (*Id.* at 14

25  § 9.1) (emphasis added).

26

27  _____

[19] As of January 1, 2020, the Licensed Territory also includes India, Nepal,
28  Bangladesh, Afghanistan, Bhutan, Maldives, Pakistan and Sri Lanka.  (*Id.*).

1   Together, this suggests that the UK Publishers were expected to "administer,

2   control, use, exploit and otherwise deal in and license" the Infringing Song in their

3   "Licensed Territory," which *does not* include the United States.  (*Id.* at 8 § 2.1).  Thus,

4   the Court finds that the SIA fails to suggest express aiming at the United States.

5   Rather, the SIA demonstrates that the UK Publishers were *only* to exploit the song in

6   the UK, belying any inference of express aiming at the United States.  Accordingly,

7   the SIA is insufficient to establish personal jurisdiction over the UK Publishers.[20]

8                    iii.    *Purported Agency Relationship between the UK*

9                            *Publishers and US Publishers*

10   The Court in its MTD Order noted that to establish an agency relationship that

11   would subject the UK Publishers to personal jurisdiction, Plaintiff would need to

12   plausibly allege that the UK Publishers "ha[ve] the right to 'substantially control' [the

13   US Publishers]."  (MTD Order at 20).  The Court concluded that Plaintiff failed to

14   make such a showing *and* failed to rebut evidence submitted by Defendants

15   suggesting only limited-approval rights.  (*Id.* at 21).

16   First, Plaintiff's SAC continues to rely on conclusory allegations.  (SAC ¶ 302)

17   (contending that "each and every Defendant was an agent, partner, affiliate, employee,

18   alter ego, or co-conspirator of each and every other Defendant, and in doing the things

19   alleged herein, each and every Defendant was acting pursuant to such conspiracy

20   and/or within the course and scope of such agency, representation, control or

21   employment and was acting with the consent, permission and authorization of the

22   other Defendants"); (*see also Id.* ¶¶ 70, 73, 76, 152, 153-54, 156, 159, 161, 221, 239,

23   260).  Plaintiff's Opposition fares no better, simply arguing in a conclusory fashion

24   that agency is established by virtue of the SIA.  (Opp'n to PJ MTD at 21).  The UK

25   _____

26   [20] As noted above, that SMP UK could enter into IPR Agreements with IPR Holders
     around the world does not suggest express aiming at the world at large (including the

27   United States).  It merely means that SMP UK is not *precluded* from entering into IPR
     Agreements with any IPR Holder from around the world – except for those from its

28   Licensed Territory.

Publishers argue that the SIA fails to suggest that the UK Publishers "control the

licensing or exploitation of the [Infringing Song] in the United States[,]" *nor* the "day-

to-day control over the US Publishers" necessary to suggest an agency relationship.

(PJ MTD at 16).  The Court agrees with the UK Publishers.

As noted above, the SIA demonstrates that the UK Publishers do *not* control the

licensing or exploitations of the Infringing Song in the United States.  (*See* SAC, Ex. 8

at 8 § 2.1).  Rather, they control the licensing and exploitation of the Infringing Song

in the *United Kingdom*.  (*Id.*).  To the extent that the UK Publishers exert any control

over the US Publishers' activities with respect to the Infringing Song, the Court has

already found that to be limited and insufficient to demonstrate an agency

relationship.  (*See* MTD Order at 21) (emphasizing that "[u]nder the [SIA], the UK

Publishers' consent is required for 'for the US Publishers to engage in certain limited

activities: to license the Infringing Song for use in motion pictures, television films, or

other audiovisual productions (i.e., to grant synchronization rights), to produce

promotional videos, 'long form' videos, or other audiovisual works, and to make

certain uses of the master sound recording'" and concluding that this was

"insufficient") (quoting Decl. of Andrew Spence ISO Prior Mot. to Dismiss ("Prior

Spence Decl."), Docket No. 74-2 ¶¶ 3, 8, 11).

Nor does any language in the SIA suggest the type of pervasive control over the

US Publishers that would amount to an agency relationship.  To the contrary, the UK

Defendants submitted a declaration stating that the UK Publishers "do not exercise

day-to-day control over the SU Publishers, and they do not supervise the US

Publishers' operations."  (Spence Decl. ¶ 18).  Plaintiff, again, "does not dispute these

assertions, does not provide competing evidence challenging the UK Publishers'

declaration, and has not articulated a reason why limited-approval rights amount to

'substantial control' over affiliates in other territories."  (MTD Order at 21).  Thus, as

before, the Court concludes that Plaintiff has failed to establish an agency relationship

1   between the UK Publishers and US Publishers.  As a result, the US Publishers'

2   contacts with the United States cannot be imputed to the UK Publishers.

3                    iv.   *Purported Alter Ego Relationship Between UK*

4                          *Publishers and US Affiliates or Parent Entities*

5          To satisfy the alter-ego test, Plaintiff must make out a prima facie showing that

6   "(1) there is such a unity of interest and ownership that the separate personalities [of

7   the two entities] no longer exists and (2) that failure to disregard [their separate

8   identifies] would result in fraud or injustice." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073

9   (9th Cir. 2015).  Establishing the first element requires a plaintiff to show that the

10  parent controls the subsidiary to such a degree as to render the latter the mere

11  instrumentality of the former.  *Id*.  "This test envisions pervasive control over the

12  subsidiary, such as when a parent corporation dictates every facet of the subsidiary's

13  business—from broad policy decisions to routine matters of day-to-day operation." *Id.*

14  (quotation marks and citation omitted).

15         The Court in its MTD Order found that Plaintiff "fail[ed] to make an adequate

16  showing of the first prong" and that its "conclusory allegations as to alter-ego [were]

17  insufficient."  (MTD Order at 21).  Plaintiff's SAC fails to cure this deficiency,

18  merely realleging in a conclusory fashion that "[SMP LLC] is [EMI UK's] alter ego,"

19  (*see* SAC ¶ 152), and that "[EMI UK], by and through its US-based Sony owners

20  which are its agents and/or alter egos, directly targets the US music market . . ." (*Id.*

21  ¶ 159).  Plaintiff's Opposition fails to meaningfully support this argument.

22  Accordingly, the Court need not expend additional analysis on this point.  As a result,

23  the US Publishers' contacts with the United States cannot be imputed to the UK

24  Publishers via an alter ego theory.

25                       d.   Jurisdictional Discovery Is Not Warranted

26         Jurisdictional discovery is appropriate only when "the existing record is

27  insufficient to support personal jurisdiction, and *the plaintiff demonstrates that it can*

28  *supplement its jurisdictional allegations through discovery*."  *MG Freesites Ltd. v.*

*DISH Techs. LLC*, 712 F.Supp.3d 1318, 1334 (N.D. Cal. 2024) (emphasis added).  It
is not appropriate, however, when a "plaintiff's claim of personal jurisdiction appears
to be both attenuated and based on bare allegations."  *Pebble Beach Co. v. Caddy*, 453
F.3d 1151, 1160 (9th Cir. 2006) (affirming district court's denial of jurisdictional
discovery).

  The Court in its MTD Order declined to grant Plaintiff's request for
jurisdictional discovery.  (MTD Order at 25-28).  Finding the "majority of Plaintiff's
claims" to be conclusory, the Court determined that Plaintiff's "speculation [did] not
support permitting jurisdictional discovery." (*Id.* at 27).  The Court finds that
Plaintiff's SAC is no less speculative or conclusory.  Plaintiff fails to add any new
facts – or present new arguments –suggesting the propriety of jurisdictional discovery.
The Court, accordingly, again **DENIES** the request for jurisdictional discovery.

### B.  The Court GRANTS the 12(b)(6) MTD with Prejudice

#### 1. *Rule 12(b)(6) Legal Standard*

  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state
a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678
(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  The
complaint need not include detailed factual allegations but must provide more than a
"formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.
Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate
"only when [the complaint] fails to state a cognizable legal theory or fails to allege
sufficient factual support for its legal theories."  *Caltex Plastics, Inc. v. Lockheed
Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016); *see* Fed. R. Civ. P. 12(b)(6).

  "[The] court must 'draw all reasonable inferences in favor of the nonmoving
party'" and take its non-conclusory allegations as true.  *Boquist v. Courtney*, 32 F.4th
764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters &
Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)).  The court is not required,
however, "to accept as true a legal conclusion couched as a factual allegation."

*Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions . . .").

Pursuant to Fed. R. Civ. P. 15(a)(2), when a motion to dismiss is granted, courts should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "'In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." leave should be granted in conformity with Rule 15(a)(2). *Hall v. City of Los Angeles*, 697 F.3d 1059, 1073 (2012) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Futility of amendment can, by itself, justify denial of leave to amend. *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). "The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

### 2. Application

Defendants argue that the claim for vicarious liability is both legally defective and factually unsupported and must be dismissed with prejudice. (12(b)(6) MTD at 3-8). As explained herein, the Court agrees, thereby dismissing the claim for vicarious infringement with prejudice.

To support any claim of secondary copyright infringement, a plaintiff "must establish that there has been direct infringement by third parties." *Perfect 10, Inc. v. Visa Intern. Service Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007) ("*Visa*"). A defendant cannot be "simultaneously directly and secondarily liable for infringement" for the same conduct. *Smith v. Weeknd*, No. CV 19-2507 PA, 2019 WL 6998666, at *3 (C.D. Cal. Aug. 23, 2019).

"To state a claim for vicarious copyright infringement, a plaintiff must allege that the defendant (1) has the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Visa*, 494 F.3d at 802. Put

differently, one "'infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.'" *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007) (*"Amazon.com"*) (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)). "[The] plaintiff must establish that the defendant exercises the requisite control over the direct infringer . . ." *Id.* "[A] defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Id.*

"The amount of control necessary to support a finding of vicarious liability is fact-specific." *Adobe Systems Inc. v. Canus Prods., Inc.*, 173 F.Supp.2d 1044, 1053 (C.D. Cal. 2001). "[T]he spectrum of control has, at one end, the landlord-tenant model, usually representing minimal ability of the premises owner to control the infringing activities of someone using his premises; and, at the other end, the employer-employee model, which represents maximum control by the premises owner." *Id.* "Such maximum control may be present either through a master-servant relationship *or* through 'pervasive participation' in the business of the infringing party." *Id.* (emphasis added) (quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996) ("*Fonovisa*")). The ability to take "certain steps that may have the indirect effect of reducing infringing activity on the Internet at large" is insufficient to demonstrate the requisite control. *Visa*, 494 F3.d at 803. "[T]he mere ability to withdraw a financial 'carrot' does not create the 'stick' of 'right and ability to control' that vicarious infringement requires." *Id.*

The Court in its MTD Order granted Defendants' motion to dismiss the second and third causes of action in the FAC for contributory copyright infringement and vicarious copyright infringement, respectively, with leave to amend.[21] (MTD Order at

---

[21] The SAC excludes the claim for contributory copyright infringement. (*Compare* FAC *with* SAC).

29-33).  The Court noted two primary issues with respect to the claim for vicarious copyright infringement.

First, the Court highlighted that, even though a party may certainly plead alternative theories of liability under Rule 8(d), Plaintiff's formulation of these secondary liability claims ran headlong into "the notice requirement of Rule 8(a)(2)." (*Id.* at 33).  Primarily, this was due to Plaintiff's alleging – in a "conclusory" fashion (*see d.*) – that each Defendant was liable for both direct *and* vicarious copyright infringement, based on "the same broad conduct, without providing sufficient non-conclusory facts that would assist each defendant in deciphering [on] what grounds Plaintiff [wa]s basing its claims against them."  (*Id.*).  For example, the Court noted that when assuming "creating the Infringing Song constitute[d] the 'predicate acts of copying' Plaintiff's song," the FAC failed to then suggest how those Defendants that were *not* part of the creation of the song had "the right and ability to supervise [such] infringing conduct."  (*Id.* at 31, 32).  Furthermore, as to the defendants that were alleged to directly infringe by creating the song, any secondary liability would subsequently need to "be based [on] some *other* directly infringing conduct."  (*Id.* at 32) (emphasis in original).

Second, the Court noted that Plaintiff's "bare allegations simply mirror[ed] the elements of the causes of action asserted and [did] not support a plausible claim for [] vicarious copyright infringement against the 12(b)(6) Defendants."  (*Id.* at 30) (citing FAC ¶¶ 72-73, 85-86, 92-93, 98-99, 104-05, 110-11, 116-17, 121-22, 126-27, 132-33, 137-38, 143-44, 148-49, 154-55, 160-61, 166-67, 172-73, 177-78, 182-83, 187-88, 192-93, 197-98, 202-03, 208-09).  In short, the factual allegations were entirely conclusory and failed to suggest the sort of "right and ability to supervise the infringing conduct[,]" as is required to state a claim for vicarious infringement.  (*Id.* at 32).  As such, the claim for vicarious copyright infringement was also insufficiently factually supported as to all Defendants and would "require more specific factual allegations than were provided in the FAC."  (*Id.*).

1    Defendants argue that Plaintiff, "ignoring the Court's rejection of [the FAC's]

2  conclusory allegations" instead "continues to rely on conclusory allegations and

3  parroting of bare legal element as to all [D]efendants, failing to provide any factual

4  content and failing to give notice of the direct infringements and direct infringers for

5  which each [D]efendant is supposably [*sic*] vicariously liable." (12(b)(6) MTD at 1).

6  The Court agrees, as explained herein. The Court begins by assessing the legal

7  viability of Plaintiff's theory of liability before turning to the factual allegations

8  presented in the SAC.

9                    a.  <u>Plaintiff's Theory of Liability Is Unsound and Unsupported</u>

10    In the SAC, Plaintiff added a series of allegations regarding the "types of

11  [direct] infringement[,]" ostensibly to "address [the Court's] concerns" about the

12  failure to satisfy Rule 8(a)(2)'s notice requirements. (*See* SAC ¶¶ 78-96; *see also*

13  MTD Order at 33). Plaintiff alleges that three broad buckets of conduct render

14  Defendants directly liable for copyright infringement: (1) creation of the song (*Id.*

15  ¶ 80), (2) licensing the song (*Id.* ¶¶ 81-87) and (3) administering or publishing the

16  song. (*Id.* ¶¶ 88-96).

17    The Court begins with the Creator Defendants. According to Plaintiff's

18  allegations, Defendants Smith, Hamilton, Napier, Eriksen, Hermansen and Stargate

19  are the authors of the Infringing Song, and Defendants TDM and 45th & 3rd are the

20  executive producer and producer, respectively, of the Infringing Song. (*Id.*). Plaintiff

21  alleges that the Creator Defendants "directly liable for copyright as they participated

22  in copying Plaintiff's work." (*Id.* ¶ 80).

23    Turning to the Licensing Defendants, Plaintiff avers that, according to

24  information on "the streaming services[,]" this group includes UMG, UMG

25  Recordings and SMP LLC, (*Id.* ¶ 84), as well as NKH, EMI BMI, NW, DMP, EMI

26  UK and SMP UK, according to "the sheet music[.]"[22] (*Id.* ¶ 85). Plaintiff alleges that

27
   _____

28  [22] Defendants dispute the accuracy of these allegations, contending that Plaintiff
   misconstrues the exhibits in question relied on to categorize these Defendants as

1  the Licensing Defendants are liable for direct copyright infringement "in that they

2  licensed the [Infringing Song] to be performed and reproduced without authorization

3  by Plaintiff." (*Id.* ¶ 86). In a conclusory fashion, Plaintiff contends that "if such

4  licensing is not direct infringement, then it is alleged to be vicarious infringement

5  (because Defendants are receiving monies as a result of the infringement[] and have

6  the ability as the licensor to stop the infringement but are not doing so)." (*Id.* ¶ 87).

7      Finally, as to the AP Defendants, Plaintiff alleges that this group includes SMP

8  LLC, NKH, EMI BMI, NW, DMP, EMI UK and SMP UK. (*Id.* ¶¶ 88, 91-92).

9  Plaintiff alleges that the AP Defendants are liable for direct copyright infringement "in

10  that they promoted the exploitation of the [Infringing Song][] and collected royalties

11  for the performance and reproduction of the work." (*Id.* ¶ 93). Again, in a conclusory

12  fashion, Plaintiff contends that "if such administration and publishing is not direct

13  infringement, then it is alleged to be vicarious infringement (because Defendants are

14  receiving monies as a result of the infringement[] and have the ability as the licensor

15  to stop the infringement but are not doing so)." (*Id.* ¶ 94). As Plaintiff frequently

16  uses the terms "licensors, administrators and/or publishers" somewhat

17  interchangeably, it is not clear what legal difference, if any, there is between the

18  Licensing Defendants and the AP Defendants (collectively, the "Non-Creator

19  Defendants"). (*See, e.g.,* SAC ¶¶ 96, 169, 176, 184, 197, 231, 238, 250, 258, 270,

20  276, 289).

21      The Court finds two major flaws with Plaintiff's theory of liability. First,

22  Plaintiff's framing of the vicarious infringement claim still fails to satisfy the notice

23  requirements of Rule 8(a)(2) – an issue that this Court has already raised. (*See* MTD

24  Order at 33). Second, Plaintiff provides no legal support for its theory that licensing

25

26

27  licensors. (12(b)(6) MTD at 3-4). As explained herein, the overall conclusion as to
   the viability – or, rather, lack thereof – of the vicarious infringement claim remains the

28  same, regardless of the accuracy of Plaintiff's characterizations.

1  infringing material is a form of *direct* copyright infringement and, if not, that it is

2  automatically vicarious infringement.  The Court addresses each issue in turn.

3              *i.   Plaintiff's Framing of the Vicarious Liability Claim Still*

4                   *Fails to Satisfy the Notice Requirements of Rule 8(a)(2)*

5          Plaintiff's (unsupported) theory of vicarious liability, more generally, can be

6  boiled down as follows: "[i]n the event that some or all of Defendants' actions and

7  inactions are determined to not be directly infringing, but another third party is

8  directly infringing, then they are alleged to be vicariously infringing." (SAC ¶ 324;

9  *see also* Opp'n to 12(b)(6) MTD at 5) (emphasizing, without legal support, its position

10 that "if an infringement is not direct, then in the alternative it is contributory or

11 vicarious").  A claim for vicarious liability cannot be framed in this reductive way for

12 a simple reason.  A plaintiff "must establish that there has been direct infringement by

13 *third parties*" in order to support a claim for vicarious infringement.  *Perfect 10, Inc.*

14 *v. Visa Intern. Service Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007) ("*Visa*") (emphasis

15 added).  Merely baldly pleading that a Defendant, if not liable for direct infringement

16 is liable for vicarious infringement, is insufficient because it fails to tie the alleged

17 vicarious infringement to a specific act of direct infringement *by a third party*.

18 Because a defendant cannot be "simultaneously directly and secondarily liable for

19 infringement" for the same conduct[,]  *Smith*, 2019 WL 6998666, at *3, Plaintiff's

20 theory leaves much to be desired.  This is particularly so where the *many* Defendants

21 are in relatively different positions from one another.

22         Defendants emphasize that Plaintiff's "allegations are insufficient to provide

23 each Defendant with notice of the direct infringements for which he, she, or it is

24 supposedly vicariously liable."  (Reply at 5).  The Court agrees.  Even to the extent

25 that Plaintiff has categorized the Defendants into groups based on conduct alleged to

26 be *directly* infringing, it has not clearly averred what directly infringing conduct is

27 purportedly the predicate for each of these groups as alleged vicarious infringers – nor

28 that the alleged vicarious infringers had the necessary control over the infringing

conduct, as explained further below.[23]  The Court has already made clear that these broad allegations are insufficient to state a claim for vicarious infringement.  (MTD Order at 33).

The shortcomings of Plaintiff's allegations are especially pronounced because the "amount of control necessary to support a finding of vicarious liability" is inherently "fact-specific."  *Adobe Systems*, 173 F.Supp.2d at 1053.  As a result, a plaintiff must allege facts demonstrating sufficient control and cannot rely on conclusory pleadings.  For example, "the mere ability to withdraw a financial 'carrot' does not create the 'stick' of 'right and ability to control' that vicarious infringement requires[,]" nor does the ability to take "certain steps that may have the indirect effect of reducing infringing activity on the Internet at large."  *Visa*, 494 F3.d at 803.  Plaintiff's broad and reductive allegations, therefore, are insufficient for this additional reason, which the Court addresses more thoroughly below.  *See, infra,* section II(B)(2)(b).

The Court reiterates that a plaintiff, in general, is free to plead alternative theories of liability under Rule 8(d).  Fed. R. Civ. P. 8(d).  But Plaintiff's undeveloped approach to its alternative theory of liability continues to be insufficient to satisfy Rule 8(a)(2)'s notice requirements.  (*See* MTD Order at 33).

---

[23] As the Court has already explained, if the predicate act is considered to be the creation of the Infringing Song, then, as to each Non-Creator Defendant, it must be clear how they maintained the requisite amount of control *over the infringer and the infringing conduct* to be vicariously liable for the Creator Defendants' infringing conduct.  Meanwhile, assuming, *arguendo*, the predicate act is the licensing or publishing of the Infringing Song (either instead of or in addition to the creation of the Infringing Song), then it must be clear how the Creator Defendants had the requisite amount of control to be vicariously liable for the Non-Creator Defendants' infringing conduct of licensing or publishing the Infringing Song.  Although the Court has already raised this issue, Plaintiff has not remedied this defect.  As explained, pleading in the alternative in this fashion does not put Defendants sufficiently on notice to defend against the allegations.

1
2

*ii. The Theory that Licensing Is Direct Infringement or, if Not,*
*Automatically Vicarious Infringement, Is Unsupported*

3        Defendants contend that Plaintiff's vicarious infringement claim simply "adopts

4    a new conclusory allegation, namely that [D]efendants are direct infringers and, if not,

5    by licensing or promoting [the Infringing Song] they are vicarious infringers."  (*Id.* at

6    4) (citing SAC ¶¶ 86-87, 93-94, 162-65, 171-72, 178-79, 191-92, 223-24, 232-33,

7    243-44, 253-54, 265-66).  Indeed, Plaintiff explicitly alleges that because "it is

8    unclear, legally speaking, if licensing and/or publishing a song is direct infringement

9    or secondary infringement[,] Plaintiff therefore alleges direct and secondary

10   infringement in the alternative."  (SAC ¶ 226; *see also Id.* ¶ 327) (" . . . [I]f the

11   Defendants are not directly liable for the streaming, downloading, sales, radio play,

12   and performances they licensed then they are certainly vicariously liable").

13   Defendants argue that Plaintiff's contention – that the act of licensing or administering

14   and publishing allegedly infringing content renders that licensor or publisher *directly*

15   liable, but, if not, then automatically vicariously liable – is flawed and unsupported by

16   statute or case law.  (12(b)(6) MTD at 7-8).  The Court agrees, as explained herein.

17       Absent any meaningful statutory analysis or citation to case law, Plaintiff

18   argues in its Opposition that "licensing conduct is unequivocally direct infringement

19   under Section 106 of the Copyright Act[.]"  (Opp'n to 12(b)(6) MTD at 4).  The Court

20   begins with the statutory language.  Under 17 U.S.C. § 106 ("Section 106"), the owner

21   of a copyright has the exclusive rights to both "do" and "authorize" the reproduction

22   of the copyrighted work, preparation of derivative works based on the copyrighted

23   work, distribution of copies to the public by sale or other transfer of ownership and

24   performances of the copyrighted work publicly or by audio transmission.  17 U.S.C.

25   § 106.  Plaintiff appears to seize on this "authoriz[ing]" language, suggesting that if a

26   defendant "authorizes" another to engage in infringing conduct that this amounts to an

27   act of direct infringement under Section 106.  (*See* Opp'n to 12(b)(6) MTD at 15)

28   ("[I]f a person or company authorizes/licenses the exploitation of an infringing work

35

on a streaming platform, radio station, or other display, reproduction, or performance, that is direct infringement (no matter how many levels it is licensed through)").  The Court does not agree with Plaintiff's conclusion that the word "authorize" in the statute suggests that any licensor of allegedly infringing content is engaging in a form of direct copyright infringement.

In *Subafilms Ltd. v. MGM-Pathe Commc'ns Co.* ("*Subafilms*"),[24] the Ninth Circuit explained that "under the 1909 [Copyright] Act[,] courts differed over the *degree* of involvement required to render a party liable as a contributory infringer." 24 F.3d 1088, 1093 (9th Cir. 1994) (emphasis in original).  As a result, "the addition of the words 'to authorize' in the 1976 Act appears best understood as merely clarifying that the Act contemplates liability for contributory infringement, and the bare act of 'authorization' can suffice." *Id.* (citing to the legislative history of the act, explaining that the "use of the phrase 'to authorize' is intended to avoid any questions as to the liability of *contributory* infringers.") (emphasis added).  The Court specifically emphasized – citing to *Lewis Galoob Toys v. Nintendo of Am., Inc.*, 964 F.2d 965, 970 (9th Cir. 1992) ("*Lewis Galoob*") – that "the addition of the words 'to authorize' in the Copyright Act was not meant to create a new form of liability for 'authorization' . . . but was intended to invoke the preexisting doctrine of contributory infringement." *Id*. at 1092.  After squaring this reading with its prior decisions, the Ninth Circuit reemphasized its "conclusion that the 'authorization' right refers to the doctrine of contributory infringement[.]" *Id.* at 1094.

---

[24] Plaintiff mischaracterizes *Subafilms* in its Opposition.  (*See* Opp'n to 12(b)(6) MTD at 11).  Plaintiff's parenthetical claims that *Subafilms* held that "the 'to authorize' language in section 106 imposes direct liability on those who improperly authorize use of infringing works via section 501."  In fact, the holding of *Subafilms* was "that the addition of the words 'to authorize' in the Copyright Act was *not* meant to create a new form of liability for 'authorization' that was divorced completely from the legal consequences of authorized conduct, but was intended to invoke the preexisting doctrine of contributory infringement."  24 F.3d at 1092 (emphasis added).  Plaintiff's counsel is cautioned that the Court takes extremely seriously all counsel's duty of candor to the Court.  *See* Cal. R. Prof. Conduct 3.1(a)(2) and 3.3(a)(1).

Defendants highlight, therefore, that, if anything, *Subafilms* suggests that allegations as to the licensing of infringing content more neatly map onto a claim of *contributory* infringement.  (12(b)(6) MTD at 7); *see Metro-Goldwyn-Mayer Studios Inc.*, 545 U.S. at 914 ("One infringes contributorily by intentionally inducing or encouraging direct infringement[] and infringes vicariously by profiting from direct infringement while declining to exercise the right to stop or limit it").  The Court agrees that licensing an allegedly infringing song more strongly suggests "facilitate[ing] third party infringement" – namely, reproduction, distribution and the like, in violation of Section 106 – rather than "fail[ing] to cause a third party to stop its directly infringing activities[,]" as is required for a vicarious infringement claim. *Amazon.com*, 508 F.3d at 1175.  As Defendants note, the Court found the claim of contributory infringement defective (*see* MTD Order at 29-33), and Plaintiff chose to eliminate it from the SAC.  (*Compare* SAC *with* FAC).  The Court agrees that Plaintiff seems to be recasting its claim for contributory infringement, while seeking to avoid satisfaction of the knowledge requirement.  (12(b)(6) MTD at 14; *see* FAC ¶ 233) (alleging that if Defendants are found not to be direct infringers, "then they are alleged to be contributorily infringing [because] Defendants license, market, and otherwise allow the song to be placed on streaming and download services, where third parties infringe the copyright").

There is an additional fatal flaw in Plaintiff's theory.  In *Lewis Galoob*, the Ninth Circuit emphasized that "a party cannot authorize another party to infringe a copyright unless the authorized conduct would itself be unlawful."  964 F.2d at 970. In the SAC, Plaintiff avers – as to each Defendant – that Defendants infringed Plaintiff's copyright by licensing the Infringing Song to "streaming and digital download services such as Spotify, YouTube, Pandora, Amazon, iTunes, and others." (SAC ¶¶ 106, 119, 126, 132, 138, 144, 164, 167, 174, 181, 187, 194, 200, 208, 228). Defendants highlight that these "identified companies are digital music providers who have the blanket, statutory right to stream and download recordings (17 U.S.C.

§ 115(d)), and Plaintiff nowhere identifies any actual or 'other' licensees." (Reply at 4). The Court agrees. Under 17 U.S.C. § 115(d), digital music providers ("DMPs") – which the statute defines as, essentially, streaming services such as Spotify, Amazon, iTunes and the like, *see Id.* § 115(e)(8) – "'may obtain a blanket license[,]'" to engage in "'covered activities[.]'" *Cintas Acuario, Inc. v. Hyphy Music, Inc.*, No. 2:23-cv-08765-WLH-E, 2024 WL 5339159, at *3 (C.D. Cal. Oct. 17, 2024) (quoting 17 U.S.C. § 115(d)). In turn, covered activity is defined as "making a digital phonorecord delivery of a musical work, including in the form of a permanent download, limited download, or interactive stream[.]" 17 U.S.C. § 115(e)(7). In other words, the DMPs' conduct of making the Infringing Song available for streaming and downloading is not *itself* "unlawful[,]" *see Lewis Galoob*, 964 F.2d at 970, given their blanket, statutory right to stream and make recordings available for download. As a result, Defendants' licensing the Infringing Song to DMPs is explicitly *not* "authoriz[ing] another party to infringe a copyright." *Id.*

Plaintiff unsurprisingly fails to cite to case law suggesting that a licensor's granting of a license to use infringing material *inherently* affords the sort of control and authority over the infringing conduct necessary to sustain a claim for vicarious copyright infringement – nor is the Court aware of any. (*See id.* at 4) (arguing in a conclusory fashion that "licensing conduct by definition gives Defendants the right to control the infringing activity"). Defendants highlight that, if this were the case, "every licensor of an allegedly infringing work would automatically be subject to a claim for vicarious copyright infringement." (Reply at 5). Defendants contend that "[n]o case supports that startling proposition and, indeed, the statute and case law refute it." (*Id.*). The Court, again, agrees.[25]

---

[25] There is good reason to conclude that merely licensing the use of infringing content cannot – and should not – automatically result in vicarious liability. Were this the case, music licensors or publishers would be unable to operate due to increasingly high costs related to the risk of liability for unknowingly licensing infringing content. Instead, licensing is best understood as a form of contributory infringement, which is

1    In short, Plaintiff's theory of liability remains flawed.  Plaintiff's SAC still fails

2    to satisfy Rule 8(a)(2)'s notice requirements for the same reason as already noted by

3    the Court.  (*See* MTD Order at 33).  And the Court is unpersuaded by Plaintiff's

4    newly raised (and unsupported) theory of liability, wherein licensing allegedly

5    infringing content is a form of direct copyright infringement or, alternatively,

6    automatically amounts to vicarious infringement.[26]

7    Given the conclusion that the licensing, administering or publishing the

8    Infringing Song cannot be a form of direct copyright infringement, then it appears that

9    there are *no* allegations of a predicate act of direct infringement for which the Creator

10   Defendants could possibly be held vicariously liable.  Accordingly, the Court

11   **GRANTS** the 12(b)(6) MTD with respect to the Creator Defendants, thereby

12   dismissing with prejudice the claim for vicarious copyright infringement against them.

b. SAC Allegations Regarding Right and Ability to Supervise and
Control Remain Conclusory[27]

15   The Court turns now to the factual allegations in the SAC.  Plaintiff has failed

16   to cure the deficiencies already highlighted by the Court in its MTD Order – namely,

only actionable where the licensor knows the content is infringing.  *See, A&M
Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001) (emphasizing that
"[c]ontributory liability requires that the secondary infringer 'know or have reason to
know' of direct infringement").  The knowledge component of contributory liability
allows music licensors and publishers to be able to operate without unreasonable risk
of liability.  The Court declines to adopt Plaintiff's interpretation.

[26] The Court does not endorse the idea that licensing infringing content is *never* a
basis for vicarious copyright infringement; rather, the Court disagrees only with the
contention that licensing allegedly infringing content is *automatically* sufficient to
support a claim of vicarious infringement.  The Court reiterates that it is necessarily a
fact-specific inquiry and, as further explained below, Plaintiff has still failed to
provide sufficient factual allegations to suggest the sort of control required to sustain a
claim for vicarious liability.

[27] The Court briefly addresses Plaintiff's argument that Defendants' "advanc[ing] a
new . . . legal theory[,]" which was not advanced in their "prior motion[s]" to dismiss,
is barred by Rule 12(g)(2).  (Opp'n to 12(b)(6) MTD at 14).  Plaintiff refers to
Defendants' argument that a vicarious copyright infringement claim requires that the
direct infringement occur on the defendant's physical or virtual premises.  (*See*
12(b)(6) MTD at 5-7).  Plaintiff argues that Rule 12(g)(2) "requires consolidation of

Plaintiff has failed to include allegations supporting the inference that Defendants

have "right and ability to supervise" the allegedly infringing conduct. (MTD Order at

32). Instead, Plaintiff merely reasserts in a conclusory fashion that each Defendant

"had the right and ability to control or stop the infringing conduct but failed to do so."

(SAC ¶¶ 105, 118, 125, 131, 137, 143, 166, 173, 180, 186, 193, 199, 207, 225, 227,

234, 245, 255, 267, 273, 278, 286, 293, 299). These are legal conclusions, not factual

allegations. Nor does Plaintiff's Opposition fare any better. Plaintiff merely repeats

the same legal conclusion that each entity "has the right and ability to control the

infringing conduct." (*See* Opp'n to 12(b)(6) MTD at 16). As the Court has already

expressed, merely parroting the elements of this claim, absent factual support, is

insufficient.[28] (MTD Order at 30).

Regardless, Plaintiff appears to miss the bigger picture. The "control" factor

necessary to establish a claim for vicarious liability requires that the "defendant

---

almost all 12(b) *arguments* in one motion, [*sic*] and prohibits *arguments* in a motion to
dismiss that could have been raised in a prior motion to dismiss but were not." (*Id.*)
(emphasis added). Defendants contend that "Rule 12(g)(2) nowhere refers to
'arguments' and, instead provides that subject to certain exceptions, a 'party that
makes a motion under [Rule 12] must not make another motion under [Rule 12]
raising a defense or objection that was available to the party but omitted from its
earlier motion.'" (Reply at 6) (citing Fed. R. Civ. P. 12(g)). In other words, "a party
who directs a 12(b)(6) motion to only some of the claims in a pleading cannot then file
a second Rule 12(b)(6) motion as to claims he failed to challenge by the first Rule
12(b)(6) motion." (*Id.*) (citing *Harrell v. City of Gilroy*, No. 17-cv-05204-LHK, 2019
WL 452039, at *7 (N.D. Cal. Feb. 5, 2019)). The Court agrees with Defendants'
interpretation of Rule 12(g)(2). Nothing in Rule 12(g)(2) prevents Defendants from
raising additional *arguments* about a cause of action that has been revived in amended
pleading after a motion to dismiss has been granted. Regardless, the Court does not
explicitly rely on Defendants' argument regarding a real or virtual premises in
reaching its conclusion, such that Plaintiff's argument is, essentially, moot.
[28] Plaintiff also alleges that all Defendants "have the right and ability to stop or limit
the exploitation of the infringing song on streaming and download services on
YouTube, Apple, Amazon, and other websites, but have declined to do so." (SAC
¶ 324). But, as the Court has already explained, these DMPs' streaming and
downloading services do not amount to copyright infringement; as a result, the "right
and ability" to stop or limit the streaming and downloading of the song is irrelevant,
where the streaming and downloading of the song itself is not a form of direct
copyright infringement.

40

exercises the requisite control *over the direct infringer*" or the infringing conduct.[29] *Amazon.com*, 508 F.3d at 1173 (emphasis added).  Here, the Court has already concluded that merely licensing or administering / publishing allegedly infringing content is not a form of direct copyright infringement.  This leaves Plaintiff's allegations that the creation of the Infringing Song is the predicate act of direct infringement.  (*See* SAC ¶¶ 80, 81, 88).  As a result, it must be that the Non-Creator Defendants have the requisite control over the Creator Defendants such that they retain "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so."  *Amazon.com*, 508 F.3d at 1173.  Nowhere does Plaintiff plausibly plead such control over the Creator Defendants nor the creation of the Infringing Song.

Plaintiff contends that "without discovery, it is impossible for Plaintiff to provide proof of each and every licensing activity and each and every direct infringement and each and every royalty collection."  (Opp'n to 12(b)(6) MTD at 13). But that is not what the Court has suggested is necessary.  Rather, the Court has emphasized that there must non-conclusory, factual allegations suggesting the Non-Creator Defendants' right and ability to control the directly infringing conduct – here, the creation of the Infringing Song.  (MTD Order at 29-33).  Plaintiff has presented no factual allegations or persuasive argument suggesting that the Non-Creator Defendants have the type of control over the Creator Defendants to have the right or ability to stop – or even influence, in any way whatsoever – the creation of the Infringing Song.

---

[29] For example, Plaintiff also alleges that "the Defendants all own, publish, or administer the copyright [of the Infringing Song] and thus have complete control over how the work is exploited[,]"  and that  "Defendants, as producers, publishers, songwriters, and copyright holders, all have control over the dissemination, sale, distribution, and licensing of the [I]nfringing [S]ong []."  (*Id.* ¶ 323).  Whether Defendants have control over how the work is exploited, or the ways in which it is disseminated, sold, distributed or licensed is irrelevant to the inquiry.  If the infringing conduct is the creation of the song, then Defendants' control must relate to the creation of the song, not its distribution.  *See Amazon.com*, 508 F.3d at 1173.

41

1    The Ninth Circuit's analysis in *Fonovisa* illustrates what is necessary to allege

2    the requisite amount of control to state a claim for vicarious copyright infringement.

3    In *Fonovisa*, the plaintiff was a California corporation that owned the copyrights to

4    certain musical recordings, and the defendant ("Cherry Auction") was the operator of

5    a swap meet. *Fonovisa*, 76 F.3d at 261. Individual vendors would "pay a daily rental

6    fee to [Cherry Auction] in exchange for booth space." *Id.* Cherry Auction, in turn,

7    "retain[ed] the right to exclude any vendor for any reason, at any time," including "for

8    patent and trademark infringement." *Id.* The plaintiff sued Cherry Auction for direct

9    copyright infringement, as well as vicarious and contributory copyright infringement,

10   related to the vendors' sale of counterfeit records at the swap meet.[30] *Id.* After the

11   district court granted the motion to dismiss, Plaintiff appealed the dismissal of its

12   claims for both contributory and vicarious copyright infringement. *Id.* The Ninth

13   Circuit reversed, finding that the plaintiff had successfully stated a claim for vicarious

14   copyright infringement. *Id.* at 264.

15   In reaching that conclusion, the Court stressed that the plaintiffs' allegations

16   suggested sufficient control over the infringing conduct.[31] The Court relied on several

17   allegations. First, the Court emphasized that "vendors occupied small booths within

18   premises that Cherry Auction controlled and patrolled." *Id.* at 262. Next, Cherry

19   Auction "had the right to terminate vendors for any reason whatsoever and through

20   that right had the ability to control the activities of the vendors on the premises." *Id.*

21   The Court concluded that "Cherry Auction's ability to police its vendors" – both

22   practically speaking, as the vendors were physically on Cherry Auction's premises, as

23   well as legally, under the "broad contract[ual terms]" governing the vendors – was

24   "sufficient to satisfy the control elements." *Id.* at 263. In essence, Cherry Auction's

---

[30] The plaintiff also sued for trademark infringement, but that is not relevant for the purposes of this Order.
[31] The Court also emphasized that the plaintiff had sufficiently alleged a direct financial benefit, but that is not relevant for the purposes of this Order, as that element does not appear to be in dispute.

42

1  unfettered ability to patrol, police and ultimately exclude a vendor from its premises

2  demonstrated the legal *and* practical ability to control the infringing conduct, as well

3  as the infringers themselves.

4      Plaintiff's *factual* allegations do not suggest the sort of fact-specific right and

5  ability to control the infringer or infringing conduct, as in *Fonovisa*.  Plaintiff's

6  allegations remain conclusory and insufficient to support a claim of vicarious liability.

7  Plaintiff's failure to cure these deficiencies already identified by the Court suggests

8  that granting further leave to amend would be "futil[e]."  *Bonin*, 59 F.3d at 845.

9  Furthermore, "[P]laintiff has previously amended the complaint."  *Ascon Properties*,

10  866 F.2d at 1160.  Accordingly, the Court **GRANTS** the 12(b)(6) MTD, thereby

11  dismissing the claim for vicarious copyright infringement with prejudice.

12      **C.**    **The Court GRANTS the MTB**

13          *1.  Motion to Bifurcate Legal Standard*

14      Federal Rule of Civil Procedure 42(b) authorizes a court to order separate trials

15  or proceedings on particular issues or claims "for convenience, to avoid prejudice, or

16  to expedite and economize."  Fed. R. Civ. P. 42(b); *Estate of Diaz v. City of Anaheim*,

17  840 F.3d 592, 603 (9th Cir. 2016).  Courts have broad discretion to sequence

18  discovery when doing so promotes efficiency without unfairly prejudicing either

19  party.  *Ellingson Timber Co. v. Great N. Ry. Co.*, 424 F.2d 497, 499 (9th Cir. 1970).

20  One goal of Rule 42(b) is to allow parties to defer potentially burdensome discovery

21  on damages or other secondary issues while threshold legal questions are resolved.

22  *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).

23      Bifurcation is particularly appropriate where early resolution of a central issue

24  could render further litigation unnecessary.  *O'Malley v. U.S. Fid. & Guar. Co.*, 776

25  F.2d 499, 501 (5th Cir. 1985).  For example, in *Smith v. Alyeska Pipeline Serv. Co.*,

26  the court granted bifurcation where discovery as to damages would have been

27  complex and the legal defenses, if successful, would eliminate the need to reach that

28  phase.  538 F.Supp. 977, 984 (D. Del. 1982).  Bifurcation of discovery is also

appropriate when "the legal and factual issues relating to liability and damages, and the evidence that is relevant to those issues, are separate and distinct." *OSHO Int'l Found. v. Chapman Way*, No. CV 19-00753-RSWL-JEM, 2019 WL 12379558, at *2 (C.D. Cal. Sept. 11, 2019).

In evaluating a motion to bifurcate discovery, courts consider factors such as the complexity of the case, the degree of overlap between liability and damages issues, the risk of prejudice or confusion and whether separating phases will promote efficiency. *Moreno v. NBC Universal Media, LLC*, No. CV 13-1038 BRO, 2013 WL 12123988, at *2 (C.D. Cal. Sept. 30, 2013) (citing *Calmar, Inc. v. Emson Research, Inc.*, 850 F.Supp. 861, 866 (C.D. Cal. 1994)); *see also Bassil v. Webster*, No. 2:20-cv-05099-SB, 2021 WL 1235258, at *2 (C.D. Cal. Jan. 15, 2021) (finding bifurcation of discovery "appropriate due to the potentially high degree of complexity and costs involved" in damages discovery in the context of a music copyright infringement case). "The burden rests with the party seeking bifurcation to demonstrate that doing so will 'promote judicial economy and avoid inconvenience or prejudice to the parties.'" *Barkley & Assoc. v. Quizlet, Inc.*, 2025 WL 2014312, at *2 (C.D. Cal. June 20, 2025) (quoting *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D. Cal. 1992)).

### 2. Application

The Court begins by assessing the degree to which bifurcation will promote efficiency. As the legal and factual issues relating to liability and damages are entirely distinct, the Court finds bifurcation appropriate, especially where damages discovery is likely to be especially burdensome. Furthermore, any risk of prejudice due to bifurcation is minimal, while the risk of prejudice appears high in the absence of bifurcation. Accordingly, for the reasons explained herein, the Court **GRANTS** the MTB.

1                  a.   <u>Bifurcation Will Promote Efficiency, Particularly as Legal and</u>

2                      <u>Factual Issues Relating to Liability and Damages Are Distinct</u>

3       Defendants contend that there are compelling reasons to bifurcate discovery

4 between liability and damages. (MTB at 5-15). Defendants argue that bifurcation is

5 particularly appropriate here, where the legal and factual issues relating to liability and

6 damages are entirely separate. (*Id.* at 5-10). As a result, it promotes judicial economy

7 to sequence discovery, especially where discovery as to damages will likely require

8 "substantial expense, effort, and delay" due to the "nature and extent of damages

9 issues and proof[.]" (*Id.* at 14, 8). As explained herein, the Court agrees.

10       First, the Court is convinced that there is little – if any – overlap between the

11 legal and factual issues relating to liability and damages in this case. This is often the

12 case with copyright infringement cases. *See, e.g., Bassil*, 2021 WL 1235258, at *2

13 (emphasizing that the "issues of liability and damages are easily severable in this

14 case," in granting the motion to bifurcate discovery as to liability and damages in

15 music copyright infringement case); *Moreno*, 2013 WL 12123988, at *2 (finding the

16 "legal and factual issues relating to liability and damages [for alleged copyright

17 infringement in sound recordings], and the evidence that will be relevant to those

18 issues, are distinct and severable" in granting the motion to bifurcate discovery);

19 *Shamraev v. TikTok Inc.*, No. 2:22-cv-01811-SB-MAR, 2022 WL 17882129, at *1

20 (C.D. Cal. Oct. 12, 2022) (granting motion to bifurcate where the "issues of liability

21 and damages are severable" in a copyright infringement case). Defendants argue that

22 discovery as to liability is "straightforward" and would involve written discovery and

23 depositions of the authors of the Song and the Infringing Song – regarding creation,

24 ownership and access – as well as of relevant third parties or experts as to the issue of

25 access. (MTB at 6). Discovery as to damages is entirely distinct, on the other hand,

26 requiring discovery and depositions of expert witnesses as to revenues and costs

27 associated with the Infringing Song, as well as depositions of "the songwriters'

28 respective business managers [and] accountants." (*Id.* at 7-8). In short, as "the legal

1  and factual issues relating to liability and damages, and the evidence that is relevant to

2  those issues, are separate and distinct[,]" bifurcation is appropriate.  *OSHO Int'l*

3  *Found.*, 2019 WL 12379558, at *2.

4        Second, given the nature of the damages issues at hand, discovery as to

5  damages will likely be especially "onerous."  *Bassil*, 2021 WL 1235258, at *3.  In the

6  case of musical copyright infringement cases, "the damages inquiry will involve

7  expansive and sensitive issues that are not relevant to the liability inquiry[.]"  *Moreno*

8  2013 WL 12123988, at *2.  For example, discovery as to damages would involve

9  calculating "revenue and profits . . . generated on numerous different formats and

10 streaming services as well as from touring and live performances," which poses a

11 significant undertaking.  *Bassil*, 2021 WL 1235258, at *3.  It is a particularly

12 significant undertaking where this case involves twenty-one Defendants, each of

13 which would be required to engage in costly and invasive discovery about sensitive

14 financial information.  (MTB at 8, 14-15).  As one goal of Rule 42(b) is to allow

15 parties to defer potentially burdensome discovery on damages or other secondary

16 issues while threshold legal questions are resolved, *Zivkovic*, 302 F.3d at 1088,

17 bifurcation is particularly appropriate here.  *See, e.g., Bassil*, 2021 WL 1235258, at *3

18 (emphasizing, in granting a motion to bifurcate, that bifurcating would "potentially

19 save the parties significant costs" as "onerous damages discovery" would be avoided).

20              b.  Any Risk of Prejudice Due to Bifurcation Is Minimal, While

21                   Prejudice in the Absence of Bifurcation Is Apparent

22        "After considering the benefits of bifurcation, the Court considers whether it

23 would prejudice the opposing party."  *Bassil*, 2021 WL 1235258, at *3 (citing Fed. R.

24 Civ. P. 42(b)).  Here, the Court finds that Plaintiff would suffer little – if any –

25 prejudice due to bifurcation, but the prejudice in the absence of bifurcation is

26 apparent.

27        The sole argument that Plaintiff offers with respect to the prejudice is that

28 bifurcation will cause "delay."  (Opp'n to MTB at 2).  But, as Defendants highlight in

46

their Reply, "[t]he parties' proposed schedule for bifurcation increases the total discovery period by, at most, five months." (Reply, Docket No. 178 at 4). The Court finds, therefore, that the prejudice to Plaintiff is minimal. On the other hand, in the absence of bifurcation, the parties may have to "incur[] the expense and effort of intrusive damages discovery that is irrelevant without liability." (MTB at 15).

"[G]eneral delay [does] not outweigh the tangible efficiency gains and cost savings likely to result from staging discovery." *Barkley & Assoc.*, 2025 WL 2014312 at *2. As Defendants emphasize, "[i]f the liability phase resolves the case, discovery would be shorter in total, and at a much lower burden to all parties involved." (*Id.*). The Court finds this persuasive. The Court agrees, therefore, that "this sequencing benefits all parties[.]" (Reply, Docket No. 178 at 4).

Accordingly, for the forgoing reasons, the Court **GRANTS** the MTB. As a result, discovery will be bifurcated, beginning with discovery as to liability, with a deadline to hear dispositive motions regarding liability on April 17, 2026. Thereafter, as necessary, the parties will proceed with discovery as to damages, following the pretrial and trial schedule found herein.

## III.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** the PJ MTD, thereby dismissing Defendants NW, SMP UK and EMI UK from the action with prejudice. The Court **GRANTS** the 12(b)(6) MTD, thereby dismissing the claim for vicarious liability as to all Defendants with prejudice. Finally, the Court also **GRANTS** the MTB, such that discovery shall be bifurcated, beginning first with discovery as to liability issues before turning to damages, if ultimately necessary. Given this conclusion, the Court **ORDERS** the following pretrial and trial dates as follows, based on the parties' joint statement (*see* Joint Statement, Docket No. 173 at 5):

///

///

| Deadline | Date |
|---|---|
| DISCOVERY PHASE 1 (LIABILITY) ||
| Fact Discovery Cutoff | January 30, 2026 |
| Initial Expert Disclosures | January 30, 2026 |
| Rebuttal Expert Disclosures | February 20, 2026 |
| Liability Expert Discovery Cutoff | March 13, 2026 |
| Dispositive Motions re Liability Hearing | April 17, 2026 |
| DISCOVERY PHASE 2 (DAMAGES) ||
| Fact Discovery Cutoff | August 14, 2026 |
| Initial Expert Disclosures | August 14, 2026 |
| Rebuttal Expert Disclosures | September 4, 2026 |
| Damages Expert Discovery Cutoff | September 25, 2026 |
| Final Day to Hear *Daubert* Motions | October 23, 2026 |
| Trial Filings – First Round | November 20, 2026 |
| Trial Filings – Second Round | December 4, 2026 |
| Final Pretrial Conference | December 18, 2026 at 3:00 p.m. |
| Trial | January 11, 2027 at 9:00 a.m. |

**IT IS SO ORDERED.**

Dated: September 4, 2025

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE